UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE POSEIDON CONCEPTS SECURITIES LITIGATION | Case No: 13-CV-1213 (DLC)<br>ECF CASE<br>CLASS ACTION<br>**JURY TRIAL DEMANDED** |

# [CORRECTED] SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiff Gerald Kolar ("Plaintiff"), by his undersigned attorneys, for his consolidated second amended complaint ("Complaint") against Defendants Lyle D. Michaluk, Matt C. MacKenzie, A. Scott Dawson, Clifford L. Wiebe, Harvey L. Winger, Dean R. Jensen, and Neil Richardson (the "Poseidon Defendants"), as well as Defendant KPMG LLP, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters:

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased the publicly traded common stock of Poseidon from March 22, 2012 to February 14, 2013, inclusive (the "Class Period") in domestic U.S. transactions, seeking to recover damages caused by Defendants' violations of the federal securities laws.

2. Poseidon Concepts Corp. was a Canadian company whose shares were traded over-the-counter in the U.S. It presented to investors a story of astonishing growth. It began as a side project of a small Canadian oil & gas company, Open Range, Inc. Open Range had developed proprietary tanks to store the vast quantities of fluid used in hydraulic fracturing. In mid-2010, Open Range began to lease the tanks to its competitors.

3. Open Range ultimately claimed to have earned about 10% of its 2010 revenues from the tank rentals, with much better reported margins than its oil & gas segment. By Q2 2011, it was purportedly earning about 40% of its revenues from the tanks. A November 2011 spin-off left the tank business as a stand-alone company. That company – Poseidon – is the securities issuer whose shares Class Members bought, to their detriment.

4. After the spin-off, Poseidon continued to report astonishing growth. Poseidon

reported full year 2011 revenues of $78.81 million1 and revenues for the first nine months of 2012 of $148.1 million. And Poseidon's reported margins were similarly superb; it claimed $68.7 million of the $148.1 million revenue (46.4%) as net income.

5. But Poseidon's success was founded on little more than fraud. About a quarter of Poseidon's 2011 revenues, and two thirds of its revenues for the first nine months of 2012, were generated from the pay portion of so-called take-or-pay contracts. Pursuant to these contracts, called master agreements herein, Poseidon's customers purportedly agreed to pay it a daily rate simply for the right to be provided with a tank upon request (both the rate and the amount of revenues from them are the "minimum pay rate"), and a higher daily rate if they were provided with a live tank (the "live rate").

6. In generally accepted oil and gas services industry accounting practices, revenues are not recognized unless the provider obtains a field ticket signed by the customer setting out the services provided and the amounts owed. Indeed, most of Poseidon's master agreements provided that without a signed field ticket, it would not be paid.

7. The majority of Poseidon's purported 2012 revenues, and about a quarter of its purported 2011 revenues, derived from minimum pay rates which were recognized pursuant to "agreements" where the field tickets – and sometimes even the master agreement – had not been signed by the customer. Poseidon violated accounting rules by recognizing revenues whenever it was missing either a signed field ticket or a signed master agreement.

8. Without signed agreements, Poseidon's attempts to collect the minimum pay rates it claimed it was owed were chaotic, providing an object lesson in why important contracts

[1] Unless otherwise noted, all dollar amounts are in Canadian dollars. Between December 31, 2011, and the end of the Class Period, the exchange rate between Canadian and U.S. dollars only varied between $0.967:1 USD and $1.026:USD.

almost always are set forth in a signed writing. Poseidon billed "customers" for services they had never agreed to buy. Poseidon billed "customers" in violation of express terms of master agreements or agreements Poseidon's sales staff agreed to in negotiating the sale. Poseidon billed "customers" for services the customer's representative had no real or apparent authority to secure. Poseidon billed some of its "customers" for services it had actually provided to other customers. Poseidon billed "customers" who had never heard of Poseidon.

9. Therefore, when Poseidon's "customers" got Poseidon's invoices, they usually refused to pay. As a result, Poseidon's accounts receivable ballooned, reaching $118.6 million by June 30, 2012.

10. Poseidon held regular board meetings to approve its financial statements. Every defendant, including KPMG, attended every such meeting. A perennial concern at these financial statement approval meetings was Poseidon's accounts receivable. At every meeting, Poseidon Vice President of Finance David Belcher told attendees that (a) Poseidon needed a signed field ticket to be paid; and (b) Poseidon frequently did not get a signed field ticket. Thus, the information Mr. Belcher provided was enough to establish that Poseidon's financial statements contained material errors. But Defendants authorized their publication anyway.

11. In August 2012, Poseidon made an extraordinary new hire – an operations controller whose first task was to get to the bottom of its accounts receivables issue. In an August 30 email, after simply calling Poseidon's customers, the operations controller reported to Poseidon's CFO that it would not be paid ***any*** of the minimum pay rates it had already recognized as revenues. The operations controller's conclusion was astonishing, since at the time, more than $60 million of Poseidon's reported accounts receivable consisted of these uncollectible minimum pay rates. In short, Poseidon would have to write off more than half of its

accounts receivable, accounting for more than half of its 2012 revenues at that time.

12. Instead of immediately restating its previous financial statements, Poseidon continued to misrepresent that it would eventually be paid on its take-or-pay contracts, and continued to recognize revenues thereon. In its Q3 2012 financial statements, Poseidon only booked a $9.5 million accounts receivable impairment.

13. Four months later, Poseidon retained accounting firm Ernst & Young to investigate. After a month-long investigation, Ernst & Young agreed with the operations controller: none of Poseidon's revenues from the pay portion of take-or-pay contracts should have been recognized. Ernst & Young thus recommended that Poseidon restate two thirds of its 2012 revenues, or about $100 million.

**A. KPMG**

14. When auditors are sued for securities fraud, it is often for failing to detect fraud a client is attempting to conceal from it. Here, though, Poseidon's employees did not try to conceal its fraud from KPMG; it volunteered to KPMG the fraud's details. Not only did employees state, at KPMG-attended meetings, that Poseidon was recognizing revenues even though it had no enforceable contract and right to be paid (because there were no signed field tickets), they separately explained to KPMG that Poseidon's ballooning accounts receivable and collection delays were caused by "systematic" issues like "not getting signed field tickets." At the meeting to approve the Q3 2012 financial statements, the head of Poseidon's U.S. operations – the operations that generated the misstatements – told KPMG that Poseidon should write down much more than $9.5 million. This head of U.S. operations testified that a KPMG partner then told him that these issues were not germane and to stop talking about them.

15. Poseidon was obviously a high risk engagement. It had grown from almost nothing to about $100 million in revenues in a year, was in a different business than Open

Range, and operated mostly in a different country. Beyond that, as KPMG knew, Poseidon's accounting resources were grossly deficient. Poseidon generated field tickets by manually entering purported terms into an Excel-like spread-sheet software, instead of proper accounting software. Using this deficient software predictably generated typos and other errors, as KPMG recognized when it urged Poseidon to upgrade to proper software. Revenue recognition decisions for Poseidon's entire U.S. operations were made by a single entry-level clerk. According to Poseidon's CFO, its accounting was "woefully understaffed" from day one.

16. KPMG's audit should have reflected these very high risks. It did not. KPMG failed to perform a number of required audit procedures that would have detected the fraud. The reason KPMG did not perform the required procedures is because KPMG recklessly budgeted only $40,000 for the audit. For comparison, a study estimated that in 2012, average Canadian audit fees for oil & gas companies were about $300,000.

17. KPMG's recklessly small budget caused it to overlook several aspects of Poseidon's fraud. The majority of Poseidon's revenues were generated in the United States, through its U.S. office in Denver. Poseidon's U.S. operations were also the source of all its accounting woes. Employees showed up late, had long lunches and gym visits during the day, and then left early. Employees could not explain what their jobs were. Poseidon's U.S. accounting operations were so obviously defective that multiple Poseidon executives diagnosed Poseidon's woes simply by visiting. A site visit is an all-but-universal component of an audit under either Canadian or American audit standards. Yet, no doubt because of its tiny budget, KPMG never visited Poseidon's shockingly poor U.S. operations. And KPMG improperly relied on management's representations, as it admitted when it filed a third party complaint against Poseidon's management alleging that their representations were the only reason it had

issued its audit report.

### B. Loss causation

18. On November 14, 2012, Poseidon announced that it had taken a $9.5 million charge for uncollectible debt, the first in its history, that it had enacted a new credit policy, and that only 38% of its accounts receivable were due from parties with investment grade credit ratings. The next trading day, Poseidon's stock price fell by USD 8.15 per share to close at USD 4.95 per share.

19. On November 28, 2012, during trading hours, analysts at BMO Capital Markets Corp and Haywood Securities Inc. downgraded their outlook on Poseidon's shares. That day, Poseidon's stock price fell by USD 1.28 to close at USD 4.07 per share.

20. On December 27, 2012, Poseidon announced that it had formed a Special Committee to evaluate issues stemming from its November 14, 2012 write-off. Poseidon admitted that "the Company may need to make additional write downs of accounts receivable in future periods and such write downs may be significant." That day, Poseidon's stock price fell about USD 1.87 per share, to close at USD 1.49.

21. On February 14, 2013, Poseidon announced its preliminary conclusions (among other things) that "approximately $95 million to $106 million [] of the Company's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the Company's financial statements." That day, Poseidon's stock price fell USD 0.61 per share to close at USD 0.28.

22. Because of Defendants' recklessness – including that of KPMG – Poseidon investors have lost their entire investment.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

25. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

26. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES AND IMPORTANT NON-PARTIES

### A. Parties

27. Court-appointed Lead Plaintiff Gerald Kolar purchased Poseidon stock at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification has previously been filed with the Court and is incorporated herein by reference.

28. Former Defendant **Poseidon Concepts Corp.** was a Canadian Corporation whose principal place of business was Calgary, Alberta, Canada. Poseidon is not named as a Defendant because of its bankruptcy.

29. Poseidon became a successor of Open Range Energy Corp. after it was reorganized on November 1, 2011, pursuant to the Business Corporations Act (Alberta), RSA 2000, c B-9, as amended.

30. Poseidon engages in the development and commercialization of fluid storage and solutions to the oil and gas industry across North America, especially in the United States. Its

U.S. operations were run out of its Denver office by Kostelecky.

31. Poseidon was at all relevant times a reporting issuer in Canada. As a reporting issuer in Canada, Poseidon was required to issue and file with SEDAR[2] quarterly financial statements and audited annual financial statements (the "Financial Statements") prepared in accordance with International Financial Reporting Standards ("IFRS"). Poseidon was required contemporaneously to file with SEDAR Management's Discussion and Analysis of the respective financial statements ("MD&A").

32. Throughout the Class Period, Poseidon's common stock was listed on the OTC Pink Sheets under ticker symbol "POOSF."

33. Defendant **Lyle D. Michaluk** is a founding member of the Company. Since November 1, 2011, Michaluk served as the Company's CEO and Director. Michaluk was replaced by Dawson as the Company's Chief Executive Officer and appointed interim CFO on December 27, 2012. Prior to November 1, 2011, Michaluk was Open Range's CFO and Vice-President.

34. Defendant **Matt C. MacKenzie** served as the Company's Chief Financial Officer from November 1, 2011 until he was replaced by Michaluk on December 27, 2012.

35. Defendant **A. Scott Dawson** is a founding member of the Company. He served as Poseidon's Chairman of the Board of Directors since November 1, 2011. He was also a member of its Audit Committee. Dawson was appointed Executive Chairman of the Company on November 19, 2012. He was appointed Interim President and CEO on December 27, 2012. Prior to November 1, 2011, Dawson was Open Range's CEO, President, and Director.

---

[2] SEDAR, the System for Electronic Document Analysis and Retrieval, is a database of Canadian securities filings similar to EDGAR.

36. Defendant **Clifford L. Wiebe** is a founding member of the Company. Since November 1, 2011, Wiebe served as the Company's President, Chief Operating Officer and Director until December 27, 2012. Wiebe was replaced by Dawson as the Company's President, Chief Operating Officer and Director, and was appointed Chief Technology Officer of the Company on December 27, 2012.

37. Defendant **Harley L. Winger** is a founding member of the Company and at all relevant times herein served as a Company Director. Prior to November 1, 2011, Winger was Open Range's Director.

38. Defendant **Dean R. Jensen** is a founding member of the Company and at all relevant times herein served as a Company Director and Chairman of its Audit Committee.

39. Defendant **Neil Richardson** served as a Company Director at all relevant times herein.

40. Dawson, Michaluk, Wiebe, Winger, Jensen, MacKenzie, and Richardson are collectively referred to herein as the "**Poseidon Defendants**."

41. Defendant **KPMG LLP**, Chartered Accountants ("**KPMG**"), a Canadian partnership, was Poseidon's independent auditor. KPMG is a member of KPMG International Cooperative, a Swiss Verein. KPMG and other national KPMG partnerships combined form a global professional accounting services company that employs more than 160,000, with 2014 revenues of more than USD 26 billion, and is one of the so-called Big Four accounting firms.

**B. Non-parties**

42. **Joseph A. Kostelecky** was hired as Open Range Business development/operations manager U.S. in December 2010, and became Poseidon's VP-U.S. Operations in November 2011. Kostelecky stayed in this position until December 2012. Kostelecky headed up Poseidon's U.S. operations.

43. **Greg Campbell** was the KPMG lead audit partner on the Poseidon account. Campbell earned his Bachelor of Commerce (B. Comm.), Accounting, in 1997, and joined KPMG that year. He has no graduate degree.[3] Campbell works out of KPMG's Calgary office, located at 3100-205 5th Avenue SW, Calgary, Alberta, T2P 4B9, about six blocks from Poseidon's Calgary office.

44. **David Belcher** was a Poseidon Vice-President of Finance. He made presentations at each of Poseidon's board meetings to approve its financial statements.

45. **Sonja Sanborn** was Poseidon's Controller.

46. **Doug Robinson** was hired as Poseidon's operations controller in or around July 2012, to sort out Poseidon's chaotic financial condition. Robinson's first task was to investigate Poseidon's alarming accounts receivable balance.

47. **Brian Swendsen** was a Poseidon sales agent. Swendsen was the son of John Swendsen, a senior executive of the National Bank of Canada, Poseidon's lenders and bankers. John Swendsen personally spoke to Defendant Michaluk to obtain a job for Brian Swendsen.

## IV. DEFENDANTS' MISCONDUCT

### A. Background

48. Poseidon began as a side project of its old firm Open Range.

49. Open Range is a junior Canadian oil and gas exploration and exploitation company.

50. Open Range employed hydrological fracturing in exploiting oil and gas wells. Open Range's operations were limited to western Canada.

51. Hydrological fracturing uses pressurized liquid made of water, sand, and various chemicals, to create cracks in the rock formations, which allows the resource to flow more freely.

[3] *See* https://www.linkedin.com/in/gregcaldwellkpmg (last visited May 15, 2015).

52. Among the challenges raised by hydrological fracturing is storage: where to store the water used in hydrological fracturing, and where to store the wastewater created by it. Companies typically store this water in underground pits lined with concrete, tarps, or steel tanks.

53. Open Range's alternative was to create large modular above-ground pools, which Poseidon called "tanks". The main advantage of the tanks was that they could be transported to the drilling site, set up, and dismantled, using less effort than either lined pits or steel tanks.

54. Open Range initially only used the pools in its own operations, but when the pools showed some success, began to offer them for lease to other oil and gas exploitation companies.

55. According to Open Range's SEDAR filings, the tank operations were launched late in Q2 2010, earned $5.32 million in 2010, and $18.9 million in the first six months of 2011 – almost half of Open Range's total revenues of $38.0 million for that time period. Further, the tanks business earned operating income of $16.1 million for that period, or substantially all of Open Range's $17.0 million in operating earnings.

56. Claiming that markets were not valuing the tank business because it was attached to Open Range's oil and gas operations, in September 2011, Open Range conducted a spin-off that resulted in its tank business becoming a stand-alone company, dubbed Poseidon (the "Spin-off").

57. The Spin-off closed on November 1, 2011.

**B. Poseidon Defendants' false statements**

*i. The accounting standards Poseidon violated*

1. Revenue recognition.

58. In its 2011 Audited Financial Statements, Defendants represented that Poseidon's revenue recognition policy was:

> Fracturing fluid tank rental revenues are generally derived from the provision of rentals and related services which are based on contracts that include fixed or determinable prices based on daily rental rates. Revenue is recognized when [(a)] there is persuasive evidence of an arrangement, [(b)] tank rentals and related services are provided, [(c)] the rate is fixed and determinable and [(d)] collectability is reasonably assured.

59. In addition, at all relevant times, Defendants claimed that Poseidon's financial statements had been presented in accordance with IFRS. Paragraph 26 of IAS 18[4] provides that unless the outcome of a transaction involving rendering of services can be reliably estimated, revenue shall be recognized only to the extent of the expenses that are recoverable. Paragraph 20 of IAS 18 provides that the outcome of a transaction can only be reliably estimated if (a) the amount of revenue can be measured reliably; (b) it is probable that the economic benefits associated with the transaction will flow to the entity; (c) the stage of completion of the transaction at the end of the reporting period can be measured reliably; and (d) the costs incurred for the transaction and the costs to complete the transaction can be measured reliably. Paragraph 23 of IAS 18 provides that to make reliable estimates, it is usually necessary for the entity to have an effective internal financial budgeting and reporting system that reviews and revises the estimates of revenue as the service is performed.

2. Accounts receivable

60. Poseidon's 2011 MD&A claimed that its impairment policy included:

> ***Poseidon evaluates its trade receivables through a continuous process of assessing its portfolio on an individual customer and overall basis. This process consists of a thorough review of collection experience, current aging status of the customer accounts, financial condition of the Corporation's customers, and other factors. Based on its review of these factors, it establishes or adjusts allowances for specific customers as well as general provisions if industry conditions warrant.*** This process involves a high degree of judgment and estimation and frequently involves significant dollar amounts. Accordingly, the Corporation's results of operations could be affected by adjustments to the

[4] "IAS" refers to International Accounting Standard, which are an element of IFRS.

allowance due to actual write-offs that differ from estimated amounts.

(Emphasis added).

61. IAS 39 governs the recognition and measurement (including impairment) of financial assets such as accounts receivable. Paragraph 14 of IAS 39 provides that "an entity shall recognize a financial asset in its statement of financial position when, and only when, the entity becomes a party to the contractual provisions of the instrument."

62. Paragraph 58 of IAS 39 provides that "an entity shall assess at the end of each reporting period whether there is any objective evidence that a financial asset or group of financial assets is impaired." If any such evidence exists, the entity must determine the amount of any impairment loss, either directly or through the use of an allowance account. *Id.*; IAS 39, ¶ 63.

*ii. Defendants did not follow IFRS and the accounting policies they disclosed to investors.*

63. A significant majority of Poseidon's revenues were purportedly earned from take-or-pay contracts. In its take-or-pay contracts, Poseidon agreed to make its tanks available to a customer. If the customer did not use the tanks during the contract period, it had to pay as a penalty a minimum daily rate – the "pay" portion of the take-or-pay contracts. Both the minimum daily rate and revenues Poseidon claimed to have earned from the "pay" portion of take-or-pay contracts are referred to in this Complaint as the "minimum pay rate." If the customer actually used the tanks, it had to pay a higher daily rate (the "live rate"). If a client purportedly elected to pay the minimum pay rate, the tanks were almost never delivered to it. At most, Poseidon moved the tanks to an area near the customer's operations. About 68.0% of Poseidon's Q1-Q3 2012 revenues came from minimum pay rates.

64. In the oil and gas service industry, for important contracts, service providers

usually enter into a master agreement that governs the terms of the services. The service providers then provide services pursuant to the master agreement. Once the services have been provided, the provider issues the customer a field ticket. The field ticket sets out an itemized list of services provided, their price, and the total price. It is signed by the authorized representatives of both the provider and the customer. The field ticket is then used to generate an invoice to the customer. Poseidon claimed to follow this practice. Poseidon's field tickets generally provide that payment is due within 45 days.

65. At all times, Poseidon's field ticketing and invoicing were replete with deficiencies and thus did not establish that the customer had an obligation to pay:

a. ***Unsigned master agreements and field tickets***. Poseidon frequently did not obtain a signed field ticket or master agreement. Without a signed field ticket or master agreement, there is no evidence that the services were provided or that the customer has agreed to pay. Moreover, because obtaining a signed field ticket is an industry standard, and because obtaining a signed contract an all-but-universal business practice, the absence of a signed field ticket or contract is affirmative evidence that the customer is not obligated to pay. Poseidon's master contract with one of its largest customers, Occidental Petroleum Corporation, provided that Occidental would make no payment without a signed field ticket. Kostelecky, at 209.[5] Kostelecky testified that this term from the Occidental contract was standard. Kostelecky, at 210. According to Mr. Kostelecky, if an invoice was not accompanied by a signed

---

[5] Citations to "Kostelecky, at __" and "Swendsen, at ___" are to pages of the Depositions of Joseph Kostelecky and Brian Swendsen, attached as Exhibits 1 and 2 to this Complaint and incorporated by reference.

field ticket, 80% of the time, it would not be paid. Kostelecky, at 210. In September 2012, Poseidon determined that only about $13.2 million of its then-$75 million in contract billings had signed field tickets and master agreements.

b. ***Double-billed customers***. The master agreements provided that customers must pay either the minimum pay rate ***or*** the live rate. If customers used the tanks, Poseidon billed them for the minimum pay rate ***and*** the live rate. Kostelecky testified that there were "copious" instances of this misconduct. Kostelecky, at 131. Poseidon was aware of this substantial problem by June 2012 at the latest.

c. ***Invoices issued to the wrong customer or sent to the wrong department***. Poseidon frequently issued invoices to the wrong customer. Though the invoice bore the correct recipient's name (i.e., the customer who was receiving the invoice), the services were provided to another customer. Thus, in addition to the fact that Poseidon would not get paid, many of Poseidon's customers then determined that Poseidon was attempting to defraud them. Poseidon also frequently sent invoices to the wrong department or wrong location of the customer, resulting in unpaid or invoices or delayed payments. Because of Poseidon's poor accounting software, see ¶66 below, Poseidon would only follow up on mis-sent invoices if the individual clerks remembered to.

d. ***Revisions and errors***. Even when Poseidon purportedly billed customers pursuant to a signed field ticket and a signed master agreement, Poseidon

frequently revised payment terms through a variety of credits, adjustments, and reversals.

e. ***Field deals***. Sales representatives were authorized to and did negotiate side deals for discounts to rental and services rate. According to Swendsen, instructions were to "sell as much as we could and let billing and the operations guys who were out in the field kind of sort that other portion [accounting and documentation] out." Swendsen, at 37-38. But Poseidon generated invoices and revenue automatically by multiplying the number of tanks committed by the daily rate. The invoices and revenues recognized therefore did not reflect the agreements Poseidon's personnel had actually reached.

f. ***Duplicate invoices***. Poseidon frequently sent duplicate invoices. Poseidon recognized revenues on each of the duplicate invoices.

g. ***Revenue recognized but not invoiced***. As of December 10, 2012, Poseidon had recognized about $35 million in revenues that it had never invoiced.

66. According to a December 12, 2012 report by Sonja Sanborn, Poseidon's Controller, the causes of Poseidon's field ticketing deficiencies were systematic and obvious, and included:

a. ***No personal knowledge or written reports***. Field activity was communicated to those creating field tickets by word of mouth. And even these word-of-mouth reports were often made much later than the purported field activity.

b. ***Grossly deficient accounting***. Field tickets were created by general administrative staff in the U.S. regional office, rather than specialized

accounting staff, or even dedicated unskilled staff.

67. Ms. Sanborn's report also showed that many of Poseidon's accounting deficiencies sprang from the fact that instead of using accounting software for its accounting, Poseidon manually inputted entries into an Excel-like spreadsheet:

a. ***Manual entry***. Field tickets were created by manually entering data into the spreadsheet, rather than through more conventional accounting software. The field tickets thus generated contained systematic errors, whether from typos, factual mistakes, or malfeasance.

b. ***Follow up***. Because Poseidon did not have a database tracking mechanism, it did not have an automated system alerting it to check up on a field ticket. Thus, when Poseidon submitted a field ticket and it was not immediately approved, Poseidon would only follow up if its concededly incompetent U.S. general administrative staff remembered to. They frequently did not.

c. ***Controls***. Few controls existed to manage and verify the accuracy of inputs into the spreadsheets.

68. Similarly, Poseidon did not follow its own impairment policy:

a. ***No evaluation***. As Kostelecky testified, Poseidon never evaluated its customers to determine whether to create an allowance for doubtful account. Kostelecky, at 190-91.

b. ***No continuous assessment***. As Kostelecky testified, Poseidon never assessed its portfolio to determine whether its receivables were collectable. Kostelecky, at 190-91.

69. After Poseidon's collapse, audit firm Ernst & Young ("E&Y") was retained to

conduct a forensic audit of its finances. E&Y determined that of Poseidon's 2012 revenues, about $100.5 million came from collecting minimum pay rates; the remaining $47.5 million came from collecting live rates. E&Y concluded that, as to the take-or-pay contracts: "[...] almost 100% of the [Contracts] are not considered valid or enforceable [...] there are virtually no valid Contracts."

70. Poseidon then worked with E&Y to arrive at an estimate of overstated 2011 accounts receivable. They estimated that of Poseidon's approximately $53.6 million in accounts receivable as of December 31, 2011, $13.3 million related to revenues that should never have been recognized.

71. Accordingly, Poseidon did not follow IFRS and its own accounting policies.

72. The approximate amount of overstatement, using financial figures drawn from each of Poseidon's SEDAR Filings, is:

Table I – Approximate amount of overstatement of revenues and accounts receivable

| | Full year 2011 | Q1 2012 | Q2 2012 | Q3 2012 |
|---|---|---|---|---|
| Revenues | $78.8 million | $52.1 million | $54.9 million | $41.1 million |
| Minimum commitment amount/overstatement | $13.3 million | $35.4 million | $37.3 million | $28.0 million |
| Revenue overstatement (percentage) | 16.9% | 68.0% | 68.0% | 68.0% |
| Unsigned field ticket and/or master agreement | $12.5 million | $26.1 million | $27.4 million | $20.6 million |
| Unsigned field ticket and/or master agreement (percentage) | 15.9% | 50% | 50% | 50% |
| Accounts receivable | $53.6 million | $83.0 million | $118.6 million | $125.5 million (net of $9.5 million impairment) |
| Overstatement of accounts receivable | $13.3 million | $48.7 million | $86.0 million | $98 million |
| Overstatement of accounts receivable (percentage) | 24.8% | 58.7% | 72.5% | 78.1% |

Sources:

*Revenues and accounts receivable – Poseidon SEDAR Filings*
*Overstated revenues/unsigned field tickets – Q1-Q3 2012 – EY INC. Preliminary Report to Norton Rose Canada LLP, February 13, 2013. E&Y's first report estimated that about 68.0% of Poseidon's 2012 revenues should not have been recognized; Table I assumes that this percentage was constant throughout 2012.*
*Accounts receivable – Q1-Q3 2012 – EY INC. Preliminary Report to Norton Rose Canada LLP, February 13, 2013. Assumes that all improperly recognized revenues were recognized as accounts receivable.*
*Overstated revenues and accounts receivable – 2011 – Email from Peter Chisolm to Leigh Cassidy and Christine Felber dated March 15, 2013, and spreadsheet attached thereto.*
*Unsigned field tickets – 2011 – Email from Allyson Finstein to Christine Felber dated March 14, 2013, and attached spreadsheet.*

*iii. Poseidon's false statements*

73. Poseidon's false statements were made in its annual and quarterly financial statements and reports filed over the course of 2012 (collectively, the filings set out in the subparagraphs of this paragraph are the "SEDAR Filings"):

a. On March 22, 2012, Poseidon filed with SEDAR its 2011 Annual Financial Statements and MD&A thereof (the "2011 Annual Filings"). Michaluk and MacKenzie signed them, and the Board formally approved them, on March 22, 2012. The Annual Financial Statements provided that "[t]he Board of Directors has approved the financial statements and information as presented in this annual release." Michaluk and MacKenzie drafted and, in conjunction with the Board, authorized publication of the Annual 2011 MD&A. The filing of these documents begins the Class Period. Michaluk and MacKenzie each certified the 2011 Annual Filings pursuant to National Instrument 52-109 ("NI 52-109 Certifications"), providing:

> ***No misrepresentations***: Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings.

***Fair presentation***: Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the annual filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the annual filings.

b. The 2011 Annual Filings (a) were purportedly presented in accordance with IFRS, which they were not, for reasons set out in ¶¶ 63-72 above; and (b) purported to follow Poseidon's revenue recognition and impairment policies, which they did not, for the reasons set out in ¶68, above. Accordingly, the revenues and accounts receivable set out in the 2011 Annual Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

c. On May 9, 2012, Poseidon filed with SEDAR its Q1 2012 Interim Financial Statements and its Q1 2012 MD&A (the "Q1 Filings"). The Q1 Interim Financial Statements provide that "The interim condensed consolidated financial statements were authorized for issuance by the Corporation's Board of Directors on May 9, 2012." The Q1 Interim Financial Statements incorporated the Annual Filings by reference, providing that "[t]hese interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk

and MacKenzie each provided NI 59-102 Certifications of the Q1 Filings. The revenues and accounts receivable set out in the Q1 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

d. On August 8, 2012, Poseidon filed with SEDAR its Q2 2012 Interim Financial Statements and its Q2 2012 MD&A (the "Q2 Filings"). The Q2 Interim Financial Statements provide that "The interim condensed consolidated financial statements were authorized for issuance by the Corporation's Board of Directors on August 8, 2012." The Q2 Interim Financial Statements incorporated the Annual Filings by reference, providing that "These interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk and MacKenzie each provided NI 59-102 Certifications of the Q2 Filings. The revenues and accounts receivable set out in the Q2 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

e. On November 14, 2012, Poseidon filed with SEDAR its Q3 2012 Interim Financial Statements and its Q3 2012 MD&A (the "Q3 Filings"). The Q3 Interim Financial Statements provide that "The interim condensed

consolidated financial statements were authorized for issuance by the Corporation's Board of Directors on November 14, 2012." The Q3 Interim Financial Statements incorporated the Annual Filings by reference, providing that "These interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk and MacKenzie each provided NI 59-102 Certifications of the Q3 Filings. The revenues and accounts receivable set out in the Q3 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

74. In addition, the Documents made the following false statements:

a. The 2011 MD&A falsely stated that:

> The Corporation evaluated the design of its internal controls over financial reporting as at December 31, 2011. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Notwithstanding the weaknesses identified with regards to complex and non-routine accounting matters, the Corporation concluded that all other of its internal controls over financial reporting have been designed properly at December 31, 2011.

In fact, for the reasons set out in ¶¶ 63-72 above and ¶¶ 98-137 below, Poseidon's

internal control deficiencies extended to simple and routine accounting matters.

b. The Q1 2012 MD&A falsely stated that:

> The Corporation evaluated the design of its internal controls over financial reporting as at March 31, 2012. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Notwithstanding the weaknesses identified with regards to complex and non-routine accounting matters, the Corporation concluded that all other of its internal controls over financial reporting had been designed properly at March 31, 2012

In fact, for the reasons set out in ¶¶ 63-72 above and ¶¶ 98-137 below, Poseidon's internal control deficiencies extended to simple and routine accounting matters.

c. The Q2 2012 MD&A falsely stated that:

> The Corporation evaluated the design of its internal controls over financial reporting as at June 30, 2012. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Subsequent to the year-ended December 31, 2011 and the quarter ended March 31, 2012, the Corporation has added further accounting and support functions which has minimized the weaknesses identified with regard to complex and non-routine accounting matters. Notwithstanding the weaknesses identified, the Corporation concluded that all other of its internal controls over financial reporting had been designed properly at June 30, 2012

In fact, for the reasons set out in ¶¶ 63-72 above and ¶¶ 98-137 below, Poseidon's internal control deficiencies extended to simple and routine accounting matters and persisted past June 30, 2012.

d. The Q3 2012 MD&A falsely stated that:

> The Corporation evaluated the design of its internal controls over financial reporting as at September 30, 2012. During this evaluation the Corporation identified weaknesses in its internal controls as a result of the limited number of finance and accounting personnel at the Corporation dealing with revenue cycle business processes and complex and non-routine accounting transactions that may arise. Specifically, the accounting complexity associated with a growing

> international oilfield services business and the lack of effective and efficient accounting processes can result in delays in the operational and corporate closing process which limit the ability of management to perform substantive reviews on a timely basis. Subsequent to the year-ended December 31, 2011 and the quarter ended September 30, 2012, the Corporation added further accounting and support functions and implemented several design improvements to its controls over revenue cycle business processes and non-routine accounting matters, which has minimized the weaknesses identified with the Corporation's internal controls over financial reporting. As a result of the identified weaknesses, which the Corporation will continue to monitor and work to address through ongoing evaluation of its internal controls and prudent personnel and technology advancements, the Corporation concluded that its internal controls over financial reporting were not completely effective at September 30, 2012. Notwithstanding the aforementioned weaknesses, the Corporation concluded that the internal controls over financial reporting were designed properly to provide reasonable assurance regarding the reliability of financial reporting by the Corporation and the preparation of its financial statements

In fact, for the reasons set out in ¶¶ 63-72 above and ¶¶ 98-137 below, Poseidon's internal controls were not designed properly to provide reasonable assurance regarding the reliability of financial reporting.

**C. Poseidon Defendants' false statements were made with scienter.**

*i. That Poseidon was not obtaining signed field tickets was openly discussed at Poseidon Board meetings seeking to approve financial statements.*

75. Poseidon's Board held regular meetings to approve Poseidon's financial statements before they were filed. These meetings provided participants with information necessary to determine that Poseidon was making materially false statements.

76. Each meeting was attended by every Poseidon Defendant. Greg Caldwell, the KPMG lead audit partner, also attended each meeting.

77. At each meeting, meeting attendees were told that: (a) Poseidon needed signed field tickets to be paid; (b) Poseidon frequently did not obtain signed field tickets; (c) obtaining signed field tickets in all cases was a priority for Poseidon.

78. At all times, Poseidon's Board had the authority to order Poseidon or KPMG to

conduct a further investigation to determine (a) whether Poseidon recognized revenues from sales where it had not obtained signed field tickets, and if so (b) how much revenue Poseidon had booked from such sales.

79. At all times, KPMG independently had the authority and the obligation to withhold or recall its audit report until it was permitted to conduct further investigation to determine (a) whether Poseidon recognized revenues from sales where it had not obtained signed field tickets, and if so (b) how much revenue Poseidon had booked from such sales. KPMG also had the authority to independently inspect all or a sample of Poseidon's field tickets to arrive at an estimate.

80. Kostelecky attended each of the meetings. Meeting attendees knew that as head of Poseidon's U.S. operations, Kostelecky had in-depth knowledge of how frequently Poseidon recognized revenues without a signed field ticket or master agreement. In fact Kostelecky has agreed that "more often than not", field tickets were not signed. Kostelecky, at 214. KPMG and the Poseidon defendants could simply have asked Kostelecky, and he would have provided this alarming information.

1. March 22, 2012 meeting

81. On March 22, Poseidon's full board held a meeting to approve its Annual 2011 Financial Statements. Present were Kostelecky and all Defendants. KPMG was present through its lead audit partner, Greg Campbell, and auditor Lisa Wesley.[6]

82. According to Mr. Kostelecky's testimony, at the March 22 meeting, Poseidon was faced with a worrying "lack of collections" of its accounts receivable. Alarmed, meeting attendees held a discussion about Poseidon's entire revenue collection and recognition process.

---

[6] Lisa Wesley is a KPMG senior audit manager. As of January 1, 2012, Wesley had worked as an auditor for KPMG for seven years.

In this discussion, David Belcher, Poseidon Finance VP, warned that field ticketing was "the first gatekeeper" to a receivable. Mr. Belcher also warned that Poseidon did not always obtain a signed field ticket. Mr. Belcher expressed his hope that in the future, may be able to obtain signed field tickets every time. Kostelecky, at 39-42.

83. Similarly, the minutes for an audit committee meeting that same day attended by Greg Caldwell and Lisa Wesley provide that "Mr. Belcher reviewed the balance sheet, noting the timing for collection of outstanding accounts receivables has improved and provided further details regarding the invoicing and collection process."

84. After Poseidon's collapse, David Belcher, Allyson Finstein, and E&Y examined Poseidon's invoices and field tickets for accounts receivable as of December 31, 2011. They determined that of Poseidon's purported $53.6 million in accounts receivable, approximately $13.3 million (24.8%) were improperly-recognized revenues that had to be reversed. Notably, these accounts receivable all arise from Poseidon's U.S. operations, and accounted for 56.6% of Poseidon's purported $23.5 million in U.S. accounts receivable accrued as of that date. Similarly, about $12.5 million of Poseidon's purported accounts receivable (23.3%) derived from invoices for which there was no signed field ticket.

2. May 9, 2012 meeting

85. On May 9, 2012, Poseidon's Board and audit committee each held a meeting to approve its Q1 2012 Interim Financial Statements. Present at the Board meeting were Kostelecky and all Defendants. KPMG was present through its lead audit partner, Greg Campbell, and auditor Lisa Wesley.

86. The Board specifically asked Mr. Belcher to explain the progress that Poseidon had made in obtaining signed field tickets since the Board's March 22 meeting.

87. Mr. Belcher again warned that while Poseidon was improving in getting signed

field tickets, it was not getting signed field tickets in all cases.

88. Mr. Belcher then explained that without a signed field ticket, Poseidon would not be paid. Thus, Mr. Belcher continued, Poseidon's inability to obtain signed field tickets would adversely affect its cash position. Kostelecky, at 48-50.

89. E&Y subsequently determined that about 50% of the revenues Poseidon recognized in Q1-Q3 2012 had no customer-signed back-up whatsoever – whether a field ticket or a master services agreement. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 revenues were improperly recognized.

90. Campbell and Wesley were also present for the May 9 audit committee meeting. According to the minutes of the May 9 Audit Committee meeting, Caldwell noted that there was "an ongoing focus on potential credit risk associated with billings and collections."

3. August 8, 2012 meeting

91. On August 8, 2012, Poseidon's Board held a meeting to approve its Q2 2012 Interim Financial Statements.

92. Mr. Belcher warned that Poseidon's accounts receivable were worryingly high. But in the course of explanation, Mr. Belcher specifically warned that while Poseidon was improving in getting signed field tickets, it was still not getting signed field tickets in all cases. Mr. Belcher told the board and KPMG that the improvement was not significant. Kostelecky, at 76-80.

93. E&Y subsequently determined that about 50% of the revenues Poseidon recognized in Q1-Q3 2012 had no customer-signed back-up whatsoever – whether a field ticket or a master services agreement. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 reported revenues were improperly recognized.

i. November 7, 2012 meeting

94. On November 7, 2012, Poseidon's Board held a meeting to approve its Q3 2012 Interim Financial Statements. Present were Kostelecky and all Defendants. KPMG was present through its lead audit partner, Greg Campbell, and another of its partners.

95. Mr. Belcher warned that accounts receivable had continued to increase. Mr. Belcher warned that attendees that "we [Poseidon] have still not closed [the] loop" on obtaining signed field tickets.

96. Mr. Belcher cited an even more alarming example. As he told attendees, Poseidon had received a call from its customer Occidental Petroleum. Occidental complained that it had received $1 million in invoices for work not performed for it. But Occidental also stated that Poseidon had performed $2.4 million of work for Occidental, but had not invoiced it for over a year. Kostelecky, at 95.

97. E&Y subsequently determined that about 50% of the revenues Poseidon recognized in Q1-Q3 2012 had no customer-signed back-up whatsoever – whether a field ticket or a master services agreement. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 purported revenues were improperly recognized.

*ii. Internal communications show that Defendants knew of Poseidon's fraud.*

1. Defendants "knew from the beginning invoicing [] without [customer] signatures was a bad idea" and knew accounts receivable were increasing because of the "chaos of invoicing without signed field tickets."

98. By January 2012, Poseidon was alarmed by its mounting stale U.S. accounts receivable. Thus, for example, on January 15, 2012 (a Sunday), Defendant MacKenzie sent a list of US accounts receivable aged over 90 days to, among others, Defendants Wiebe and Michaluk. These stale accounts receivable amounted to $8.3 million.

99. By March 2012, it was becoming clear to Poseidon and KPMG alike that Poseidon had substantial accounts receivable problems that were linked to improper invoicing in its U.S. operations.

100. In an email sent on March 15, 2012 to, among others, Defendants Michaluk and Wiebe, and Kostelecky and Belcher, Defendant MacKenzie warned:

> Hello all – I've been looking through our US accounts receivables, namely the amounts due over 60 – 90 days ($7.3 mm in total []), and thought I'd send a quick note.
> The end of our first quarter is due over two weeks away, and we need to make an aggressive push on both invoicing and collections prior to March 31; our auditors, bankers, and shareholders are all watching our growing A/R # of days outstanding and it's something we need to remain very diligent on (***auditors have been questioning accuracy of invoicing*** []) [].
> I broke down the list of the top 10 US receivables amounts / clients and they account for $14.3 mm, or 80%, of the $17.8 mm total receivables [].
> []
>
> Bottom line, all large and small accounts should be called in this big push for next few weeks, but the aforementioned top 10 was my simple way of attacking a very large list of clients.
> []
> I also recognize we're still feeling the effects of the old issues, but we need to get over this hump very soon, ***as I daresay that nothing in our entire organization is more important today than this collections / invoicing issue.***
> []
>
> (Emphasis added).

101. Kostelecky replied expressing his hope that "[w]e continue to push on ward [sic] and will have a clean invoicing system as well as fully up to date as of March 31, 2012 for Q1."

102. As Defendants knew, the problem did not improve. On April 6, 2012, MacKenzie emailed Michaluk about dire accounts receivable collections and of securing financing before the public became aware of the problem:

> To: Lyle Michaluk
> From: Matt MacKenzie
> Sent: Fri 06/04/2012 4:07:00 PM

Subject: Re: RE:

The late afternoon collections update from Ally was $650k for the week... ***that made me warm up even more to 2-3 year [financing] deal (what the bankers giveth they can't take away, assuming we're onside with covenants of course). I'm absolutely perplexed on how collections have even gotten worse over the last three weeks [...] companies 1/3 of our size would easily collect $500k in a week!***

(Emphasis added)

103. Poseidon was well aware that (a) without signed field tickets, it would not be paid; and (b) a huge portion of its EBITDA derived from revenues where there was no signed field tickets. Thus, on May 4, 2012, Mr. Belcher emailed Defendants Michaluk and MacKenzie:

From: David Belcher
Sent: Friday, May 04, 2012 10:02 PM
To: Matt MacKenzie; Lyle Michaluk
Subject: Reserve on 01 Bonus

***I have been thinking about the large part of our EBITDA based on accruals (field tickets not signed) and it makes me nervous. What do we look like if those field tickets do not get signed and we have a negative revision to revenue?***

I was thinking that although we are able to book revenue on an accrual basis (***consistent with KPMG review***) that perhaps we adjust the bonus down to reflect the % of invoiced revenue and defer the balance of the payment until actual invoice? We could put the message to staff that the bonus is still payable but only upon the receipt of signed field tickets (leading to invoices) and develop a process to pay the balance once the revenue is actually invoiced.

***Not to be a fear monger but the paying of executive bonus based on accrual strikes me as very Nortel like and makes me extremely nervous.***

The message that bonus would be payable upon invoicing on signed field tickets might prove a very healthy incentive to our staff to get those tickets signed and in.

(Emphasis added).

104. In fact, Poseidon knew from the start that invoicing without signed field tickets was extremely problematic. In an email exchange taking place on May 17, 2012, between Allyson Finstein and Amanda Erickson, Ms. Feinstein observed that "Sorry, during the chaos of invoicing without signed field tickets, I will probably be doubling [sic] checking on things, to

make sure we should have invoiced, since a lot of things are coming back otherwise and I don't want to upset customers. Even though it's too late with some ." (Emoticon in original). Erickson, for her part, stated that "I knew from the beginning invoicing and mailing without signatures was a bad idea, but I guess we really didn't have a choice."

105. And on August 5, 2012, MacKenzie observed in an email to David Belcher that $19 million of Poseidon's purported accounts receivable were over 120 days old. MacKenzie expressed surprise the amount was so little.

106. As the summer of 2012 wore on, Poseidon conducted an inventory of its unsigned master agreements. According to an Excel spreadsheet emailed to Allyson Finstein and Doug Robinson on August 8, 2012, only 11[7] of Poseidon's 54 master agreements were signed.

107. In late August, Robinson began calling Poseidon purported customers to determine why accounts receivable were going unpaid.

108. In an email to MacKenzie on August 30 summarizing his findings, Robinson warned that "there are no immediate plans on anyone [sic] end to pay" Poseidon's invoices:

> From: Doug Robinson
> Sent: Thursday, August 30, 2012 12:39 PM
> To: Matt MacKenzie
> Subject: Re: how goes the battle down there?
>
> Definitely growing. Good meeting with Steve on the field ticketing side, I anticipate immediate improvement in the quality and the turn around of the field tickets for his region, need to have the same conversation with Brian (likely next week).
>
> Lots of calls being made, lots of blank stairs [sic], and head scratching from our customers end. There is an extremely wide gap in their expectations of these "contracts" and ours.
>
> In a lot of cases I have been talking to customers who we have millions of dollars

[7] In fact, twelve were signed.

in receivable balances who have no idea of who Poseidon is, aren't set up in their systems , no MSA's [Master Agreement] on file, no W2's on file etc. Good news is that 95% of the customers we have spoke to seem very "eager" to figure out what is going on, and why these obligations haven't been recorded on their books.

Bad news is that I have absoluetly [sic] no confidence that we will be paid any of the contract revenue that we have entered, (likely in the 60 million dollar range). Going to collect everyones [sic] comment from calls at end of day, and likely need to call Joe at end of day to give a chance to explain what is happening here. Tomorrows meeting will either be very long or very short , because there are no immediate plans on anyone [sic] end to pay these.

If you want to discuss before then, I'll give you a buzz in a bit. Let me know what works for you.

109. Later that day, Robinson replied to the same email:

Not the answers I was expecting [...]
Joe [Kostelecky] always seems to have the answers and comes through when required, so it better be same in this scenario, ***the backup data for the contracts needs to be supplied immediately***

(Emphasis added).

110. On September 19, Poseidon held a meeting to discuss invoicing and accounts receivable. At least Defendant MacKenzie and Kostelecky were present. That day, MacKenzie emailed to Kostelecky an excel spreadsheet showing that Poseidon had signed backup for only about $13.2 million of its $75.0 million billed. The spreadsheet also stated that $38.2 million of Poseidon's purported revenues were "vulnerable", with the remaining $23.6 million "TBD". MacKenzie emailed a second spreadsheet, stating that even setting aside unsigned contracts, there was a "billing variance" of $17.4 million.

111. On September 20, 2012, Robinson received a letter from counsel to WPX Energy Rocky Mountain, LLC, a purported Poseidon customer, concerning about USD 7.2 million of unpaid invoices related to 8 tanks purportedly rented by WPX between April 2011 and April

2012. WPX's letter recounted: (a) that WPX had never entered into any rental agreement with WPX; (b) no tank was ever delivered to WPX; (c) WPX did not even exist in May 2011, when it supposedly signed a rental agreement with Poseidon for one tank; (d) WPX's internal records disputed all of Poseidon's claims, and (e) according to WPX's field representative, there was never even a conversation about WPX renting eight tanks. Robinson immediately emailed the letter to Kostelecky. Poseidon did not recognize the funds purportedly owed by WPX as bad debts in Q3 2012, though IFRS required it to.

112. On November 5, 2012, MacKenzie, among others, held a meeting with KPMG lead audit partner Greg Caldwell and KPMG auditor Abraham Nel to discuss uncollectible debts as well as $4.4 million of revenue that had been accrued in 2011 but never invoiced. According to a memo provided to KPMG soon thereafter, Poseidon explained about the 2011 revenue that (a) all but $140,000 had not been collected, (b) Poseidon's poor internal controls which had led to these issues included "forgot to bill", "manual/excel-based billing system", and "[i]nadequate staffing issues in US", and (c) there were doubts about the collectability of the revenue (e.g., for one client with $1.1 million in 2011 revenues outstanding, Magna, "accounting [was] not aware of agreement").

113. On November 16, 2012, Mr. Robinson emailed MacKenzie and Michaluk a spreadsheet. The body of the email stated "Here is the listing of PCI [Poseidon U.S.] customers where either we have contract disputes or have substantial unpaid balances which are under dispute." The spreadsheet listed $73.9 million in disputed revenues. Mr. Robinson shared his analysis with Caldwell of KPMG, Jensen, and Dawson.

114. Notwithstanding their conclusions that much of Poseidon's revenues were unsupported, as set out in ¶¶108-111, at an Audit Committee meeting on November 13, 2012,

Michaluk represented that he and MacKenzie had reviewed all the outstanding accounts receivable and determined that Poseidon should only take a $9.5 million bad debt expense, according to that meeting's minutes.

115. In an email sent October 22, 2012, Defendant MacKenzie apologized for a slow response, blaming an inquiry by Poseidon's board into its invoicing issues: "Sorry for delay, dealing with a Board that has completely lost their mind and are acting completely irrational ... these guys have been a rubber stamp Board and completely ignored their fiduciary duty for a year, only to now panic."

*iii. Poseidon's issuance of credit notes contradicted both the amount of the revenues it had recognized and the manner in which it recognized them.*

116. Poseidon routinely issued credit notes to its customers. These credit notes rebated customers a portion – or all – of the amounts Poseidon had invoiced them. Accordingly to Kostelecky, the notes were issued weekly. Kostelecky, at 164. Defendant MacKenzie was consulted more often than not in deciding whether to issue a credit note. Kostelecky, at 173. The credit notes were issued in conjunction with credit memos, which were prepared from Poseidon's Canadian office. Under IFRS, Poseidon was required to recognize the credit notes as expenses on its financial statements, but it did not. *See* ¶ 62, above.

117. In practice, Poseidon invoiced and recognized revenues by mechanically multiplying the number of tanks, the tanks' daily rates, and either the live rate or the minimum pay rate. Customers' complaints leading to credit notes made clear that Poseidon field personnel were frequently negotiating different deal terms. For example Kostelecky cites as an example a customer who agreed with field personnel that the customer would not have to pay for a tank for 30 days. Kostelecky, at 168. The facts that caused Poseidon to issue the credit notes thus provided evidence that its mechanical invoicing process improperly recognized revenues.

*iv. Poseidon had dangerously poor accounting resources.*

118. KPMG knew that, from the date of the Spin-off, Poseidon had three critical accounting deficiencies.

119. First, as set out above in ¶67, above, Poseidon used software similar to Excel as its accounting software. KPMG recognized that Poseidon's use of this accounting software created significant deficiencies, and urged that Poseidon upgrade its accounting software, which it did in mid 2012. Kostelecky, at 175-176.

120. Second, Poseidon did not provide its accounting staff with written policies, guidelines, or instructions on revenue recognition or invoicing, until mid-Q2 2012. Kostelecky, at 177.

121. And third, Poseidon's accounting staff was thinly stretched. As of November 1, 2011, Poseidon's accounting team had only five members. Until May 2012, there were no accountants who worked in Poseidon's U.S. operations. Kostelecky, at 169. Unusually, Poseidon's CFO, Defendant MacKenzie, had no qualifications as an accountant, either. And until Q3 2012, the accounting for Poseidon's entire U.S. operations was managed by a single, entry-level clerk located in Poseidon's Denver office, who was responsible for all revenue recognition decisions.

122. Throughout 2012, Poseidon increased its accounting staff. For example, Belcher reported to the Board on May 9 that Poseidon had hired additional accountants in both the U.S. and Canada after March 22. At the August 8 Board Meeting, it was reported that Poseidon had hired yet more internal accounting staff, including a collections employee in Denver. Kostelecky, at 78-79.

123. Yet even after these hires, Poseidon had very few accounting staff. For example, in an email sent on August 2, 2012, MacKenzie observed that Poseidon's accounting staff was

between a fifth and a third of its peers with the same revenues and sales volume – even after the hires. MacKenzie added that "it's fair to say that our $100+mm revenue company was ***woefully understaffed from an accounting / admin standpoint since the first day of spinout***." (Emphasis added).

124. Poseidon's Denver office in particular was a disaster. After spending several weeks there in September 2012, Robinson noted that "[N]obody can really tell me what their full job entails. They have some idea of what they do, but it's vague. People come and go at all hours, they do not show up for work on time most days, they take long lunches, and leave early. Again, I'm not blaming anyone, but I am saying since we don't have defined roles, or defined management or leadership in the Denver office, it runs amuck [sic]." But Robinson merely echoed what various defendants had previously concluded but done nothing about.[8]

125. In fact, Defendants knew Poseidon's internal controls were defective. For example, in a May 6, 2012 email discussing a potential new internal controls hire, Defendant MacKenzie commented to Poseidon's controller "just make sure dave [belcher] doesn't highlight how light we are on [internal] controls in the interview! ... we'll only really open up to candidates after they've signed on dotted line and are under the umbrella." The controller responded that she had done as MacKenzie asked, showing that his comment was not a joke.

---

[8] Defendant Wiebe, August 2: "I arrived in the Denver office this morning at 8:05, and it was empty excepting Suzie. [] I asked that everyone be available when we returned [] for a quick getogether, and when we arrived back at the office at 1115, Ally, Suzy, and the newest employee were at the office, and the other two had gone for a workout and are yet to return as I am writing this email [12:01] – I see this as slap in my face and an indication that they will do as they please. This is likely why we are having our collections and billing issues as seems not everyone gives as much as is required ..........."

*v. The evidence that Poseidon was improperly recognizing revenues was available to all Defendants at all times on Poseidon's shared server, the P-Drive.*

126. Poseidon's policy called for it to scan all master agreements and place them on its shared drive (the "P-Drive"). Kostelecky was charged with implementing this policy as to Poseidon's U.S. operations.

127. Defendants knew the primary documents were available on the P-Drive. For example, in an email dated April 19, 2012, Belcher alarmingly called attention to "a significant amount of [missing] revenue for the first three months of the year."[9] Kostelecky responded, copying Defendants Michaluk and MacKenzie, that "[t]he issue at hand is clearly not getting data in the system [] Every week the data needs to be analyzed and adjusted based on our contracts and signed commitments (***please look them up on the P drive if there's a question on one***)". (Emphasis added).

128. In fact, though, by August 2012, Poseidon was recognizing revenue from 54 purported take-or-pay contracts. Only 12 were executed by the customer; 42 were not. And there were only 12 signed master agreements on the P-Drive.

*vi. Poseidon's mounting accounts receivable shows Defendants Poseidon's revenues are improperly recognized.*

129. Throughout 2011 and 2012, Poseidon recognized revenues from sales that had never actually happened. Because Poseidon was frequently not paid, these "revenues" caused its accounts receivable to balloon, even though its field tickets purportedly imposed on its customers an obligation to pay within 45 days:

a. As of September 30, 2011, Poseidon recognized accounts receivable of $40.2 million;

[9] Not for the first time; Belcher remarked that this was "déjà vu all over again."

b. As of December 31, 2011, Poseidon recognized accounts receivable of $53.6 million

c. As of March 31, 2012, Poseidon recognized accounts receivable of $83.0 million;

d. As of June 30, 2012, Poseidon recognized accounts receivable of $118.6 million;

e. As of September 30, 2012, Poseidon recognized accounts receivable of $125.5 million, net of a write-off of $9.5 million.

130. By dollar amount, most of Poseidon's accounts receivable were issued pursuant to contracts calling for it to be paid 45 days after a field ticket was issued and revenue recognized. Yet Poseidon had much more than 45 days' worth of sales outstanding, providing evidence that there were deficiencies in Poseidon's revenue recognition, collectability, or both.

131. Defendants recognized that the mounting accounts receivable called into question its revenue recognition practices. At each of the March 22, May 9, and August 8 meetings, Belcher warned attendees – including all Defendants in this action, including KPMG – that the accounts receivable were ballooning:

a. March 22: Belcher warned meeting attendees of Poseidon's "lack of collections". According to Kostelecky, based on discussions at the meeting, Poseidon's board perceived that the lack of collections was a problem. According to Kostelecky, Days Sales Outstanding ("DSO"), which measures accounts receivable as a function of daily revenues, was "a huge part" of the March 22 meeting's discussions. Kostelecky, at 50.

b. In an April 12, 2012 email to (among others) Defendant Wiebe, copying

Defendant Michaluk, MacKenzie stated that "we will need to have a discussion later this week around cash management and tank builds for both next few months and 2H/12. ***I'm becoming increasingly worried about our collections***." (emphasis added).

c. May 9: Belcher warned meeting attendees of Poseidon's mounting accounts receivable. Belcher told attendees that Poseidon's processes were improving, but did not offer an explanation for Poseidon's mounting accounts receivable. DSO were "a huge part" of the May 9 meeting's discussions, too. Kostelecky, at 50. According to the meeting minutes, MacKenzie stated that improving accounts receivable collection was a "major focus" of Poseidon.

d. August 8, 2012: Belcher warned that meeting participants that accounts receivable had ballooned. According to Kostelecky, both Caldwell and Jensen expressed concerns about mounting accounts receivable. Caldwell, in particular, stated that Poseidon may have to set up a bad debt reserve if it did not decrease accounts receivable by the end of the next quarter. Kostelecky, at 76-77.

132. As set out in ¶¶107-108 above, in late August, 2012, Robinson called a series of Poseidon's customers who purportedly owed Poseidon money, and determined that it was unlikely Poseidon would ever be paid at all.

133. Following Robinson's calls, Poseidon established a group called Project Pluto, consisting of Defendants Winger, Jensen, Michaluk, Wiebe, and Kostelecky, Poseidon's general counsel, and a Poseidon collections employee who worked out of its Denver office. The group was established at the direction of Poseidon's Board. The purpose of Project Pluto was to determine what portion of Poseidon's receivables, if any, could be collected. KPMG was aware

of Project Pluto; among other things, Project Pluto was discussed at Poseidon's next Board meeting, which KPMG attended.

134. At that November 9 meeting, meeting attendees discussed the need for a write-down of accounts receivable. Belcher and MacKenzie discussed at least five accounts that should be written down, including Williams Energy, Chesapeake, Cimarex, and Great Western.

135. Belcher recounted that one of Poseidon's accounting staff had received a call from Occidental Petroleum, one of Poseidon's largest customers. Occidental Petroleum reported that it had received invoices for work for $1 million that Poseidon had actually performed for a different customer, but that Poseidon had performed $2.4 million of work for Occidental Petroleum more than a year before but had never invoiced it. Kostelecky, at 95.

136. At the November 9 meeting, it was agreed that Poseidon would take a $9.5 million write-down. Kostelecky stated that the write-down should be larger, because some of the accounts not discussed at the meeting were also uncollectable, in whole or in part. But as Kostelecky was providing his summary, a KPMG partner cut him short, telling him "let's go through with what we have in front of us." Kostelecky obeyed KPMG's instructions, and shut up. Kostelecky, at 83-84.

137. KPMG attended the November 9 meeting, but nonetheless never raised the possibility that Poseidon had improperly recognized revenues.

**D. KPMG**

*i. KPMG's Statements.*

138. KPMG also falsely stated that (a) in its opinion, Poseidon's financial statements were presented in accordance with IFRS; (b) it had conducted its audit in accordance with Canadian Generally Accepted Auditing Standards ("Canadian GAAS"):

> To the Shareholders of Poseidon Concepts Corp. We have audited the accompanying consolidated financial statements of Poseidon Concepts Corp.,

which comprise the consolidated statements of financial position as at December 31, 2011, December 31, 2010 and January 1, 2010, the consolidated statements of income (loss) and comprehensive income (loss), changes in shareholders' equity and cash flows for the years ended December 31, 2011 and December 31, 2010, and notes, comprising a summary of significant accounting policies and other explanatory information.

**Management's responsibility for the consolidated financial statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. ***We conducted our audits in accordance with Canadian generally accepted auditing standards.*** Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement. An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

***In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of Poseidon Concepts Corp. as at December 31, 2011, December 31, 2010 and January 1, 2010, and its consolidated financial performance and its consolidated cash flows for the years ended December 31, 2011 and December 31, 2010 in accordance with International Financial Reporting Standards.***

(signed) "KPMG LLP"
Chartered Accountants
Calgary, Canada
March 22, 2012
(Bold and italicized emphasis added).

139. KPMG's statements were false because as set out more fully below, (a) it did not

follow Canadian GAAS; and (b) no reasonable auditor would conclude that Poseidon's financial statements were fairly presented in accordance with IFRS

140. Finally, KPMG also omitted to disclose facts it had a legal obligation to disclose.

141. Canadian National Instrument 51-102 4.3 (3) provides

> (3) Disclosure of Auditor Review of Interim Financial Statements
> (a) If an auditor has not performed a review of the interim financial statements required to be filed under subsection (1), the interim financial statements must be accompanied by a notice indicating that the financial statements have not been reviewed by an auditor.
> (b) If a reporting issuer engaged an auditor to perform a review of the interim financial statements required to be filed under subsection (1) ***and the auditor was unable to complete the review, the interim financial statements must be accompanied by a notice indicating that the auditor was unable to complete a review of the interim financial statements and the reasons why the auditor was unable to complete the review.***
> (c) If an auditor has performed a review of the interim financial statements required to be filed under subsection (1) and the auditor has expressed a reservation in the auditor's interim review report, the interim financial statements must be accompanied by a written review report from the auditor.

142. Contrary to subsection (a), Poseidon's interim financial statements did not state that they had not been reviewed by an auditor, and each of the interim MD&A stated that the accompanying financial statements had been reviewed by Poseidon's auditor.

143. Accordingly, pursuant to subsection (c), KPMG had a legal obligation to express any reservations with respect to Poseidon's interim financial statements in a written review report accompanying the financial statements.

144. KPMG had actual knowledge that Poseidon's Q1-Q3 2012 financial statements were not presented in accordance with IFRS. It was thus obligated to (a) issue review reports expressing reservations as to Poseidon's financial statements, and (b) require that Poseidon publish them in conjunction with is Q1-Q3 2012 Interim Financial Statements.

*ii. KPMG's statements were false.*

1. Canadian GAAS

145. In its engagements with Poseidon, KPMG stated that it had complied with Canadian GAAS. Those professional standards provide specific requirements and procedures for auditors involved with a publicly-traded company, including requirements concerning audits of annual financial statements and reviews of interim financial statements. KPMG consistently represented, either expressly or impliedly, that it had complied with those standards, which was false.

146. At all material times, KPMG did not comply with Canadian GAAS.

2. Poseidon disclosed its fraud to KPMG.

147. This is not a typical auditor case. Poseidon never sought to hide its fraud from KPMG. On the contrary, it volunteered to KPMG details of the fraud. For example, as set out above in ¶¶ 75-97, above, in Board and Audit Committee meetings KPMG attended, senior Poseidon executives regularly volunteered that (a) Poseidon did not obtain signed field tickets, and (b) without signed field tickets, Poseidon would not be paid. Poseidon regularly volunteered further damaging information to KPMG, including that its ballooning accounts receivables were caused by the fact that it did not obtain signed field tickets. *See* ¶164, below. KPMG could have obtained whatever evidence Poseidon didn't volunteer simply by asking for it. KPMG ignored the evidence and did not ask follow-up questions. And then, when in November 2012, Kostelecky attempted to present KPMG with evidence that Poseidon's accounts receivable should be extensively written down, KPMG just told him to shut up.

3. KPMG's shockingly poor audit.

148. KPMG knew, or was reckless in not knowing, that Poseidon was a high risk client.

149. Poseidon's 2010 revenues were $5.6 million. Its 2011 revenues were $78.7 million. In 2010, Poseidon was a small unit of an oil & gas company. By the end of 2011, it was a standalone oil & gas services company. Open Range's historic market was Western Canada; Poseidon's market was the U.S.

150. As KPMG knew, Poseidon's internal accounting was dangerously poor. KPMG specifically remarked that Poseidon's use of software similar to Excel was dangerous, and urged it to upgrade. KPMG knew that Poseidon had no auditors in the U.S. that its accounting function was overburdened and unqualified – in the words of Poseidon's CFO, "woefully understaffed." Yet according to the minutes of an audit committee meeting taking place March 22, 2012, KPMG represented that Poseidon's internal controls were sufficient to give it comfort that its opinion was reliable.

151. Indeed, KPMG specifically identified revenue recognition as one of just two fraud risks in the Poseidon audit. In response, KPMG told the audit committee that it would document and test Poseidon's processes and controls over revenue accrual.

152. KPMG knew that Poseidon's officers' compensation structure was heavily tied to Poseidon's revenues. For example, Michaluk and Wiebe each had annual salaries of $200,000, a relatively small amount for officers of a public company, and Kostelecky's was $150,000. They drew most of their compensation from quarterly bonuses of up to $480,000 for Michaluk and Wiebe and up to $300,000 for Kostelecky that were directly tied to Poseidon's EBITDA for that quarter.

153. The Board minutes for the May 9 meeting reflect a comment from Caldwell that the audit had been "quite complex." Reflecting these extreme risks, as well as the amounts at stake – Poseidon's market capitalization, as of December 31, 2011, exceeded $925 million –

KPMG's audit of Poseidon should have been a careful, measured, time-consuming affair. It was anything but: the audit's total budget was $40,000.

154. According to an analysis conducted by Audit Analytics, an independent research provider, in 2012, the average audit fee for Canadian oil & gas industry companies was about $300,000.

*4. KPMG's recklessly small audit budget dooms the audit.*

155. KPMG's recklessly small budget imposed insuperable obstacles that prevented the audit from complying with Canadian GAAS:

a. ***Materiality***: As part of an audit plan, auditors will typically establish a materiality threshold. This threshold plays a large role in the audit, as it determines permissible misstatements and sample sizes. In its 2010 audit of Open Range, KPMG established a materiality threshold of $1.0 million; with Poseidon's 2011 audit, the threshold was $2.5 million.

b. ***Small sample sizes***: Canadian GAAS permits an auditor to use sampling instead of testing an entire population. KPMG employed exceptionally small samples.

c. ***Site visits***: Site visits are an almost universal audit component. Yet though Poseidon generated most of its revenues in the U.S., KPMG never visited its U.S. offices nor any of its U.S. personnel, according to testimony by both Kostelecky and Swendsen. Kostelecky, at 95-96; Swendsen, at 29.

d. ***Far too few audit team members***: KPMG's Audit Plan, provided to Poseidon's audit committee members, listed five KPMG professionals to contact, two of whom were tax experts. Even though Poseidon earned most of its revenues in the United States, all five worked out of KPMG's Calgary office.

e. ***Reliance on management's representation***: After it was sued in Canada, KPMG filed

a third party complaint against certain of Poseidon's officers and directors. KPMG confessed a shocking reliance on Poseidon's representations, alleging (among other things) that Poseidon's management's representations were the sole cause of KPMG's alleged misrepresentations over which the Canadian plaintiffs sued it. *Ramzy v. KPMG LLP*, Court of Queen's Bench of Alberta, No. 1401 07353, Third Party Claim of Defendant/Third Party Plaintiff KPMG LLP, at ¶29 (July 29, 2014).

f. ***Failure to follow up on concerns***: According to the minutes of the May 9 Audit Committee meeting, Caldwell noted that there was "an ongoing focus on potential credit risk associated with billings and collections", but Caldwell neither questioned why Poseidon had not taken a bad debt expense nor sought to determine whether Poseidon was following its own accounting policy. In comments to Poseidon's Q1 2012 financial statements attached to a May 1, 2012 email, KPMG noted that accounts receivable had ballooned by almost $30 million in Q1 2012, and asked Poseidon whether it could collect its accounts receivable. In comments to Poseidon's Q2 2012 financial statements attached to a July 30, 2012 email, KPMG circled the amount of Poseidon's outstanding accounts receivable, and wrote in "↑121% since [year end]/ 111% of revenue wow! How are you okay?" KPMG also commented "you may want to include a credit risk note [] (explain a little to the reader since such a big [delta, i.e., change]." But KPMG did not require that Poseidon recognize a bad debt expense.

156. Even Poseidon insiders, reckless as they were, realized that KPMG's audits were reckless. In a January 23, 2012 email, Ms. Sanborn said to Marcello D'Egidio (Manager, Tax and Treasury at Poseidon):

> Like our 2010 [Financial Statements] had a bunch of wrong stuff in them that weren't rolled forward properly that I think Dave accidentally forgot ... so she is wondering if we need to refile.
> That being said KPMG didn't catch either, hahaha

157. Similarly, Poseidon's audit committee exhibited alarming ignorance about accounting matters. For example, in an email dated November 26, 2012, Defendant Richardson emailed all board members asking whether Poseidon followed U.S. GAAP or IFRS. Defendant Jensen referred Defendant Richardson to KPMG.

5. Other specific GAAS failures.

a. KPMG was required to design audit procedures in response to Poseidon's admission that it needed a signed field ticket to be paid but frequently did not obtain one.

158. CAS 230 Paragraph 11 provides:

> If:
>
> (a) audit evidence obtained from one source is inconsistent with that obtained from another; or
> (b) the auditor has doubts over the reliability of information to be used as audit evidence,
> the auditor shall determine what modifications or additions to audit procedures are necessary to resolve the matter, and shall consider the effect of the matter, if any, on other aspects of the audit.

159. KPMG knew that Poseidon was recognizing revenues even when it did not have signed field tickets:

a. At each of the March 22, May 9, and August 8 meetings, Poseidon admitted that it did not always obtain a customer-signed field ticket.

b. In an email to Mr. Belcher dated March 8, 2012, KPMG senior accountant Natalia Krizbai acknowledged that "not signed field tickets" was an audit issue.

c. In connection with the audit of Poseidon's 2012 annual financial statements, KPMG examined the transaction documents for a sample of entries in Poseidon's accounts receivable. On or before March 9, 2012, KPMG created a spreadsheet listing the results of its inspection. The spreadsheet includes two columns - "Field Ticket signed (Y/N)" and "MSA [master agreement] signed (Y/N)." The spreadsheet reports that in numerous cases, field tickets were not signed. The master agreement column was not filled in.

d. In connection with its review of Poseidon's Q2 2012 financial statements, on July 27, 2012, KPMG auditor Meghan Misquita drafted an explanatory paragraph explaining that Poseidon's unsigned field tickets and other issues had led to uncollected accounts receivable, which provided:

> Poseidon has no collection issues that they are aware, ***but currently the company does have an issue with timely field ticketing execution / billing***. There is currently bottlenecks relating to the field ticketing process primarily which in turn pushes out A/R [accounts receivable] collection cycle. Doug was hired recently to help handle the revenue and accounts receivable process. Per discussion with Doug, a big problem stems from making sure that everything is order with the billing process. In many cases, there are accounts that are far overdue because of problems with invoicing (ie: [sic] ***customer name is incorrect, the AFE wasn't included on the invoice, the invoice was sent to the wrong department***). Doug has been working with the field technicians and plans to implement formal training for them in order to ensure they are collecting the appropriate information from the customer and having field tickets signed so that the invoicing process can happen immediately once field work has been completed. Per Doug, Poseidon has set a goal to collect $50M of their receivables by the end of Q3 and he believes this is feasible for them to do.
> (emphasis added)

160. KPMG knew or was reckless in not knowing that Poseidon could not recognize revenues without signed field tickets:

a. Ms. Krizbai's March 8 email to Mr. Belcher stated that she was reviewing

Poseidon's Master Agreements. According to Mr. Kostelecky, Poseidon's Master Agreements typically provided that Poseidon's customer would not pay without a signed field ticket. See ¶65.a, above.

b. At each of the March 22, May 9, and August 8 meetings, which KPMG attended, Mr. Belcher warned that Poseidon needed customer-signed field tickets to be paid, and that the fact that Poseidon did not obtain signed field tickets was causing its accounts receivable to balloon.

161. These admissions gave KPMG persuasive audit evidence that Poseidon was improperly recognizing revenues. Accordingly, upon hearing Poseidon's confession, KPMG was required to plan and perform audit procedures to determine whether Poseidon's revenues recognized without signed field tickets could be recognized. It did not; in fact, KPMG's opinions were issued the same day as each of the March 22, May 9, and August 8 meetings, and KPMG never even bothered to count up the revenue for which there was no signed field ticket. Accordingly, KPMG violated CAS 230, Paragraph 11.

b. KPMG was required to reconsider its opinion when it learned from Poseidon's operations controller that its "systematic" deficiency in "not getting signed field tickets" was causing customers not to pay it.

162. CAS 560, Paragraph 14, provides:

[I]f, after the financial statements have been issued, a fact becomes known to the auditor that, had it been known to the auditor at the date of the auditor's report, may have caused the auditor to amend the auditor's report, the auditor shall:
[]
(b) Determine whether the financial statements need amendment.

163. CAS 560, Paragraph 17, expands:

If management does not take the necessary steps to ensure that anyone in receipt of the previously issued financial statements is informed of the situation and does not amend the financial statements in circumstances where the auditor believes they need to be amended, the auditor shall notify and management and [] those

> charged with governance [] that the auditor will seek to prevent future reliance on the auditor's report. If, despite such notification, management or those charged with governance do not take these necessary steps, the auditor shall take appropriate action to seek to prevent reliance on the auditor's report.

164. Asked to explain ballooning accounts receivable, in an August 2, 2012 email, Poseidon's Doug Robinson told KPMG auditor Meghan Misquita that "[a]ny collection delays whether they be from big players or small players have been systematic of the same issues, not getting field tickets signed in a timely manner and not submitting contract bills in a appropriatly [sic]." Robinson's email provided KPMG with further persuasive evidence that Poseidon's should not have recognized revenues without a signed field ticket, because customers were refusing to pay without one. Robinson's email further provided KPMG with persuasive evidence that such failures were frequent enough to account for Poseidon's ballooning accounts receivable. Similarly, the November 5 discussion referred to in ¶111, above, established that Poseidon's deficiencies had led to material revenue overstatement in 2011.

165. Accordingly, KPMG was required to demand that Poseidon warn investors not to rely on KPMG's audit report or warn investors itself. KPMG did not do so, and violated CAS 560, Paragraphs 14, 17.

6. KPMG's claim that Poseidon's financial statements were presented in accordance with IFRS did not fairly align with the information in its possession at the time.

166. As set out in ¶ 138, above, KPMG stated that in its opinion, Poseidon's 2011 Annual Financial Statements were presented in accordance with IFRS.

167. In addition, as set out in ¶¶139-144 above, the law imposed on KPMG an obligation to disclose its review report of Poseidon's Interim Financial Statements if it disagreed with Poseidon's Interim Financial Statements.

168. No reasonable auditor would believe that Poseidon's financial statements were

presented in accordance with IFRS, for the following reasons, among others:

a. **KPMG let Poseidon recognize revenues even in cases where even Poseidon believed it could not be paid**: KPMG was present for meetings at which Poseidon admitted that without a signed field ticket it would not be paid, and that it frequently did not obtain a signed field ticket. Coupled, these admissions establish that a material portion of Poseidon's revenues should not have been recorded. But KPMG neither insisted Poseidon write off the revenues it had identified, nor independently attempted to determine what portion of Poseidon's revenues derived from invoices where there was no signed field ticket.

b. **No expense for uncollectable accounts receivable**: Paragraph 22 of IAS 18, which governs uncollectability of financial assets, requires that "when an uncertainty arises about the collectability of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognized as an expense, rather than as an adjustment of the amount of revenue originally recognized." Its financial statements were required to account for the amount of the credits as expenses.

c. **No bad debt allowance**: Paragraph 58 of IAS 39 governs impairment and uncollectibility of financial assets. It requires that "an entity shall assess at the end of each reporting period whether there is any objective evidence that a financial asset or group of financial assets is impaired." If any such evidence exists, the entity must determine the amount of any impairment loss. Paragraph 63 of IAS 39 requires the carrying amount of the asset to be reduced either directly or through the use of an allowance account. That Poseidon was compelled to issue credit notes cast doubt on

the collectability of Poseidon's other accounts receivable. Yet throughout its existence, Poseidon's financial statements never included a single dollar of impaired accounts receivable. Further, the substance of the credit notes made it clear that Poseidon could not simply recognize revenues by mechanically multiplying daily rates times number of days committed. Yet a KPMG memo dated May 3, 2012, observed that Poseidon's "[a]ccrued revenue at March 31, 2012 was determined based on signed tank rental agreements between Poseidon and the lessee. ***Great Plains calculates Poseidon's accrued revenue based on the day rate per tank leased multiplied by the number of days not invoiced for at March 31, 2012. The accruals are calculated by customer and summarized in a system generated consolidated revenue report***."

*iii. KPMG's conscious misbehavior*

169. KPMG conspired with management to present a materially inaccurate view of Poseidon's finances.

170. As set out above, on August 2, 2012, KPMG received an email from Mr. Belcher, stating that Poseidon had "systematic" deficiencies in getting field tickets signed, which resulted in ballooning accounts receivable.

171. In an August 3, 2012 presentation to Poseidon's Audit Committee, under header "Accounts Receivable", KPMG reported that "conversations [management] have held with customers have not indicted [sic] significant disputes over amounts [owed]."

172. On November 5, 2012, as set out above in ¶111, Poseidon informed KPMG that almost $4.3 million in revenues from 2011 had not been collected and that Poseidon's poor internal controls – including that it "forgot to bill" customers – left doubts about whether Poseidon would ever be able to collect.

173. On November 8, 2012, Dawson emailed Winger to report on a conversation Poseidon had had with Greg Caldwell of KPMG. According to Dawson, based on these conversations, "suffice it to say there is more than a little concern about the potential for future collection issues."

174. Yet on November 13, 2012, KPMG issued a report to Poseidon's audit committee claiming that management had told it:

a. "During the third quarter of 2012 the new operations controller reconciled many of the customer accounts for 2011 and year-to-date 2012 to ensure all amounts outstanding were accurate, owed from customers and complete. The process did identify approximately $2.5 million in additional revenue relating to 2011 that had been recognized in the third quarter."

b. "they [management] are meeting on a regular basis to discuss outstanding amounts and are meeting with customers."

175. KPMG further represented that "[w]e have reviewed management's assessment and find it to be supportable." KPMG's assessment was a brazen lie. The operations controller had met with customers, and had been told that Poseidon's revenue records were not accurate. *See* ¶108, above. Poseidon received letters from customers and their attorneys, claiming that Poseidon's revenue records were not accurate. *See* ¶¶ 96, 111. Poseidon contemporaneously estimated that $73.9 million of its accounts receivable were disputed. *See* ¶113.

176. At the November 13 Audit Committee Meeting, see ¶ 114 above, Caldwell told the Audit Committee KPMG was "comfortable" with the mere $9.5 million bad debt expense, claiming that a bad debt provision of less than 10% is "reasonable and consistent with [Poseidon's] peer group." Even as KPMG made these claims, multiple senior Poseidon

executives were telling it that much of Poseidon's revenues were not collectible.

## V. THE TRUTH CONCEALED BY DEFENDANTS' MISCONDUCT IS REVEALED, CAUSING INVESTORS' LOSSES

177. On November 14, 2012, Poseidon Concepts shocked the market by releasing the results from its Q3 2012 operations, announcing, among other things, that:

(a) it was taking a charge of $9.5 million for uncollectible debt, reducing its accounts receivable position and taking a charge to its net income and reported assets;

(b) there had been a significant increase in the size of its accounts receivable portfolio to $125.5 million (net of the $9.5 million write-off), including $36 million past due (outstanding for more than 120 days);

(c) its internal controls over financial reporting were "not completely effective";

(d) it was introducing a new credit policy to mitigate the problems with doubtful receivables: "The Corporation has established a credit policy under which each customer is analyzed for creditworthiness before the Corporation begins to provide services to the customer and prior to offering standard payment terms and conditions. Credit limits are established for each customer, which represents the maximum exposure. The Corporation's credit limit review includes customer cash flow analysis, external debt ratings, and credit references when appropriate. Customers that fail to meet the Corporation's benchmark creditworthiness may transact with the Corporation only after providing a cash deposit to offset a portion of the credit amount; these customers will be subject to an added level of monitoring by the Corporation until sufficient payment history is established"; and

(e) only 38% of its accounts receivable portfolio was due from investment grade parties.

178. In response to the Company's disclosure on November 14, 2012, the Company's stock fell USD 8.15 per share, or approximately 62%, from its previous closing price, to close at USD 4.95 per share on November 15, 2012.

179. On November 19, 2012, Poseidon issued a press release announcing a change in management with the appointment of Dawson as the Executive Chairman of the Company, whose role is to act as a liaison between the Board of Directors and management.

180. On November 28, 2012, the Canadian law firm Siskinds LLP announced it had

filed a class-action lawsuit in the Ontario Superior Court of Justice against Poseidon and certain of its officers and directors, alleging Poseidon made materially false and misleading statements regarding its financial conditions, especially the overstatement of revenue and overstatement of accounts receivables during Q4 2011 through Q3 2012, and false and misleading disclosures concerning its compliance with IFRS and its own accounting policies.

181. On the same day, analysts at BMO Capital Markets Corp. and Haywood Securities Inc. downgraded their outlook of Poseidon's shares trading on the Toronto Stock Exchange.

182. As a result, Poseidon's stock price fell USD 1.28 per share, or approximately 24%, from its previous closing price, to close at USD 4.07 per share on November 28, 2012.

183. On December 27, 2012, Poseidon issued a press release announcing the formation of a Special Committee to evaluate and resolve various issues stemming from the Company's write-off of some of its accounts receivable and evolving business strategy, and stating in relevant part:

> the Company may need to make additional write downs of accounts receivable in future periods and such write downs may be significant.

184. On the same press release, the Company disclosed additional changes to its management and stated in relevant part:

> [E]ffective immediately Mr. A. Scott Dawson will assume the role of Interim President and Chief Executive Officer, Mr. Michaluk will assume the role of Interim Chief Financial Officer and Mr. Wiebe will assume the role of Chief Technology Officer. Messrs. James McKee, Lyle Michaluk and Cliff Wiebe have resigned from the Board of Directors.

185. In light of the Company's disclosures on December 27, 2012, Poseidon's stock price fell USD 1.87 per share, or approximately 56%, from its previous closing price, to close at USD 1.49.

186. The following day, analysts at First Energy Capital Corp. and Haywood Securities Inc. downgraded their outlook of Poseidon.

187. In response, Poseidon's stock price fell another USD 0.20 per share, or approximately 13%, from its previous closing price, to close at USD 1.29 per share on December 28, 2012.

188. On February 14, 2013, Poseidon issued a press release announcing the findings of the Special Committee which stated in relevant part:

> Based on the recommendation of the Special Committee and the interim report of its advisors, the Board of Directors has determined, on a preliminary basis, that primarily related to long term take-or-pay arrangements:
>
> - approximately $95 million to $106 million (subject to detailed quantification by the Company) of the Company's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the Company's financial statements; and
>
> - as a result of recording the foregoing revenues, approximately $94 million to $102 million (subject to detailed quantification by the Company) of the Company's $125.5 million accounts receivable as at September 30, 2012 should not have been recorded in the Company's financial statements as accounts receivable.
>
> As a result of the foregoing, the first, second and third quarter 2012 financial statements (the "Financial Statements") will be restated and the Company advises investors that they should no longer rely on the Financial Statements as well as the corresponding Management's Discussion & Analysis. Further, the Company advises that all previous guidance with respect to the Company's business should no longer be relied upon.

189. The February 14, 2013 press release also stated that Poseidon's financial statements for the first three quarters of 2012 did not comply with IFRS or with Poseidon's own accounting policies. That press release additionally stated that the need for the restatement was " "primarily related to [the Company's] long term take-or-pay arrangements."

190. In reaction to the Company's disclosure on February 14, 2013, the Company's stock price fell USD 0.61 per share, or approximately 69%, from its previous closing price, to

close at USD 0.28 per share.

191. On April 9, 2013, Poseidon issued a press release providing in relevant part:

> As previously announced in its February 14, 2013 press release, the Special Committee (along with its advisors) has continued its review and assessment of, among other things, the Company's public disclosure of its financial results. This included the review and assessment of the Company's financial statements for the year-ended December 31, 2011 (the "2011 Annual Financials"). Based upon the investigation by the Special Committee, questions have arisen with respect to the recorded revenues in the 2011 Annual Financials. At this time, it is uncertain whether or not a restatement of the 2011 Annual Financials is required.

## VI. RESPONDEAT SUPERIOR

192. KPMG is liable for the acts of Greg Campbell, Lisa Wesley, and other KPMG employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

193. The *scienter* of Greg Campbell, Lisa Wesley, and other KPMG employees is similarly imputed to KPMG under *respondeat superior* and agency principles.

194. Poseidon is liable for the acts of the Poseidon Defendants and other Poseidon employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

195. The scienter of the Poseidon Defendants and other Poseidon employees and agents is similarly imputed to Poseidon under *respondeat superior* and agency principles.

## VII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

196. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of Poseidon during the Class Period and who were damaged thereby. Excluded

from the Class are Defendants, the present and former officers and directors of Poseidon and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

197. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Poseidon's stock was actively traded on the OTC Pink Sheets.

198. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Members of the Class may be identified from records maintained by Poseidon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

199. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

201. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class

Period misrepresented material facts about the business, and financial performance of Poseidon; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

202. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

203. At all relevant times, the market for Poseidon common stock was an efficient market for the following reasons, among others:

a. Poseidon's stock listed on the Toronto stock exchange traded on an efficient market and the common stock in this action tracked the movements of the Toronto stock;

b. During the Class Period, on average 6,073,232 shares of Poseidon were traded on a weekly basis among the Toronto Stock Exchange and the OTC Pink marketplace. During the Class Period, approximately 81 million shares were outstanding.[10] Approximately 7.5% of all outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

c. Poseidon regularly communicated with public investors via established market

[10] In its Q3 2012 MD&A filed on SEDAR on November 14, 2012, the Company stated for the three months ended September 30, 2012, the Company had a weighted average basis of approximately 81,097,000 basic common shares outstanding.

communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Poseidon was followed by several securities analysts employed by major brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

e. Numerous FINRA member firms were active market-makers in Poseidon at all times during the Class Periods; and

f. Unexpected material news about Poseidon was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

## IX. FIRST CAUSE OF ACTION
## Violation of Section 10(b) of the Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against the Poseidon Defendants and KPMG

204. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

205. This cause of action is asserted against all Defendants.

206. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Poseidon's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

207. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business,

operations and future prospects of Poseidon as specified herein.

208. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Poseidon's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Poseidon and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Poseidon securities during the Class Period.

209. KPMG knowingly or recklessly issued false and misleading audit and review reports certifying Poseidon's financial statements during the Class Period.

210. Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially

false and misleading.

211. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Poseidon's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

212. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Poseidon's securities was artificially inflated during the Class Period.

213. In ignorance of the fact that market prices of Poseidon's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Poseidon's securities during the Class Period at artificially high prices and were damaged thereby.

214. At the time of said misrepresentations and omissions, Plaintiff and other members

of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Poseidon's financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Poseidon securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

215. By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

216. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

217. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## X. SECOND CAUSE OF ACTION
## Violation of Section 20(a) of the Exchange Act
## Against the Poseidon Defendants

218. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

219. This second cause of action is asserted against each of the Poseidon Defendants.

220. The Poseidon Defendants acted as controlling persons of Poseidon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Poseidon Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements that Plaintiff contends are false and misleading. The Poseidon Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

221. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

222. As set forth above, Poseidon violated Section 10(b) and Rule 10b-5 by their acts and Poseidon as alleged in this Complaint.

223. By virtue of their positions as controlling persons, the Poseidon Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

224. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 8, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Horne

Laurence M. Rosen
lrosen@rosenlegal.com
Phillip Kim
pkim@rosenlegal.com
Jonathan Horne
jhorne@rosenlegal.com
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY, 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

**CERTIFICATE OF SERVICE**

I, Jonathan Horne, hereby certify that on July 8, 2015, I filed a copy of the foregoing document with the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Jonathan Horne