UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE POSEIDON CONCEPTS
SECURITIES LITIGATION

Case No: 13-CV-1213 (DLC)

ECF CASE

CLASS ACTION

**JURY TRIAL DEMANDED**

**THIRD AMENDED COMPLAINT FOR**

**VIOLATION OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiff Gerald Kolar ("Plaintiff"), by his undersigned attorneys, for his Third Amended Complaint for Violation of Federal Securities Laws (the "Complaint") against Defendants Lyle D. Michaluk, Matt C. MacKenzie, A. Scott Dawson, Clifford L. Wiebe, Harvey L. Winger, Dean R. Jensen, and Neil Richardson (the "Poseidon Defendants"), as well as Defendant KPMG LLP (with the Poseidon Defendants, the "Defendants") alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters:

## I.       NATURE OF THE ACTION

1.       This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased the publicly traded common stock of Poseidon Concepts Corp. ("Poseidon", or the "Company") from March 22, 2012 to February 14, 2013, inclusive (the "Class Period") in domestic U.S. transactions or in transactions on a domestic U.S. exchange, seeking to recover damages caused by Defendants' violations of the federal securities laws.

### A.  Poseidon Defendants

2.       Poseidon was a Canadian company whose shares were traded over-the-counter in the U.S. It told investors a story of astonishing growth. It began as a side project of a small Canadian oil & gas company, Open Range, Inc.

3.       Open Range had developed proprietary tanks to store the vast quantities of fluid used in hydraulic fracturing. In mid-2010, Open Range began to lease the tanks to its competitors. Open Range claimed to have earned about 10% of its 2010 revenues from the tank rentals, with much better reported margins than its oil & gas segment. By Q2 2011, it was purportedly earning about 40% of its revenues from the tanks. A November 2011 spin-off left the tank business as a stand-alone company. That company – Poseidon – is the securities issuer

whose shares Class Members bought, to their loss.

4.      After the spin-off, Poseidon continued to report astonishing growth. Poseidon reported full year 2011 revenues of $78.81 million[1] and revenues for the first nine months of 2012 of $148.1 million. And Poseidon reported similarly superb margins; Poseidon recognized $68.7 million of the $148.1 million revenue (46.4%) as net income.

5.      But Poseidon's success was founded on little more than fraud. Poseidon provided services to its purported customers pursuant to master agreements. About a quarter of Poseidon's 2011 revenues, and two thirds of its revenues for the first nine months of 2012, were generated from the pay portion of so-called take-or-pay master agreements. Poseidon's customers purportedly agreed to pay it a daily rate simply for the right to be provided with a tank upon request (both the rate and the amount of revenues from them are the "minimum pay rate"), and a higher daily rate if they were provided with a live tank (the "live rate"). Thus, Poseidon's customers purportedly agreed to pay to have access to the tanks, but then rarely used the tanks.

6.      Accounting rules required Poseidon to recognize revenue only if, among other things, there was persuasive evidence of an arrangement, and the rate is fixed and determinable. In generally accepted oil and gas services industry accounting practices, revenues are not recognized unless the provider obtains a field ticket signed by the customer setting out the services provided and the amounts owed; the field ticket evidences both the arrangement and the rate. Indeed, most of Poseidon's master agreements provided that without a signed field ticket, it would not be paid.

7.      But virtually all of Poseidon's purported 2011 revenues from minimum pay rates

---

[1] Unless otherwise noted, all dollar amounts are in Canadian dollars. Between December 31, 2011, and the end of the Class Period, the exchange rate between Canadian and U.S. dollars only varied between $0.967:1 USD and $1.026:USD.

derived from purported transactions in which purported customers had signed neither the master agreement nor the field ticket. And in Q1-Q3 2012, Poseidon recognized $69-80 million in revenue from transactions with neither a signed field ticket nor a signed master agreement.

8.      Poseidon violated accounting rules by recognizing revenues whenever it was missing either a signed field ticket or a signed master agreement.

9.      Without signed agreements, Poseidon's attempts to collect the minimum pay rates it claimed it was owed were chaotic. Poseidon billed "customers" for services they had never agreed to buy. Poseidon billed "customers" in violation of express terms of master agreements or agreements Poseidon's sales field staff agreed to give the customer in negotiating the sale. Poseidon billed "customers" for services the customer's representative had no real or apparent authority to secure. Poseidon billed some of its "customers" for services it had actually provided to other customers. Poseidon billed "customers" who had never met with or indeed heard of Poseidon.

10.     Therefore, when Poseidon's "customers" got Poseidon's invoices, they usually refused to pay. And Poseidon's accounts receivable ballooned, reaching $118.6 million by June 30, 2012.

11.     Poseidon held regular board meetings to approve its financial statements. Every defendant, including KPMG, attended every such meeting. A perennial concern at these financial statement approval meetings was Poseidon's accounts receivable. At every meeting, Poseidon Vice President of Finance David Belcher told attendees that (a) Poseidon needed a signed field ticket to be paid; and (b) Poseidon frequently did not get a signed field ticket. Thus, the information Mr. Belcher provided was enough to establish that Poseidon's financial statements contained material errors. But the Poseidon Defendants authorized their publication anyway.

12.     In August 2012, Poseidon made an extraordinary new hire – an operations controller whose first task was to get to the bottom of its accounts receivables issue. In an August 30 email, after simply calling Poseidon's customers, the operations controller reported to Poseidon's CFO that Poseidon would not be paid *any* of the minimum pay rates it had already recognized as revenues. The operations controller's conclusion was astonishing, since at the time, more than $60 million of Poseidon's reported accounts receivable consisted of these uncollectible minimum pay rates. In short, Poseidon would have to write off more than half of its accounts receivable, accounting for more than half of its 2012 revenues at that time.

13.     Instead of immediately restating Poseidon's previous financial statements, Defendants continued to misrepresent that Poseidon would eventually be paid on its take-or-pay contracts, and they continued to recognize revenues thereon. In its Q3 2012 financial statements, Poseidon only booked a $9.5 million accounts receivable impairment.

14.     Four months later, Poseidon retained accounting firm Ernst & Young to investigate. After a month-long investigation, Ernst & Young agreed with the operations controller: none of Poseidon's revenues from the pay portion of take-or-pay contracts should have been recognized. Ernst & Young thus recommended that Poseidon restate two thirds of its 2012 revenues, or about $100 million.

### B.  KPMG

15.     When an auditor is sued for securities fraud, it is often for failing to detect fraud a client is attempting to conceal from the auditor. Here, though, Poseidon's employees did not try to conceal its fraud from KPMG; they volunteered to KPMG the fraud's details. Not only did employees state, at KPMG-attended meetings, that Poseidon was recognizing revenues even though it had no enforceable contract and right to be paid (because there were no signed field tickets), they separately explained to KPMG that Poseidon's ballooning accounts receivable and

collection delays were caused by "systematic" issues like "not getting signed field tickets."

16.     And Poseidon's not getting signed field tickets was only one of the many red flags KPMG saw and consciously disregarded.

17.     Accounting rules and Poseidon's own publicly-disclosed accounting policy required Poseidon to continuously evaluate its accounts receivable for collectability. KPMG, as Poseidon's auditor, was required to audit Poseidon's impairment provisions in Poseidon's financial statements.

18.     But Poseidon had *never even evaluated* its accounts receivable for impairment until Q3 2012. Thus, there were no impairment evaluations for KPMG to review. Thus, had KPMG taken the first step of any audit of impairment evaluations – asking to see Poseidon's impairment evaluations – KPMG would have determined that Poseidon was violating accounting rules and its own policy.

19.     Further, KPMG showed willful blindness to Poseidon's violation of accounting rules. Joseph Kostelecky, the head of Poseidon's U.S. operations attended the Poseidon Q3 2012 audit committee meeting where it decided to recognize an impairment. Kostelecky later testified that at the Q3 2012 board meeting, he had begun to tell KPMG and Poseidon's board that Poseidon should recognize a much greater impairment because Poseidon's accounts with other customers were uncollectable. But even as Kostelecky was attempting to discuss Poseidon's massive accounts receivable problem with Poseidon's board, a KPMG partner interrupted to say that other impairments were not germane, and that the U.S. head should stop talking about them.

20.     Poseidon was obviously a high risk engagement. It had grown from almost nothing to about $100 million in revenues in a year, was in a different business than Open Range, and conducted most of its operations in a different country. Beyond that, as KPMG knew,

Poseidon's accounting systems and personnel were grossly deficient. Poseidon generated field tickets by manually entering purported deal terms into an Excel-like spreadsheet software, instead of proper accounting software. Using this deficient software predictably generated typos and other errors, as KPMG recognized when it urged Poseidon to upgrade to proper software. Revenue recognition decisions for Poseidon's entire U.S. operations were made by a single entry-level clerk located in Poseidon's U.S. office. According to Poseidon's CFO, its accounting was "woefully understaffed" from day one.

21.    KPMG's audit should have reflected these very high risks. It did not.  KPMG failed to perform a number of required audit procedures that would have detected the fraud. The reason KPMG did not perform the required procedures is because KPMG recklessly budgeted and billed only $40,000 for the audit. For comparison, a study estimated that in 2012, average Canadian audit fees for oil & gas companies were about $300,000.

22.    KPMG's recklessly small budget caused it to overlook several aspects of Poseidon's fraud. The majority of Poseidon's revenues were generated in the United States, through its U.S. office in Denver. Poseidon's U.S. operations were also the source of all its accounting woes. Employees showed up late, had long lunches and gym visits during the day, and then left early. Employees could not explain what their jobs were. Poseidon's U.S. accounting operations were so obviously defective that multiple Poseidon executives diagnosed Poseidon's woes simply by visiting. A site visit is an all-but-universal component of an audit under either Canadian or American audit standards. Yet KPMG never visited Poseidon's shockingly poor U.S. operations. And KPMG improperly relied on management's representations, as it admitted when it filed a third party complaint against Poseidon's management alleging that their representations were the only reason it had issued its audit

5

report.

### C.  Loss causation

23.     On November 14, 2012, Poseidon announced that it had taken a $9.5 million charge for uncollectible debt, the first in its history, that it had enacted a new credit policy, and that only 38% of its accounts receivable were due from parties with investment grade credit ratings. The next trading day, Poseidon's stock price fell by USD 8.15 per share to close at USD 4.95 per share.

24.     On November 28, 2012, during trading hours, analysts at BMO Capital Markets Corp and Haywood Securities Inc. downgraded their outlook on Poseidon's shares. That day, Poseidon's stock price fell by USD 1.28 to close at USD 4.07 per share.

25.     On December 27, 2012, Poseidon announced that it had formed a Special Committee to evaluate issues stemming from its November 14, 2012 write-off. Poseidon admitted that "the Company may need to make additional write downs of accounts receivable in future periods and such write downs may be significant." That day, Poseidon's stock price fell about USD 1.87 per share, to close at USD 1.49.

26.     On February 14, 2013, Poseidon announced its preliminary conclusions (among other things) that "approximately $95 million to $106 million [] of the Company's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the Company's financial statements." That day, Poseidon's stock price fell USD 0.61 per share to close at USD 0.28.

27.     Because of Defendants' reckless false statements, Poseidon investors have lost their entire investment.

### II.      JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

30.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

31.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.     PARTIES AND IMPORTANT NON-PARTIES
#### A.  Parties

32.     Court-appointed Lead Plaintiff Gerald Kolar purchased Poseidon stock at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification has previously been filed with the Court and is incorporated herein by reference. Mr. Kolar bought all of his Poseidon stock on a domestic exchange and/or in domestic transactions.

33.     Former Defendant **Poseidon Concepts Corp.** was a Canadian Corporation whose head administrative offices were in Calgary, Alberta, Canada. Poseidon is not named as a Defendant because of its bankruptcy.

34.     Poseidon engages in the development and commercialization of fluid storage and solutions to the oil and gas industry across North America, especially in the United States. Its U.S. operations were run out of its Denver office by Kostelecky.

35.     Poseidon was at all relevant times a reporting issuer in Canada. Poseidon was

required to issue and file with SEDAR[2] quarterly financial statements and audited annual financial statements prepared in accordance with International Financial Reporting Standards ("IFRS"). Poseidon was required contemporaneously to file with SEDAR Management's Discussion and Analysis of the respective financial statements ("MD&A").

36.    Defendant **Lyle D. Michaluk** is a founding member of the Company. Since November 1, 2011, Michaluk served as the Company's CEO and Director. Michaluk was replaced by Dawson as the Company's Chief Executive Officer and appointed interim CFO on December 27, 2012. Prior to November 1, 2011, Michaluk was Open Range's CFO and Vice-President.

37.    Defendant **Matt C. MacKenzie** served as the Company's Chief Financial Officer from November 1, 2011 until he was replaced by Michaluk on December 27, 2012.

38.    Defendant **A. Scott Dawson** is a founding member of the Company. He served as Poseidon's Chairman of the Board of Directors since November 1, 2011. He was also a member of its Audit Committee.   Dawson was appointed Executive Chairman of the Company on November 19, 2012. He was appointed Interim President and CEO on December 27, 2012. Prior to November 1, 2011, Dawson was Open Range's CEO and President, and one of its Director.

39.    Defendant **Clifford L. Wiebe** is a founding member of the Company. Wieber November 1, 2011, Wiebe served as the Company's President, Chief Operating Officer and Director from November 1, 2011, to December 27, 2012. Wiebe then became Poseidon's Chief Technology Officer.

40.    Defendant **Harley L. Winger** is a founding member of the Company and at all

---

[2] SEDAR, the System for Electronic Document Analysis and Retrieval, is a database of Canadian securities filings similar to EDGAR.

relevant times served as a Company Director. Prior to November 1, 2011, Winger was Open Range's Director.

41.    Defendant **Dean R. Jensen** is a founding member of the Company and at all relevant times served as a Company Director and Chairman of its Audit Committee.

42.    Defendant **Neil Richardson** served as a Company Director at all relevant times.

43.    Dawson, Michaluk, Wiebe, Winger, Jensen, MacKenzie, and Richardson are collectively referred to herein as the "**Poseidon Defendants**."

44.    Defendant **KPMG LLP**, Chartered Accountants ("**KPMG**"), a Canadian partnership, was Poseidon's independent auditor. KPMG is a member of KPMG International Cooperative, a Swiss Verein. KPMG and other national KPMG partnerships combine to form a global professional accounting services company that employs more than 160,000, with 2014 revenues of more than USD 26 billion. KPMG is one of the so-called Big Four accounting firms.

### B.  Non-parties

45.    **Joseph A. Kostelecky** was hired as Open Range Business Development/Operations Manager (U.S.) in December 2010, and became Poseidon's VP-U.S. Operations in November 2011. Kostelecky stayed in this position until December 2012. Kostelecky headed up the U.S. tank operations of Open Range and, after the Spin-Off, of Poseidon.

46.    **Greg Caldwell** was KPMG's lead audit partner on the Poseidon account. Caldwell earned his Bachelor of Commerce (B. Comm.), Accounting, in 1997, and joined KPMG that year. He has no graduate degree.[3] Caldwell works out of KPMG's Calgary office.

47.    **David Belcher** was a Poseidon Vice-President of Finance. He made presentations

_____

[3] *See* https://www.linkedin.com/in/gregcaldwellkpmg (last visited May 15, 2015).

at each of Poseidon's board meetings to approve its financial statements.

48.     **Sonja Sanborn** was Poseidon's Controller.

49.     **Doug Robinson** was hired as Poseidon's operations controller in or around July 2012, to sort out Poseidon's chaotic financial condition. Robinson's first task was to investigate Poseidon's alarming accounts receivable balance.

50.     **Brian Swendsen** was a Poseidon sales agent. Swendsen was the son of John Swendsen, a senior executive of the National Bank of Canada, Poseidon's lenders and bankers. John Swendsen personally spoke to Defendant Michaluk to obtain a job for Brian Swendsen.

## IV.     DEFENDANTS' MISCONDUCT
### A.  Background

51.     Poseidon began as a side project of Open Range.

52.     Open Range is a junior Canadian oil and gas exploration and exploitation company.

53.     Open Range employed hydraulic fracturing, better known as fracking, to exploit oil and gas wells. Open Range's operations were limited to western Canada.

54.     Fracking is an oil drilling technique that uses pressurized liquid made of water, sand, and various chemicals to create cracks in rock formations holding oil, which allows the oil to flow more freely.

55.     Among the challenges raised by fracking is storage: where to store the water used in fracking, and where to store the wastewater created by it. Companies typically store this water in underground pits lined with concrete, tarps, or steel tanks.

56.     Open Range's alternative was to create large modular above-ground pools, which Poseidon called "tanks". The main advantage of the tanks was that they could be transported to the drilling site, set up, and dismantled using less effort than either lined pits or steel tanks.

10

57.     Open Range initially only used the pools in its own operations, but when the pools showed some success, began to offer them for lease to other oil and gas exploitation companies as a sideline to its main business.

58.     Open Range launched its tank leasing operations late in Q2 2010. It recognized $5.32 million in revenues from its tank operations in 2010. In the first six months of 2011, Open Range recognized $18.9 million in revenues from its tank operations, and the $16.1 million in net income Open Range recognized from these sales accounted for substantially all of Open Range's net income in that period.

59.     Claiming that markets were not valuing the tank business because it was attached to Open Range's oil and gas operations, in September 2011, Open Range conducted a spin-off that resulted in its tank business becoming a stand-alone company, dubbed Poseidon (the "Spin-off").

60.     The Spin-off closed on November 1, 2011.

61.     Poseidon's explosive growth continued. Poseidon recognized $59.9 million in revenues the second half of 2011,[4] and nearly that much again in just the first quarter of 2012.

### B.  Poseidon Defendants' false statements
#### i.  Poseidon's financial statements violated accounting standards.

62.     Poseidon's 2011 annual financial statements represented that Poseidon's revenue recognition policy was:

> Fracturing fluid tank rental revenues are generally derived from the provision of rentals and related services which are based on contracts that include fixed or determinable prices based on daily rental rates. Revenue is recognized when [(a)] there is persuasive evidence of an arrangement, [(b)] tank rentals and related services are provided, [(c)] the rate is fixed and determinable and [(d)] collectability is reasonably assured.

---

[4] While Poseidon was not a stand-alone company for part of the second half of 2011, the $59.9 million includes only revenues earned by Open Range's tank business.

63.     In addition, Poseidon's financial statements stated that they had been presented in accordance with IFRS.

64.     Paragraph 26 of IAS 18[5] provides that unless the outcome of a transaction involving rendering of services can be reliably estimated, revenue shall be recognized only to the extent of the expenses that are recoverable. Paragraph 20 of IAS 18 provides that the outcome of a transaction can only be reliably estimated if (a) the amount of revenue can be measured reliably; (b) it is probable that the economic benefits associated with the transaction will flow to the entity; (c) the stage of completion of the transaction at the end of the reporting period can be measured reliably; and (d) the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

65.     Paragraph 23 of IAS 18 provides that to make reliable estimates, it is usually necessary for the entity to have an effective internal financial budgeting and reporting system that reviews and revises the estimates of revenue as the service is performed.

66.     IAS 39 governs the recognition and measurement (including impairment) of financial assets such as accounts receivable. Paragraph 14 of IAS 39 provides that "an entity shall recognize a financial asset in its statement of financial position when, and only when, the entity becomes a party to the contractual provisions of the instrument."

67.     A significant majority of Poseidon's revenues were purportedly earned from take-or-pay contracts. In its take-or-pay contracts, Poseidon agreed to make its tanks available to a customer. If the customer did not use the tanks during the contract period, it had to pay as a penalty a minimum daily rate – the "pay" portion of the take-or-pay contracts. Both the

---

[5] "IAS" refers to International Accounting Standard, which are an element of IFRS.

minimum daily rate and revenues Poseidon claimed to have earned from the "pay" portion of take-or-pay contracts are referred to in this Complaint as the "minimum pay rate." If the customer actually used the tanks, it had to pay a higher daily rate (the "live rate"). If a client purportedly elected to pay the minimum pay rate, the tanks were almost never delivered to it. At most, Poseidon moved the tanks to an area near the customer's operations. About 68.0% of Poseidon's Q1-Q3 2012 revenues came from minimum pay rates.

68.     In the oil and gas service industry, for important contracts, service providers usually enter into a master agreement that governs the terms of the services. The service providers then provide services pursuant to the master agreement. Once the services have been provided, the provider issues the customer a field ticket. The field ticket sets out an itemized list of services provided, their price, and the total price. It is signed by the authorized representatives of both the provider and the customer. The field ticket is then used to generate an invoice to send the customer. Poseidon claimed to follow this practice.

69.     At all times, Poseidon's field ticketing and invoicing were replete with deficiencies and thus did not establish that the customer had an obligation to pay:

   a.  **_Unsigned master agreements and field tickets_**. Poseidon frequently did not obtain a signed field ticket or master agreement. Without a signed field ticket or master agreement, there is no evidence that the services were provided or that the customer has agreed to pay. Moreover, because obtaining a signed field ticket is an industry standard, and because obtaining a signed contract an all-but-universal business practice, the absence of a signed field ticket or contract is affirmative evidence that the customer is not obligated to pay. Poseidon's master contract with one of its largest customers, Occidental

Petroleum Corporation, provided that Occidental would make no payment without a signed field ticket. Kostelecky, at 209.[6] Kostelecky testified that this term from Poseidon's Occidental contract was standard in Poseidon's contracts. Kostelecky, at 210. According to Mr. Kostelecky, if Poseidon submitted an invoice without an accompanying signed field ticket, 80% of the time, the customer would not pay. Kostelecky, at 210. In September 2012, Poseidon determined that only about $13.2 million of its then-$75 million in minimum pay rates were supported by signed field tickets and master agreements.

b. ***Double-billed customers***. The master agreements provided that customers must pay either the minimum pay rate ***or*** the live rate. If customers used the tanks, Poseidon billed them for the minimum pay rate ***and*** the live rate. Kostelecky testified that there were "copious" instances of this misconduct. Kostelecky, at 131. Poseidon was aware of this substantial problem by June 2012 at the latest.

c. ***Invoices issued to the wrong customer or sent to the wrong department***. Poseidon frequently issued invoices to the wrong customer. Though the invoice bore the correct recipient's name (i.e., the customer who was receiving the invoice), the services were provided to another customer. Thus, not only would the customer that received the invoice not pay Poseidon, but many customers came to believe that Poseidon was trying to defraud them.

---

[6] Citations to "Kostelecky, at __" and "Swendsen, at ___" are to pages of the Depositions of Joseph Kostelecky and Brian Swendsen, attached as Exhibits 1 and 2 to this Complaint and incorporated by reference.

Poseidon also frequently sent invoices to the wrong department or wrong location of the customer, resulting in unpaid or invoices or delayed payments. Because of Poseidon's poor accounting software, see ¶¶141-144 below, Poseidon would only follow up on mis-sent invoices if the individual clerks remembered to.

d. *Revisions and errors*. Even when Poseidon purportedly billed customers pursuant to a signed field ticket and a signed master agreement, Poseidon frequently revised payment terms through a variety of credits, adjustments, and reversals.

e. *Duplicate invoices*. Poseidon frequently sent duplicate invoices. Poseidon recognized revenues on each of the duplicate invoices.

f. *Revenue recognized but not invoiced*. As of December 10, 2012, Poseidon had recognized about $35 million in revenues that it had never invoiced.

70.     After Poseidon's collapse, accounting firm Ernst & Young ("E&Y") was retained to conduct an investigation of Poseidon's financial statements. E&Y determined that of Poseidon's 2012 revenues, about $100.5 million came from minimum pay rates; the remaining $47.5 million came from live rates. E&Y concluded that, as to the take-or-pay contracts: "[...] almost 100% of the [Contracts] are not considered valid or enforceable [...] there are virtually no valid Contracts."

71.     Poseidon then worked with E&Y to arrive at an estimate of overstated 2011 accounts receivable. They estimated that of Poseidon's approximately $53.6 million in accounts receivable as of December 31, 2011, $13.3 million related to revenues that should never have been recognized.

15

72.     Accordingly, Poseidon did not follow IFRS and its own accounting policies.

73.     The approximate amount of overstatement against revenue and accounts receivable Poseidon originally reported in its SEDAR Filings is:

Table I – Approximate amount of overstatement of revenues and accounts receivable

| | Full year 2011 | Q1 2012 | Q2 2012 | Q3 2012 |
|---|---|---|---|---|
| Revenues | $78.8 million | $52.1 million | $54.9 million | $41.1 million |
| Dollar amount of revenue overstatement from incorrectly recognized minimum pay rate | $13.3 million | $35.4 million | $37.3 million | $28.0 million |
| Revenue overstatement (percentage) | 16.9% | 68.0% | 68.0% | 68.0% |
| Dollar amount of Unsigned field ticket and/or master agreement | $12.5 million | $26.1 million | $27.4 million | $20.6 million |
| Unsigned field ticket and/or master agreement (percentage) | 15.9% | 50% | 50% | 50% |
| Accounts receivable | $53.6 million | $83.0 million | $118.6 million | $125.5 million (net of $9.5 million impairment) |
| Overstatement of accounts receivable | $13.3 million | $48.7 million | $86.0 million | $98 million |
| Overstatement of accounts receivable (percentage) | 24.8% | 58.7% | 72.5% | 78.1% |

*Sources:*
*Revenues and accounts receivable – Poseidon SEDAR Filings*
*Overstated revenues/unsigned field tickets – Q1-Q3 2012 – EY INC. Preliminary Report to Norton Rose Canada LLP, February 13, 2013. E&Y's first report estimated that about 68.0% of Poseidon's 2012 revenues should not have been recognized; Table I assumes that this percentage was constant throughout 2012.*
*Accounts receivable – Q1-Q3 2012 – EY INC. Preliminary Report to Norton Rose Canada LLP, February 13, 2013. Assumes that all improperly recognized revenues were recognized as accounts receivable.*
*Overstated revenues and accounts receivable – 2011 – Email from Peter Chisolm to Leigh Cassidy and Christine Felber dated March 15, 2013, and spreadsheet attached thereto.*
*Unsigned field tickets – 2011 – Email from Allyson Finstein to Christine Felber dated March 14, 2013, and attached spreadsheet.*

16

### ii. Poseidon Defendants' false statements

74.     Poseidon's false statements were made in its annual and quarterly financial statements and reports filed over the course of 2012 (collectively, the filings set out in the subparagraphs of this paragraph are the "SEDAR Filings"):

   a.   On March 22, 2012, Poseidon filed with SEDAR its 2011 Annual Financial Statements and MD&A thereof (the "2011 Annual Filings"). Michaluk and MacKenzie signed them, and the Board formally approved them, on March 22, 2012. The Annual Financial Statements provided that "[t]he Board of Directors has approved the financial statements and information as presented in this annual release." Michaluk and MacKenzie drafted and, in conjunction with the Board, authorized publication of the Annual 2011 MD&A. The filing of these documents begins the Class Period. Michaluk and MacKenzie each certified the 2011 Annual Filings pursuant to National Instrument 52-109 ("NI 52-109 Certifications"), providing:

*No misrepresentations*: Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings.
*Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the annual filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the annual filings.

   b.   The 2011 Annual Filings (a) were purportedly presented in accordance with IFRS, which they were not, for reasons set out in ¶¶ 67-73 above; and (b) purported to follow Poseidon's impairment policies, which they did not, for the reasons set out in ¶¶123-126, below. Accordingly, the revenues and

17

accounts receivable set out in the 2011 Annual Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

c.  On May 9, 2012, Poseidon filed with SEDAR its Q1 2012 Interim Financial Statements and its Q1 2012 MD&A (the "Q1 Filings"). The Q1 Interim Financial Statements provide that "The interim condensed consolidated financial statements were authorized for issuance by the Corporation's Board of Directors on May 9, 2012." The Q1 Interim Financial Statements incorporated the Annual Filings by reference, providing that "[t]hese interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk and MacKenzie each provided NI 59-102 Certifications of the Q1 Filings. The revenues and accounts receivable set out in the Q1 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

d.  On August 8, 2012, Poseidon filed with SEDAR its Q2 2012 Interim Financial Statements and its Q2 2012 MD&A (the "Q2 Filings"). The Q2 Interim Financial Statements provide that "The interim condensed consolidated financial statements were authorized for issuance by the Corporation's Board

of Directors on August 8, 2012." The Q2 Interim Financial Statements incorporated the Annual Filings by reference, providing that "These interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk and MacKenzie each provided NI 59-102 Certifications of the Q2 Filings. The revenues and accounts receivable set out in the Q2 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

e. On November 14, 2012, Poseidon filed with SEDAR its Q3 2012 Interim Financial Statements and its Q3 2012 MD&A (the "Q3 Filings"). The Q3 Interim Financial Statements provide that "The interim condensed consolidated financial statements were authorized for issuance by the Corporation's Board of Directors on November 14, 2012." The Q3 Interim Financial Statements incorporated the Annual Filings by reference, providing that "These interim condensed consolidated financial statements were prepared in accordance with International Accounting Standard (IAS) 34, 'Interim Financial Reporting', of International Financial Reporting Standards (IFRS), and using the accounting policies disclosed in the consolidated

19

financial statements for the year ended December 31, 2011. These interim condensed consolidated financial statements are intended to be read in conjunction with the consolidated financial statements for the year ended December 31, 2011 and do not include all of the information required for full annual financial statements." Michaluk and MacKenzie each provided NI 59-102 Certifications of the Q3 Filings. The revenues and accounts receivable set out in the Q3 Filings were overstated. The approximate amount of the overstatement is set out in Table I, above.

75.    In addition, the SEDAR Filings made the following false statements:

     a.    The 2011 MD&A falsely stated that:

The Corporation evaluated the design of its internal controls over financial reporting as at December 31, 2011. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Notwithstanding the weaknesses identified with regards to complex and non-routine accounting matters, the Corporation concluded that all other of its internal controls over financial reporting have been designed properly at December 31, 2011.

The statement was false because, as set out in ¶¶ 141-148, Poseidon's internal control deficiencies extended to simple and routine accounting matters.

     b.    The Q1 2012 MD&A falsely stated that:

The Corporation evaluated the design of its internal controls over financial reporting as at March 31, 2012. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Notwithstanding the weaknesses identified with regards to complex and non-routine accounting matters, the Corporation concluded that all other of its internal controls over financial reporting had been designed properly at March 31, 2012

In fact, for the reasons set out in ¶¶ 141-148 below, Poseidon's internal control deficiencies extended to simple and routine accounting matters.

      c.   The Q2 2012 MD&A falsely stated that:

The Corporation evaluated the design of its internal controls over financial reporting as at June 30, 2012. During this evaluation the Corporation identified weaknesses due to the limited number of finance and accounting personnel at the Corporation dealing with complex and non-routine accounting transactions that may arise. Subsequent to the year-ended December 31, 2011 and the quarter ended March 31, 2012, the Corporation has added further accounting and support functions which has minimized the weaknesses identified with regard to complex and non-routine accounting matters. Notwithstanding the weaknesses identified, the Corporation concluded that all other of its internal controls over financial reporting had been designed properly at June 30, 2012

In fact, for the reasons set out in ¶¶ 141-148 below, Poseidon's internal control deficiencies extended to simple and routine accounting matters and persisted past June 30, 2012.

      d.   The Q3 2012 MD&A falsely stated that:

The Corporation evaluated the design of its internal controls over financial reporting as at September 30, 2012. During this evaluation the Corporation identified weaknesses in its internal controls as a result of the limited number of finance and accounting personnel at the Corporation dealing with revenue cycle business processes and complex and non-routine accounting transactions that may arise. Specifically, the accounting complexity associated with a growing international oilfield services business and the lack of effective and efficient accounting processes can result in delays in the operational and corporate closing process which limit the ability of management to perform substantive reviews on a timely basis. Subsequent to the year-ended December 31, 2011 and the quarter ended September 30, 2012, the Corporation added further accounting and support functions and implemented several design improvements to its controls over revenue cycle business processes and non-routine accounting matters, which has minimized the weaknesses identified with the Corporation's internal controls over financial reporting. As a result of the identified weaknesses, which the Corporation will continue to monitor and work to address through ongoing evaluation of its internal controls and prudent personnel and technology advancements, the Corporation concluded that its internal controls over financial reporting were not completely effective at September 30, 2012. Notwithstanding the aforementioned weaknesses, the Corporation concluded that the internal

controls over financial reporting were designed properly to provide reasonable assurance regarding the reliability of financial reporting by the Corporation and the preparation of its financial statements

In fact, for the reasons set out in ¶¶ 141-148 below, Poseidon's internal controls were not designed properly to provide reasonable assurance regarding the reliability of financial reporting.

### C.  Poseidon Defendants made their false statements with scienter.
   i.  *That Poseidon was not obtaining signed field tickets was openly discussed at Poseidon Board meetings seeking to approve financial statements.*

76.     Poseidon's Board held regular meetings to approve Poseidon's financial statements before they were filed. These meetings provided participants with information necessary to determine that Poseidon was making materially false statements.

77.     Each meeting was attended by every Poseidon Defendant. Greg Caldwell of KPMG also attended each meeting.

77.     At each meeting, meeting attendees were told that: (a) Poseidon needed signed field tickets to be paid; (b) Poseidon frequently did not obtain signed field tickets; (c) obtaining signed field tickets in all cases was a priority for Poseidon.

78.     At all times, Poseidon's Board had the authority to order Poseidon or KPMG to conduct a further investigation to determine (a) whether Poseidon recognized revenues from sales where it had not obtained signed field tickets, and if so (b) how much revenue Poseidon had booked from such sales.

79.     Kostelecky attended each of the meetings. Meeting attendees knew that as head of Poseidon's U.S. operations, Kostelecky had in-depth knowledge of how frequently Poseidon recognized revenues without a signed field ticket or master agreement. Kostelecky later btestified that "more often than not", field tickets were not signed. Kostelecky, at 214.

1.   2011 annual financial statements meeting

80.     On March 22, Poseidon's full board held a meeting to approve its Annual 2011

Financial Statements (the "2011 Annual Meeting"). Kostelecky and all Defendants attended.

KPMG attended through its lead audit partner, Greg Caldwell, and auditor Lisa Wesley.[7]

81.     According to Mr. Kostelecky's testimony, at the 2011 Annual Meeting,

Poseidon's board was alarmed that Poseidon could not collect its accounts receivable. Meeting

attendees held a discussion about Poseidon's entire revenue collection and recognition process.

In this discussion, David Belcher, Poseidon Finance VP, warned that field ticketing was "the first

gatekeeper" to a receivable. Mr. Belcher also warned that Poseidon did not always obtain a

signed field ticket. Mr. Belcher expressed his hope that in the future, Poseidon might be able to

obtain signed field tickets every time. Kostelecky, at 38-42.

82.     The minutes for an audit committee meeting that same day (also attended by Greg

Caldwell and Lisa Wesley) similarly provide that "Mr. Belcher reviewed the balance sheet,

noting the timing for collection of outstanding accounts receivables has improved and provided

further details regarding the invoicing and collection process."

83.     After Poseidon's collapse, a team including Mr. Belcher, Allyson Finstein, and

E&Y examined Poseidon's invoices and field tickets. They determined that of Poseidon's

purported $53.6 million in accounts receivable as of December 31, 2011, up to approximately

$13.3 million (24.8%) were improperly-recognized revenues that had to be reversed. Notably,

these accounts receivable all arose from Poseidon's U.S. operations, and accounted for 56.6% of

the purported $23.5 million in U.S. accounts receivable Poseidon had recognized as of that date.

Similarly, about $12.5 million of Poseidon's purported accounts receivable (23.3%) derived from

---

[7] Lisa Wesley is a KPMG senior audit manager. As of January 1, 2012, Wesley had worked as an
auditor for KPMG for seven years.

invoices for which there were no signed field ticket.

2.   Q1 2012 financial statement meeting

84.     On May 9, 2012, Poseidon's Board and audit committee each held a meeting to approve Poseidon's Q1 2012 Interim Financial Statements (the "Q1 2012 Meetings"). Present at the Board meeting were Kostelecky and all Defendants. KPMG attended through its lead audit partner Greg Caldwell and its auditor Lisa Wesley.

85.     At the Q1 2012 Meeting, the Board specifically asked Mr. Belcher to explain the progress that Poseidon had made in obtaining signed field tickets since the Board's 2011 Annual Meeting.

86.     Mr. Belcher again warned that while Poseidon was improving in getting signed field tickets, it was not getting signed field tickets in all cases.

87.     Mr. Belcher then explained that without a signed field ticket, Poseidon would not be paid. Thus, Mr. Belcher continued, because Poseidon could not obtain signed field tickets, it would not be able to collect accounts receivable, which would adversely affect its cash position. Kostelecky, at 48-50.

88.     E&Y subsequently determined that Poseidon had no customer back-up whatsoever – whether a field ticket or a master services agreement – for about 50% of the revenues Poseidon recognized in Q1-Q3 2012. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 revenues were improperly recognized.

89.     Caldwell and Wesley were also present for the May 9 audit committee meeting. According to the minutes of the May 9 audit committee meeting, Caldwell noted that there was "an ongoing focus on potential credit risk associated with billings and collections."

3.   Q2 2012 financial statements meeting

90.     On August 8, 2012, Poseidon's Board held a meeting to approve its Q2 2012

Interim Financial Statements (the "Q2 2012 Meeting").

91.    Mr. Belcher warned that Poseidon's accounts receivable were worryingly high. Mr. Belcher specifically warned that while Poseidon was still not getting signed field tickets in all cases. Mr. Belcher told the board and KPMG that any improvement in obtaining signed field tickets was not significant. Kostelecky, at 76-80.

92.    E&Y subsequently determined that Poseidon had no customer back-up whatsoever – whether a field ticket or a master services agreement – for about 50% of the revenues Poseidon recognized in Q1-Q3 2012. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 revenues were improperly recognized.

i.    Q3 2012 financial statements meeting

93.    On November 13, 2012, Poseidon's Board held a meeting of its board and its audit committee to approve its Q3 2012 Interim Financial Statements (the "Q3 2012 Meetings"). Kostelecky and all Defendants attended. KPMG attended through its lead audit partner, Greg Caldwell, and another of its partners.

94.    Mr. Belcher warned that accounts receivable had continued to increase. Mr. Belcher warned that attendees that "we [Poseidon] have still not closed [the] loop" on obtaining signed field tickets.

95.    Mr. Belcher cited an alarming example. As he told attendees, Poseidon had received a call from its customer Occidental Petroleum. Occidental complained that it had received $1 million in invoices from Poseidon for tanks that Poseidon had not leased *to Occidental*. But Occidental also stated that Poseidon had leased $2.4 million of tanks to Occidental, *but had not invoiced Occidental for over a year*. Kostelecky, at 95.

96.    E&Y subsequently determined that Poseidon had no customer back-up whatsoever – whether a field ticket or a master services agreement – for about 50% of the

revenues Poseidon recognized in Q1-Q3 2012. E&Y also determined that about 68.0% of Poseidon's Q1-Q3 2012 revenues were improperly recognized.

> ii. *Internal communications show that Defendants knew of Poseidon's fraud.*
>> 1. Defendants "knew from the beginning invoicing [] without [customer] signatures was a bad idea" and knew accounts receivable were increasing because of the "chaos of invoicing without signed field tickets."

97.    By January 2012, Poseidon was alarmed by its mounting stale U.S. accounts receivable. Thus, for example, on January 15, 2012 (a Sunday), Defendant MacKenzie sent a list of US accounts receivable aged over 90 days to, among others, Defendants Wiebe and Michaluk. These stale accounts receivable amounted to $8.3 million:

> Was just looking through our list of A/R across the US, and while I might be stating the obvious with a few of these, thought I'd highlight a top 10 list over 90 days that Allie should concentrate on. It obviously includes our largest customers, but there were a few other smaller players with everything over 90 days (also a high priority in case these folks get into any balance sheet trouble).
>
> Anschutz - $2.6mm total ($1.9mm over 90 days)
> Chesapeake - $2.5mm total ($1.7mm over 90 days)
> Hess - $4.5mm total ($1.5mm over 90 days)
> Samson - $2.3mm total ($1.4mm over 90 days)
> Oasis - $0.5mm total (all over 90 days)
> Nadal and Gussman - $0.4mm total (all over 90 days)
>
> Kodiak - $0.4mm over 90 days (something wonky going on with the amounts pre-90 days)
> Slawson - $0.4mm total (all over 90 days)
> Cornerstone - $0.3mm total (all over 90 days)
> Arsenal - $0.2mm total (all over 90 days)
> I also looked through Canada A/R and it's very clean, only one customer over 90 days (TAQA) and just two customers over 60 days (PetroBakken and Open Range, let's send someone to Rob's office to collect the latter!)

98.     By March 2012, it had become clear to Poseidon and KPMG alike that Poseidon had substantial accounts receivable problems that were linked to improper invoicing in its U.S. operations.

99.     In an email sent on March 15, 2012 to, among others, Defendants Michaluk and Wiebe, and Kostelecky and Belcher, Defendant MacKenzie warned:

> Hello all – I've been looking through our US accounts receivables, namely the amounts due over 60 – 90 days ($7.3 mm in total []), and thought I'd send a quick note.
> The end of our first quarter is due over two weeks away, and we need to make an aggressive push on both invoicing and collections prior to March 31; our auditors, bankers, and shareholders are all watching our growing A/R # of days outstanding and it's something we need to remain very diligent on (***auditors have been questioning accuracy of invoicing*** []) [].
> I broke down the list of the top 10 US receivables amounts / clients and they account for $14.3 mm, or 80%, of the $17.8 mm total receivables [].
> []
>
> Bottom line, all large and small accounts should be called in this big push for next few weeks, but the aforementioned top 10 was my simple way of attacking a very large list of clients.
> []
> I also recognize we're still feeling the effects of the old issues, but we need to get over this hump very soon, ***as I daresay that nothing in our entire organization is more important today than this collections / invoicing issue.***
> []

(Emphasis added).

100.    Kostelecky replied expressing his hope that "[w]e continue to push on ward [sic] and will have a clean invoicing system as well as fully up to date as of March 31, 2012 for Q1."

101.    On April 6, 2012, MacKenzie emailed Michaluk about dire accounts receivable collections and of securing financing before the public became aware of the problem:

> To:   Lyle Michaluk
> From: Matt MacKenzie
> Sent: Fri 06/04/2012 4:07:00 PM
> Subject: Re: RE:

The late afternoon collections update from Ally was $650k for the week... *that made me warm up even more to 2-3 year [financing] deal (what the bankers giveth they can't take away, assuming we're onside with covenants of course). I'm absolutely perplexed on how collections have even gotten worse over the last three weeks [...] companies 1/3 of our size would easily collect $500k in a week!\*

(Emphasis added)

102.    The Poseidon Defendants knew that (a) without signed field tickets, Poseidon would not be paid; and (b) much of if not most of Poseidon's earnings derived from contracts where Poseidon had no signed field tickets. Thus, on May 4, 2012, Mr. Belcher emailed Defendants Michaluk and MacKenzie:

> From: David Belcher
> Sent: Friday, May 04, 2012 10:02 PM
> To: Matt MacKenzie; Lyle Michaluk
> Subject:  Reserve on 01 Bonus
>
> *I have been thinking about the large part of our EBITDA based on accruals (field tickets not signed) and it makes me nervous. What do we look like if those field tickets do not get signed and we have a negative revision to revenue?*
>
> I was thinking that although we are able to book revenue on an accrual basis (*consistent with KPMG review*) that perhaps we adjust the bonus down to reflect the % of invoiced revenue and defer the balance of the payment until actual invoice? We could put the message to staff that the bonus is still payable but only upon the receipt of signed field tickets (leading to invoices) and develop a process to pay the balance once the revenue is actually invoiced.
>
> *Not to be a fear monger but the paying of executive bonus based on accrual strikes me as very Nortel like and makes me extremely nervous.*
>
> The message that bonus would be payable upon invoicing on signed field tickets might prove a very healthy incentive to our staff to get those tickets signed and in.

(Emphasis added).

103.    Further, Defendants knew Poseidon's internal controls were defective. For example, in a May 6, 2012 email discussing a potential new internal controls hire, Defendant MacKenzie commented to Poseidon's controller "just make sure dave [belcher] doesn't highlight how light we are on [internal] controls in the interview! ... we'll only really open up to

candidates after they've signed on dotted line and are under the umbrella." The controller responded that she had done as MacKenzie asked, showing that his comment was not a joke.

104.    In an email exchange taking place on May 17, 2012, between Allyson Finstein and Amanda Erickson, Ms. Finstein observed "Sorry, during the chaos of invoicing without signed field tickets, I will probably be doubling [sic] checking on things, to make sure we should have invoiced, since a lot of things are coming back otherwise and I don't want to upset customers. Even though it's too late with some 😊." (Emoticon in original). Erickson, for her part, stated that "I knew from the beginning invoicing and mailing without signatures was a bad idea, but I guess we really didn't have a choice."

105.    And on August 5, 2012, MacKenzie observed in an email to David Belcher that $19 million of Poseidon's purported accounts receivable were over 120 days old. MacKenzie expressed surprise the amount was so little.

106.    Poseidon's policy called for it to scan all master agreements and place them on its shared drive (the "P-Drive"). Kostelecky was charged with implementing this policy as to Poseidon's U.S. operations.

107.    Defendants knew that master agreements were available on the P-Drive. For example, in an email dated April 19, 2012, Belcher alarmingly called attention to "a significant amount of [missing] revenue for the first three months of the year."[8] Kostelecky responded, copying Defendants Michaluk and MacKenzie, that "[t]he issue at hand is clearly not getting data in the system [] Every week the data needs to be analyzed and adjusted based on our contracts and signed commitments (*please look them up on the P drive if there's a question on one*)". (Emphasis added).

---

[8] Not for the first time; Belcher remarked that this was "déjà vu all over again."

108.    As the summer of 2012 wore on, Poseidon conducted an inventory of its unsigned

master agreements. According to an Excel spreadsheet emailed to Allyson Finstein and Doug

Robinson on August 8, 2012, only 11[9] of Poseidon's 54 master agreements were signed. All of

the Master Agreements were available on the P-Drive.

109.    In late August, Robinson began calling Poseidon purported customers to

determine why accounts receivable were going unpaid.

110.    In an email to MacKenzie on August 30 summarizing his findings, Robinson

warned that "there are no immediate plans on anyone [sic] end to pay" Poseidon's invoices:

> From: Doug Robinson
> Sent: Thursday, August 30, 2012 12:39 PM
> To: Matt MacKenzie
> Subject: Re: how goes the battle down there?
>
> Definitely growing. Good meeting with Steve on the field ticketing side, I
> anticipate immediate improvement in the quality and the turn around of the field
> tickets for his region, need to have the same conversation with Brian (likely next
> week).
>
> Lots of calls being made, lots of blank stairs [sic], and head scratching from our
> customers [sic] end. There is an extremely wide gap in their expectations of these
> "contracts" and ours.
>
> In a lot of cases I have been talking to customers who we have millions of dollars
> in receivable balances who have no idea of who Poseidon is, aren't set up in their
> systems, no MSA's [Master Agreement] on file, no W2's on file etc. Good news
> is that 95% of the customers we have spoke to seem very "eager" to figure out
> what is going on, and why these obligations haven't been recorded on their books.
>
> Bad news is that I have absoluetly [sic] no confidence that we will be paid any of
> the contract revenue that we have entered, (likely in the 60 million dollar range).
> Going to collect everyones [sic] comment from calls at end of day, and likely
> need to call Joe at end of day to give a chance to explain what is happening here.
> Tomorrows meeting will either be very long or very short, because there are no
> immediate plans on anyone [sic] end to pay these.

---

[9] In fact, twelve were signed.

If you want to discuss before then, I'll give you a buzz in a bit. Let me know what works for you.

111.    Later that day, Robinson replied to the same email:

Not the answers I was expecting [...]
Joe [Kostelecky] always seems to have the answers and comes through when required, so it better be same in this scenario, ***the backup data for the contracts needs to be supplied immediately***

(Emphasis added).

112.    On September 19, Poseidon held a meeting to discuss invoicing and accounts receivable. At least Defendant MacKenzie and Kostelecky were present. That day, MacKenzie emailed to Kostelecky an excel spreadsheet showing that Poseidon had signed backup for only about $13.2 million of its $75.0 million billed. The spreadsheet also stated that $38.2 million of Poseidon's purported revenues were "vulnerable", with the remaining $23.6 million "TBD". MacKenzie emailed a second spreadsheet, stating that even setting aside unsigned contracts, there was a "billing variance" of $17.4 million.

113.    On November 13, 2012, Michaluk represented that he and MacKenzie had reviewed all the outstanding accounts receivable and determined that Poseidon should only take a $9.5 million bad debt expense, according to that meeting's minutes.

114.    In an email sent October 22, 2012, Defendant MacKenzie apologized for a slow response, blaming an inquiry by Poseidon's board into its invoicing issues: "Sorry for delay, dealing with a Board that has completely lost their mind and are acting completely irrational ... these guys have been a rubber stamp Board and completely ignored their fiduciary duty for a year, only to now panic."

31

### D. KPMG
#### i. KPMG's Statements.

115.    KPMG falsely stated that (a) in its opinion, Poseidon's financial statements were

presented in accordance with IFRS; (b) it had conducted its audit in accordance with Canadian

Generally Accepted Auditing Standards ("Canadian GAAS"):

> To the Shareholders of Poseidon Concepts Corp. We have audited the accompanying consolidated financial statements of Poseidon Concepts Corp., which comprise the consolidated statements of financial position as at December 31, 2011, December 31, 2010 and January 1, 2010, the consolidated statements of income (loss) and comprehensive income (loss), changes in shareholders' equity and cash flows for the years ended December 31, 2011 and December 31, 2010, and notes, comprising a summary of significant accounting policies and other explanatory information.
>
> **Management's responsibility for the consolidated financial statements**
> Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.
>
> **Auditors' responsibility**
> Our responsibility is to express an opinion on these consolidated financial statements based on our audits. ***We conducted our audits in accordance with Canadian generally accepted auditing standards.*** Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement. An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.
>
> **Opinion**
> ***In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of Poseidon Concepts Corp. as at December 31, 2011, December 31, 2010 and January 1, 2010, and***

*its consolidated financial performance and its consolidated cash flows for the years ended December 31, 2011 and December 31, 2010 in accordance with International Financial Reporting Standards.*
(signed) "KPMG LLP"
Chartered Accountants
Calgary, Canada
March 22, 2012
(Bold and italicized emphasis added) (the "Audit Report")

116.    KPMG's statements were false because as set out more fully below, (a) it did not follow Canadian GAAS; and (b) no reasonable auditor would conclude that Poseidon's financial statements were fairly presented in accordance with IFRS.

117.    At all times, KPMG had the authority and the obligation to withhold or recall its audit report until it was permitted to conduct further investigation to determine (a) whether Poseidon recognized revenues from sales where it had not obtained signed field tickets, and if so (b) how much revenue Poseidon had booked from such sales. KPMG also had the authority to independently inspect all or a sample of Poseidon's field tickets to arrive at an estimate.

### ii.   KPMG's statements were false.
#### 1.   Poseidon did not conceal its fraud from KPMG.

118.    This is not a typical auditor case. Poseidon never sought to hide its fraud from KPMG. On the contrary, it volunteered to KPMG details of the fraud. For example, as set out above in ¶¶ 76-96, above, in Board and Audit Committee meetings KPMG attended, senior Poseidon executives regularly volunteered that (a) Poseidon did not obtain signed field tickets, and (b) without signed field tickets, Poseidon would not be paid. Poseidon regularly volunteered further damaging information to KPMG. For example, in an August 2, 2012 email Poseidon's Doug Robinson told KPMG auditor Meghan Misquita that "[a]ny collection delays whether they be from big players or small players have been systematic of the same issues, not getting field tickets signed in a timely manner and not submitting contract bills in a appropriately [sic].". KPMG could have obtained whatever evidence Poseidon didn't volunteer simply by asking for

it. KPMG ignored the evidence Poseidon volunteered and did not ask follow-up questions. And then, when in November 2012, Kostelecky attempted to present KPMG with evidence that Poseidon's accounts receivable should be extensively written down, KPMG shut him up.

> 2.   KPMG had actual knowledge of and consciously disregarded red flags.

119.   In the course of the audit and through the end of the Class Period,[10] KPMG saw red flags showing that its Audit Report was false.

> a.   Red flags relating to allowance for bad debt.

120.   Throughout 2011 and 2012, Poseidon recognized revenues from sales that had never actually happened. Because the customers refused to pay, these "revenues" caused its accounts receivable to balloon:

> a.   As of September 30, 2011, Poseidon recognized accounts receivable of $40.2 million;

> a.   As of December 31, 2011, Poseidon recognized accounts receivable of $53.6 million

> b.   As of March 31, 2012, Poseidon recognized accounts receivable of $83.0 million;

---

[10] CAS 230 Paragraph 11 provides:
   If:

   (a) audit evidence obtained from one source is inconsistent with that obtained from another; or
   (b) the auditor has doubts over the reliability of information to be used as audit evidence,
   the auditor shall determine what modifications or additions to audit procedures are necessary to resolve the matter, and shall consider the effect of the matter, if any, on other aspects of the audit.

Accordingly, when KPMG was presented with red flags after its audit, it was required to investigate and determine whether its audit report was false when made.

c.   As of June 30, 2012, Poseidon recognized accounts receivable of $118.6 million;

d.   As of September 30, 2012, Poseidon recognized accounts receivable of $125.5 million, net of a write-off of $9.5 million.

121.   By dollar amount, most of Poseidon's accounts receivable were issued pursuant to contracts calling for Poseidon to be paid 45 days after a field ticket was issued and revenue recognized. Yet Poseidon had much more than 45 days' worth of sales outstanding, providing evidence that there were deficiencies in Poseidon's revenue recognition, collectability, or both.

122.   Paragraph 58 of IAS 39 requires that companies evaluate its accounts receivable to determine whether collectability is reasonably assured, by providing that "an entity shall assess at the end of each reporting period whether there is any objective evidence that a financial asset or group of financial assets is impaired." If any such evidence exists, the entity must determine the amount of any impairment loss, either directly or through the use of an allowance account. *Id.*; IAS 39, ¶ 63.

123.   Poseidon's 2011 MD&A claimed that it implemented its obligations under IAS 39 through an impairment policy providing that:

> **Poseidon evaluates its trade receivables through a continuous process of assessing its portfolio on an individual customer and overall basis. This process consists of a thorough review of collection experience, current aging status of the customer accounts, financial condition of the Corporation's customers, and other factors. Based on its review of these factors, it establishes or adjusts allowances for specific customers as well as general provisions if industry conditions warrant.** This process involves a high degree of judgment and estimation and frequently involves significant dollar amounts. Accordingly, the Corporation's results of operations could be affected by adjustments to the allowance due to actual write-offs that differ from estimated amounts.

124.   KPMG was obligated to review Poseidon's accounting records to determine whether it had followed IAS 39 and its own impairment policy.

125.    But Poseidon did not follow its own impairment policy:

    a.  ***No evaluation***. As Kostelecky testified, Poseidon never evaluated its customers to determine whether to create an allowance for doubtful account. Kostelecky, at 190-91.

    b.  ***No continuous assessment***. As Kostelecky testified, Poseidon never assessed its portfolio to determine whether its receivables were collectable. Kostelecky, at 190-91.

126.    Thus, Poseidon did not have any records documenting Poseidon's review of accounts receivable for impairment.

127.    Thus, KPMG could not have met its obligation to review Poseidon's records to determine whether Poseidon had correctly evaluated its accounts receivable to determine whether to impair them as required by IAS 39 and Poseidon's own impairment policy, because Poseidon did not have any records to show to KPMG. One of three things happened: (a) KPMG asked for the documents and never got them; (b) KPMG never asked for the documents; or (c) KPMG asked for the documents, and was told that Poseidon did not perform the impairment evaluations mandated by IAS 39 and its own impairment policy.

128.    It was apparent to KPMG that Poseidon was not conducting the evaluations IAS 39 and Poseidon's own impairment policy required. Poseidon did not recognize any allowance for bad debt until its Q3 2012 financial statements. Yet KPMG knew and understood that Poseidon's accounts receivable were ballooning:

    a.  At the 2011 Annual meeting, Belcher warned meeting attendees of Poseidon's "lack of collections". According to Kostelecky, discussions of Days Sales Outstanding ("DSO"), a measure of accounts receivable as a function of daily

revenues, were "a huge part" of the March 22 meeting's discussions. Kostelecky, at 50.

b.  In comments to Poseidon's Q1 2012 financial statements attached to a May 1, 2012 email, KPMG noted that accounts receivable had ballooned by almost $30 million in Q1 2012, and asked Poseidon whether it could collect its accounts receivable.

c.  According to the minutes of the May 9 Audit Committee meeting, Caldwell noted that there was "an ongoing focus on potential credit risk associated with billings and collections", but Poseidon did not take any reserve for bad debt.

d.  In comments to Poseidon's Q2 2012 financial statements attached to a July 30, 2012 email, KPMG circled the amount of Poseidon's outstanding accounts receivable, and wrote in  "↑121% since [year end]/ 111% of revenue wow! How are you okay?" KPMG also commented "you may want to include a credit risk note [] (explain a little to the reader since such a big [delta, i.e., change])." In connection with KPMG's review of Poseidon's Q2 2012 financial statements, on July 27, 2012, KPMG auditor Meghan Misquita drafted an explanatory paragraph explaining that Poseidon's unsigned field tickets and other issues had led to uncollected accounts receivable, which provided, among other things, that "Poseidon has no collection issues that they are aware".

e.  At the Q2 2012 Meeting, Cadwell stated that Poseidon may have to set up a bad debt reserve if it did not increase accounts receivable by the end of the next quarter. Kostelecky, at 76-77.

f.  As set out in ¶¶109-110 above, in late August, 2012, Robinson called a series of Poseidon's customers who purportedly owed Poseidon money, and determined that it was unlikely Poseidon would ever be paid at all. Following Robinson's calls, Poseidon established a group called Project Pluto, consisting of Defendants Winger, Jensen, Michaluk, Wiebe, and Kostelecky, Poseidon's general counsel, and a Poseidon collections employee who worked out of its Denver office. The group was established at the direction of Poseidon's Board. The purpose of Project Pluto was to determine what portion of Poseidon's receivables, if any, could be collected. KPMG was aware of Project Pluto; among other things, Project Pluto was discussed at Poseidon's next Board meeting, which KPMG attended.

g.  At the Q3 2013 Meeting, meeting attendees discussed the need for a write-down of accounts receivable. Belcher and MacKenzie discussed at least five accounts that should be written down, including Williams Energy, Chesapeake, Cimarex, and Great Western. Belcher recounted that one of Poseidon's accounting staff had received a call from Occidental Petroleum, one of Poseidon's largest customers. Occidental Petroleum reported that it had received invoices for work for $1 million that Poseidon had actually performed for a different customer, but that Poseidon had performed $2.4 million of work for Occidental Petroleum more than a year before but had never invoiced it. Kostelecky, at 95.

129.  Indeed, KPMG was willfully blind. At the Q3 2012 Meetings, it was agreed that Poseidon would take a $9.5 million write-down. Kostelecky stated that the write-down should be

larger, because some of the accounts not discussed at the meeting were also uncollectable, in whole or in part. But as Kostelecky was providing his summary, a KPMG partner cut him short, telling him "let's go through with what we have in front of us." Kostelecky obeyed KPMG's instructions, and shut up. Kostelecky, at 83-84.

130.    Accordingly, KPMG either knew or was reckless in not knowing that Poseidon was not conducting quarterly or more frequent impairment evaluations required by IAS 39 and Poseidon's own impairment policy.

b.   Red flags relating to revenue recognition.

131.    KPMG specifically identified revenue recognition as one of just two fraud risks in the Poseidon audit. In response, KPMG told the audit committee that it would document and test Poseidon's processes and controls over revenue accrual.

132.    KPMG knew that Poseidon was recognizing revenues even when it did not obtain signed field tickets.

133.    First, at each of the 2011 Annual, Q1 2012, Q2 2012, and Q3 2012 Meetings, Poseidon admitted that it did not always obtain a customer-signed field ticket.

134.    Second, in an email to Mr. Belcher dated March 8, 2012, KPMG senior accountant Natalia Krizbai acknowledged that "not signed field tickets" was an audit issue.

135.    Third, in connection with the audit of Poseidon's 2011 annual financial statements, KPMG examined the transaction documents for a sample of entries in Poseidon's accounts receivable. On or before March 9, 2012, KPMG created a spreadsheet listing the results of its inspection. The spreadsheet includes two columns - "Field Ticket signed (Y/N)" and "MSA [master agreement] signed (Y/N)."

a.   The spreadsheet reports that in numerous cases, field tickets were not signed.

b.   The master agreement column was not filled in. The spreadsheet listed 17 of

Poseidon's purported customers. According to a report prepared by E&Y for Poseidon, Poseidon did not have signed master agreements with three of the customers – Nadal Gussman, Devon, and Samson. Nadal Gussman accounted for $1.2 million in accounts receivable. In addition, Poseidon did not have a signed master agreement with Williams Energy, yet Poseidon's 2011 financial statements nevertheless reflected $2.0 million in revenue and accounts receivable attributable to Williams.

    c.   The spreadsheet reported that two of the other 17 entities listed on the spreadsheet, Anschutz and Chesapeake, had not paid certain bills Poseidon claimed were overdue. In fact, Anschutz and Chesapeake claimed that their signatures on the master agreements and/or field tickets were forged.

136.    KPMG knew or was reckless in not knowing that Poseidon could not recognize revenues without signed field tickets:

    a.   Ms. Krizbai's March 8 email to Mr. Belcher stated that she was reviewing Poseidon's Master Agreements. According to Mr. Kostelecky, Poseidon's Master Agreements typically provided that Poseidon's customer would not pay without a signed field ticket. See ¶69.a, above.

    b.   At each of the 2011 Annual, Q1 2012, and Q2 2012 Meetings, Mr. Belcher warned that Poseidon needed customer-signed field tickets to be paid, and that the fact that Poseidon did not obtain signed field tickets was causing its accounts receivable to balloon.

137.    On September 20, 2012, Robinson received a letter from counsel to WPX Energy Rocky Mountain, LLC, a purported Poseidon customer, concerning about USD 7.2 million of

unpaid invoices related to 8 tanks purportedly leased by WPX between April 2011 and April 2012. WPX's letter recounted: (a) that WPX had never entered into any rental agreement with WPX; (b) no tank was ever delivered to WPX; (c) WPX did not even exist in May 2011, when it supposedly signed a rental agreement with Poseidon; (d) WPX's internal records disputed all of Poseidon's claims, and (e) according to WPX's field representative, there was never even a conversation about WPX renting eight tanks. Robinson immediately emailed the letter to Kostelecky. Poseidon did not restate its financial statements to remove revenue from transactions with WPX. KPMG reviewed or had access to WPX's attorney's letter.

138.    On November 5, 2012, MacKenzie, among others, held a meeting with KPMG lead audit partner Greg Caldwell and KPMG auditor Abraham Nel to discuss uncollectible debts as well as $4.4 million of revenue that had been accrued in 2011 but never invoiced. According to a memo provided to KPMG soon thereafter, Poseidon explained about the 2011 revenue that (a) only $140,000 had been collected, (b) Poseidon's poor internal controls which had led to these issues included "forgot to bill", "manual/excel-based billing system", and "[i]nadequate staffing issues in US", and (c) there were doubts about the collectability of the revenue (e.g., for one client with $1.1 million in 2011 revenues outstanding, Magna, "accounting [was] not aware of agreement").

139.    On November 16, 2012, Mr. Robinson emailed MacKenzie and Michaluk a spreadsheet. The body of the email stated "Here is the listing of PCI [Poseidon U.S.] customers where either we have contract disputes or have substantial unpaid balances which are under dispute." The spreadsheet listed $73.9 million in disputed revenues. Mr. Robinson shared his analysis with Caldwell of KPMG, Jensen, and Dawson.

140.    These admissions gave KPMG persuasive audit evidence that Poseidon was

41

improperly recognizing revenues. Accordingly, upon hearing Poseidon's confession, KPMG was required to plan and perform audit procedures to determine whether Poseidon's revenues recognized without signed field tickets could be recognized.

c.   Red flags relating to weak internal controls.

141.    KPMG knew that, from the date of the Spin-off, Poseidon had three critical accounting deficiencies.

142.    Until mid-2012, Poseidon did not have specialized accounting software, instead conducting its audits on an Excel-like software platform.

143.    According to a December 12, 2012 report by Sonja Sanborn, reliance on Excel led to systematic and predictable deficiencies:

a.   ***Manual entry***. Field tickets were created by manually entering data into the spreadsheet, rather than through more conventional accounting software. The field tickets thus contained numerous material errors, whether from typos, factual mistakes, or malfeasance.

b.   ***Follow up***. Because Poseidon did not have a database tracking mechanism, it did not have an automated system alerting it to check up on a field ticket. Thus, when Poseidon submitted a field ticket and it was not immediately approved, Poseidon would only follow up if its concededly incompetent U.S. general administrative staff remembered to. They frequently did not.

c.   ***Controls***. Few controls existed to manage and verify the accuracy of inputs into the spreadsheets.

144.     KPMG recognized that Poseidon's use of Excel accounting software created significant deficiencies, and urged that Poseidon upgrade its accounting software, which it only did in mid 2012. Kostelecky, at 175-176.

42

145.    Second, Poseidon did not provide its accounting staff with written policies, guidelines, or instructions on revenue recognition or invoicing, until mid-Q2 2012. Kostelecky, at 177. Poseidon's Denver office in particular was an obvious deficiency. After spending several weeks there in September 2012, Robinson noted that "[N]obody can really tell me what their full job entails. They have some idea of what they do, but it's vague. People come and go at all hours, they do not show up for work on time most days, they take long lunches, and leave early. Again, I'm not blaming anyone, but I am saying since we don't have defined roles, or defined management or leadership in the Denver office, it runs amuck [sic]." But Robinson merely echoed what various defendants had previously concluded but done nothing about.

146.    And third, Poseidon's accounting staff was thinly stretched. As of November 1, 2011, Poseidon's accounting team had only five members. Until May 2012, there were no accountants who worked in Poseidon's U.S. operations. Kostelecky, at 169. Unusually, Poseidon's CFO, Defendant MacKenzie, had no qualifications as an accountant, either. And until Q3 2012, the accounting for Poseidon's entire U.S. operations was managed by a single, entry-level clerk located in Poseidon's Denver office, who was responsible for all revenue recognition decisions.

147.    According to Ms. Sanborn's December 12 report, Poseidon's unqualified and untrained accounting staff predictably caused chaos in revenue recognition.

      a.  ***No personal knowledge or written reports***. Field activity was communicated to those creating field tickets by word of mouth. And even these word-of-mouth reports were often made much later than the purported field activity.

      b.  ***Grossly deficient accounting***. Field tickets were created by general administrative staff, rather than specialized accounting staff or even dedicated

unskilled staff. The personnel were located in the U.S. office.

148.    Indeed, Poseidon itself recognized that its poor internal accounting systems and personnel put it at high risk. For example, in an email sent on August 2, 2012, MacKenzie observed that Poseidon's accounting staff was between a fifth and a third of its peers with the same revenues and sales volume – even after new hires. MacKenzie added that "it's fair to say that our $100+mm revenue company was *woefully understaffed from an accounting / admin standpoint since the first day of spinout*." (Emphasis added).

### d.   Red flags related to field deals

149.    As reflected in its financial statements, Poseidon invoiced and recognized revenues by mechanically multiplying the number of tanks, the tanks' daily rates, and either the live rate or the minimum pay rate. KPMG was subjectively aware that Poseidon recognized revenues in this manner. For example, a KPMG memo dated May 3, 2012, observed that Poseidon's "[a]ccrued revenue at March 31, 2012 was determined based on signed tank rental agreements between Poseidon and the lessee. *Great Plains calculates Poseidon's accrued revenue based on the day rate per tank leased multiplied by the number of days not invoiced for at March 31, 2012. The accruals are calculated by customer and summarized in a system generated consolidated revenue report.*"

150.    But Poseidon's sales representatives were authorized to and did negotiate side deals for discounts to rental and services rate. According to Swendsen, instructions were to "sell as much as we could and let billing and the operations guys who were out in the field kind of sort that other portion [accounting and documentation] out." Swendsen, at 37-38.

151.    Poseidon's chaotic invoicing generated frequent customer complaints. One frequent complaint was that the invoice Poseidon issued ignored the terms of an agreement Poseidon's field representative had made with the customer. Kostelecky testified that the most

44

frequent complaint was "discrepancy in pricing", citing as an example a Poseidon sales agent who promised a customer a free month. Kostelecky, at 168.

152.    Poseidon responded to these customer complaints by issuing credit notes reflecting the terms that the parties had agreed upon. According to Kostelecky, the notes were issued "weekly". Kostelecky, at 164. KPMG had an obligation to review the credit notes to ensure that Poseidon applied the correct accounting treatment.

153.    That Poseidon was issuing credit notes was evidence that collectability of its accounts receivable was not reasonably assured under Paragraph 58 of IAS 39. *See* ¶¶ 120-130, above. In addition, though, the fact that Poseidon was issuing credit notes to reflect the deals its field representatives had negotiated showed to KPMG that the field representatives had the authority to offer discounts and other field deals. Because KPMG knew that field representatives had the authority to negotiate deals and frequently used it, KPMG knew or was reckless in not knowing that Poseidon could not recognize revenues simply by multiplying tanks by daily rates, ignoring any deals Poseidon's representatives negotiated.

### 3.   KPMG's audit violated Canadian GAAS.

154.    KPMG knew, or was reckless in not knowing, that Poseidon was a high risk client.

155.    Poseidon's 2010 revenues were $5.6 million. Its 2011 revenues were $78.7 million. In 2010, Poseidon was a small unit of an oil & gas company. By the end of 2011, it was a standalone oil & gas services company. Open Range's historic market was Western Canada; Poseidon's market was the U.S.

156.    As KPMG knew, Poseidon's internal accounting was dangerously poor. KPMG specifically remarked that Poseidon's use of software similar to Excel was dangerous, and urged it to upgrade. KPMG knew that Poseidon had no auditors in the U.S. that its accounting function

was overburdened and unqualified – in the words of Poseidon's CFO, "woefully understaffed." Yet according to the minutes of an audit committee meeting taking place March 22, 2012, KPMG represented that Poseidon's internal controls were sufficient to give it comfort that its opinion was reliable.

157.    KPMG knew that Poseidon's officers' compensation structure was heavily tied to Poseidon's revenues. For example, Michaluk and Wiebe each had annual salaries of $200,000, a relatively small amount for officers of a public company, and Kostelecky's was $150,000. They drew most of their compensation from quarterly bonuses of up to $480,000 for Michaluk and Wiebe and up to $300,000 for Kostelecky that were directly tied to Poseidon's EBITDA for that quarter.

158.    The Board minutes for the May 9 meeting reflect a comment from Caldwell that the audit had been "quite complex." Reflecting these extreme risks, as well as the amounts at stake – Poseidon's market capitalization, as of December 31, 2011, exceeded $925 million – KPMG's audit of Poseidon should have been a careful, measured, time-consuming affair. It was anything but: the audit's total bill was $40,000.

159.    According to an analysis conducted by Audit Analytics, an independent research provider, in 2012, the average audit fee for Canadian oil & gas industry companies was about $300,000.

160.    KPMG's recklessly small budget  imposed insurmountable obstacles that prevented the audit from complying with Canadian GAAS:

a.   *Materiality*: As part of an audit plan, auditors will typically establish a materiality threshold. This threshold plays a large role in the audit, as it determines permissible misstatements and sample sizes. In its 2010 audit of Open Range, KPMG established

a materiality threshold of $1.0 million; with Poseidon's 2011 audit, the threshold was $2.5 million.

b. ***Small sample sizes***: Canadian GAAS permits an auditor to use sampling instead of testing an entire population. KPMG employed exceptionally small samples.

c. ***Site visits***: Site visits are an almost universal audit component. Yet though Poseidon generated most of its revenues in the U.S., KPMG never visited Poseidon's U.S. offices nor any of its U.S. personnel, according to testimony by both Kostelecky and Swendsen. Kostelecky, at 95-96; Swendsen, at 29.

d. ***Too few audit team members***: KPMG's Audit Plan, provided to Poseidon's audit committee members, listed five KPMG professionals to contact, two of whom were tax experts. Even though Poseidon earned most of its revenues in the United States, all five worked out of KPMG's Calgary office.

e. ***Reliance on management's representation***: After it was sued in Canada, KPMG filed a third party complaint against certain of Poseidon's officers and directors. KPMG confessed a shocking reliance on Poseidon's representations, alleging (among other things) that Poseidon's management's representations were the sole cause of KPMG's alleged misrepresentations over which the Canadian plaintiffs sued it. *Ramzy v. KPMG LLP*, Court of Queen's Bench of Alberta, No. 1401 07353, Third Party Claim of Defendant/Third Party Plaintiff KPMG LLP, at ¶29 (July 29, 2014).

161.    Similarly, Poseidon's audit committee exhibited alarming ignorance about accounting matters. For example, in an email dated November 26, 2012, Defendant Richardson emailed all board members asking whether Poseidon followed U.S. GAAP or IFRS. Defendant Jensen referred Defendant Richardson to KPMG.

### iii.   KPMG's conscious misbehavior

162.    KPMG conspired with management to present a materially inaccurate view of Poseidon's finances.

163.    As set out above, on August 2, 2012, KPMG received an email from Mr. Belcher, stating that Poseidon had "systematic" deficiencies in getting field tickets signed, which resulted in ballooning accounts receivable.

164.    In an August 3, 2012 presentation to Poseidon's Audit Committee, under header "Accounts Receivable", KPMG reported that "conversations [management] have held with customers have not indicted [sic] significant disputes over amounts [owed]."

165.    On November 5, 2012, as set out above in ¶138, Poseidon informed KPMG that almost $4.3 million in revenues from 2011 had not been collected and that Poseidon's poor internal controls left doubts about whether Poseidon would ever be able to collect.

166.    On November 8, 2012, Dawson emailed Winger to report on a conversation Poseidon had had with Greg Caldwell of KPMG. According to Dawson, based on conversations with Caldwell, "suffice it to say there is more than a little concern about the potential for future collection issues."

167.    In addition, before the Q3 2013 Meetings, Robinson had met with customers, and had been told that Poseidon's revenue records were not accurate. *See* ¶110. Poseidon received communications from customers and their attorneys claiming that Poseidon's revenue records were not accurate. *See* ¶¶ 95, 137. Poseidon contemporaneously estimated that $73.9 million of its accounts receivable were disputed. *See* ¶139. There is no reason to believe that Poseidon withheld any of the information from KPMG; indeed, the limited record created thus far shows that Poseidon willingly volunteered the information to KPMG. *See* ¶¶ 95.

168.    Yet on November 13, 2012, KPMG issued a report to Poseidon's audit committee

claiming that management had told it:

    a.  "During the third quarter of 2012 the new operations controller reconciled many of the customer accounts for 2011 and year-to-date 2012 to ensure all amounts outstanding were accurate, owed from customers and complete. The process did identify approximately $2.5 million in additional revenue relating to 2011 that had been recognized in the third quarter."

    b.  "they [management] are meeting on a regular basis to discuss outstanding amounts and are meeting with customers."

    c.  KPMG further represented that "[w]e have reviewed management's assessment and find it to be supportable."

    d.  At the Q3 2012 Meetings, Caldwell told the Audit Committee KPMG was "comfortable" with the mere $9.5 million bad debt expense, claiming that a bad debt provision of less than 10% is "reasonable and consistent with [Poseidon's] peer group."[11]

### V.   THE TRUTH CONCEALED BY DEFENDANTS' MISCONDUCT IS REVEALED, CAUSING INVESTORS' LOSSES

169.   On November 14, 2012, Poseidon Concepts shocked the market by releasing the results from its Q3 2012 operations, announcing, among other things, that:

    a.  it was taking a charge of $9.5 million for uncollectible debt, reducing its accounts receivable position and taking a charge to its net income and reported assets;

    b.  there had been a significant increase in the size of its accounts receivable

---

[11] KPMG may have been influenced to set aside its scruples by the fact that one of the purposes of the Q3 2012 Meetings was to approve KPMG's audit plan, including its fees.

portfolio to $125.5 million (net of the $9.5 million write-off), including $36

million past due (outstanding for more than 120 days);

c.   its internal controls over financial reporting were "not completely effective";

d.   it was introducing a new credit policy to mitigate the problems with doubtful

receivables:

"The Corporation has established a credit policy under which each customer is analyzed for creditworthiness before the Corporation begins to provide services to the customer and prior to offering standard payment terms and conditions. Credit limits are established for each customer, which represents the maximum exposure. The Corporation's credit limit review includes customer cash flow analysis, external debt ratings, and credit references when appropriate. Customers that fail to meet the Corporation's benchmark creditworthiness may transact with the Corporation only after providing a cash deposit to offset a portion of the credit amount; these customers will be subject to an added level of monitoring by the Corporation until sufficient payment history is established"; and

e.   only 38% of its accounts receivable portfolio was due from investment grade

parties.

170.   In response to the Company's disclosure on November 14, 2012, the Company's

stock fell USD 8.15 per share, or approximately 62%, from its previous closing price, to close at

USD 4.95 per share on November 15, 2012.

171.   On November 28, 2012, the Canadian law firm Siskinds LLP announced that it

had filed a class-action lawsuit in the Ontario Superior Court of Justice against Poseidon and

certain of its officers and directors, alleging Poseidon made materially false and misleading

statements regarding its financial conditions, especially the overstatement of revenue and

overstatement of accounts receivables during Q4 2011 through Q3 2012, and false and

misleading disclosures concerning its compliance with IFRS and its own accounting policies.

172.   On the same day, analysts at BMO Capital Markets Corp. and Haywood

Securities Inc. downgraded their outlook on Poseidon's shares.

173.    As a result, Poseidon's stock price fell USD 1.28 per share, or approximately 24%, from its previous closing price, to close at USD 4.07 per share on November 28, 2012.

174.    On December 27, 2012, Poseidon issued a press release announcing the formation of a Special Committee to evaluate and resolve various issues stemming from Poseidon's write-off of some of its accounts receivable and evolving business strategy, and stating in relevant part:

> [T]he Company may need to make additional write downs of accounts receivable in future periods and such write downs may be significant.

175.    In the same press release, the Company disclosed additional changes to its management and stated in relevant part:

> [E]ffective immediately Mr. A. Scott Dawson will assume the role of Interim President and Chief Executive Officer, Mr. Michaluk will assume the role of Interim Chief Financial Officer and Mr. Wiebe will assume the role of Chief Technology Officer. Messrs. James McKee, Lyle Michaluk and Cliff Wiebe have resigned from the Board of Directors.

176.    In light of the Company's disclosures on December 27, 2012, Poseidon's stock price fell USD 1.87 per share, or approximately 56%, from its previous closing price, to close at USD 1.49.

177.    The following day, analysts at First Energy Capital Corp. and Haywood Securities Inc. downgraded their outlook of Poseidon.

178.    In response, Poseidon's stock price fell another USD 0.20 per share, or approximately 13%, from its previous closing price, to close at USD 1.29 per share on December 28, 2012.

179.    On February 14, 2013, Poseidon issued a press release announcing the findings of the Special Committee which stated in relevant part:

> Based on the recommendation of the Special Committee and the interim report of its advisors, the Board of Directors has determined, on a preliminary basis, that primarily related to long term take-or-pay arrangements:

- approximately $95 million to $106 million (subject to detailed quantification by the Company) of the Company's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the Company's financial statements; and

- as a result of recording the foregoing revenues, approximately $94 million to $102 million (subject to detailed quantification by the Company) of the Company's $125.5 million accounts receivable as at September 30, 2012 should not have been recorded in the Company's financial statements as accounts receivable.

As a result of the foregoing, the first, second and third quarter 2012 financial statements (the "Financial Statements") will be restated and the Company advises investors that they should no longer rely on the Financial Statements as well as the corresponding Management's Discussion & Analysis. Further, the Company advises that all previous guidance with respect to the Company's business should no longer be relied upon.

180.    The February 14, 2013 press release also stated that Poseidon's financial statements for the first three quarters of 2012 did not comply with IFRS or with Poseidon's own accounting policies.

181.    In reaction to the Company's disclosure on February 14, 2013, the Company's stock price fell USD 0.61 per share, or approximately 69%, from its previous closing price, to close at USD 0.28 per share.

182.    On April 9, 2013, Poseidon issued a press release providing in relevant part:

As previously announced in its February 14, 2013 press release, the Special Committee (along with its advisors) has continued its review and assessment of, among other things, the Company's public disclosure of its financial results. This included the review and assessment of the Company's financial statements for the year-ended December 31, 2011 (the "2011 Annual Financials"). Based upon the investigation by the Special Committee, questions have arisen with respect to the recorded revenues in the 2011 Annual Financials. At this time, it is uncertain whether or not a restatement of the 2011 Annual Financials is required.

### VI.    CLASS MEMBERS BOUGHT POSEIDON STOCK ON A DOMESTIC EXCHANGE AND IN DOMESTIC TRANSACTIONS

183.    Throughout the Class Period, Poseidon stock was actively traded on the OTC Pink Sheets under ticker POOSF. The OTC is a U.S. electronic inter-dealer quotation system. It

displays quotes, last-sale prices, and volume information. To trade a security on the OTC, broker-dealers must obtain FINRA's authorization to trade that particular security. Mr. Kolar bought all of his Poseidon stock on the OTC Pink Sheets under ticker POOSF.

184.    Mr. Kolar incurred irrevocable liability to pay for the securities in the United States. Mr. Kolar resided in Florida in the entire time he purchased Poseidon stock. Mr. Kolar bought all his Poseidon stock through his U.S. Charles Schwab account. Mr. Kolar's broker was located in Florida. Certain of Mr. Kolar's purchases were for his IRA. Mr. Kolar bought his Poseidon stock using U.S. dollars. Only one of Charles Schwab's 300 offices is located outside the United States. Once Mr. Kolar entered his order to purchase Poseidon stock, he no longer had the discretion to revoke acceptance.

## VII.    THE COURT HAS JURISDICTION OVER KPMG
### A.  Poseidon based its operations in the U.S.

185.    Poseidon conducts its U.S. operations through a subsidiary, Poseidon Concepts, Inc. ("Poseidon U.S."). At all times, Poseidon U.S. was a U.S. resident. It was a Delaware corporation, with its principal executive offices in Denver, Colorado.

186.    Poseidon recognized the majority of its purported revenues from transactions in the U.S.:

| Period | U.S. revenues | Canadian revenues | U.S. as percentage of total |
|--------|---------------|-------------------|-----------------------------|
| Full year 2011 | $52.4 million | $27.9 million | 66.4% |
| First 9 months of 2012 | $127.9 million | $20.2 million | 86.3% |

187.    As of January 2012, 80% of Poseidon's tank fleet was deployed in the U.S. As of January 15, 2012, all but 1 of Poseidon's clients with accounts receivable balances over 90 days were U.S. customers.

188.    Both Poseidon and Poseidon U.S. have filed for bankruptcy protection in both the

U.S. and Canada. Poseidon's Monitor publicly filed a list of creditors with claims of more than $1,000. The list shows that:

    a.  63 of 108 creditors were based in the U.S.;

    b.  Excluding a $79.5 million claim from the banks supplying Poseidon's credit facility, $10.8 million of the $14.5 million in claims were made by U.S. creditors.

189.    During the course of its audit and reviews, KPMG corresponded with key Poseidon employees who were located in the U.S., including Kostelecky and Allyson Finstein. Moreover, KPMG corresponded with Canada-based Poseidon employees at the time they were visiting the United States.

190.    Under Canadian GAAS, external confirmations from third parties are a critical element of an audit. CAS 505.3. Third party confirmations are typically used to confirm accounts payable and accounts receivable. They are typically sent directly to the third parties. CAS 505.7. And site visits are an all-but-universal audit component.

191.    Accordingly, by engaging itself as the independent auditor of a company whose operations took place predominantly in the United States, KPMG committed itself to a relationship that required continuing and wide-ranging contacts with Poseidon in the United States.

**B.  Poseidon offered its stock in the U.S. with KPMG's consent**

192.    In conjunction with the Spin-Off, KPMG expressed an opinion on Poseidon's financial statements as of September 14, 2011 (the "Spin-Off KPMG Opinion"). In January 2012, Poseidon conducted a public offering of its shares, selling $82.5 million of its shares (the "Offering").

193.    Poseidon conducted the Offering in Canada, the U.K. – and the United States.

Poseidon's underwriting agreement specifically permitted the underwriters to sell Poseidon's shares to qualified institutional buyers and accredited investors in the United States. And the Offering's final prospectus (the "Prospectus")[12] used to sell the shares specifically stated that Poseidon had permitted the underwriters to sell its shares in the United States. Prospectus, at 12. In fact, Poseidon actually did sell its shares in the United States. Poseidon Concepts press release dated January 13, 2012.

194. In connection with the Offering, Poseidon drafted a private placement memorandum to be used to sell the Offering shares in the U.S. (the "U.S. Private Placement Memorandum"). Cl. 3. (e). According to the Underwriting Agreement, delivery of the U.S. Private Placement Memorandum was a condition precedent to conducting the offering. 4. (a)(ii). According to the Underwriter Agreement, KPMG's comfort letter would be reproduced in the U.S. Private Placement Memorandum.

195. By two letters dated January 26, 2012, KPMG specifically consented to the use of its audit report on Open Range's 2010 annual financial statements and of the Spin-Off KPMG Opinion in the Prospectus. KPMG represented in both letters that it had read the Prospectus. Both KPMG letters were publicly filed.

196. KPMG also consented to the use of its audit report on Open Range's 2010 annual financial statements and of the Spin-Off KPMG Opinion in the U.S. Private Placement Memorandum.

197. Without KPMG's consent, the U.S. Private Placement could not have taken place.

198. KPMG's engagement letter for the audit of Poseidon's 2011 financial statements (the "Engagement Letter") explicitly contemplated that Poseidon might use KPMG's 2011 audit

---

[12] Filed January 26, 2012.

report in a private placement or offering in the U.S. or Canada. The Engagement Letter authorized KPMG without further action by Poseidon to conduct any work necessary to provide a consent or comfort letter to the underwriters in any such offering or private placement. The Engagement Letter also obliged KPMG to conduct such work if requested by Poseidon. The Engagement Letter also obliged KPMG to provide a consent letter and/or a comfort letter to the Underwriters if Poseidon gave KPMG adequate notice to conduct this additional work and KPMG's additional work turned up no red flags.

## VIII. RESPONDEAT SUPERIOR

199.   KPMG is liable for the acts of Greg Caldwell, Lisa Wesley, and other KPMG employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

200.   The *scienter* of Greg Caldwell, Lisa Wesley, and other KPMG employees is similarly imputed to KPMG under *respondeat superior* and agency principles.

201.   Poseidon is liable for the acts of the Poseidon Defendants and other Poseidon employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

202.   The scienter of the Poseidon Defendants and other Poseidon employees and agents is similarly imputed to Poseidon under *respondeat superior* and agency principles.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

203.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of Poseidon during the Class Period and who were damaged thereby.  Excluded

from the Class are Defendants, the present and former officers and directors of Poseidon and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

204.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Poseidon's stock was actively traded on the OTC Pink Sheets.

205.    While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class.  Members of the Class may be identified from records maintained by Poseidon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

206.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

207.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

208.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  whether statements made by Defendants to the investing public during the Class

Period misrepresented material facts about the business, and financial performance of Poseidon; and

c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

209.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

210.   At all relevant times, the market for Poseidon common stock was an efficient market for the following reasons, among others:

a.   Poseidon's stock listed on the Toronto stock exchange traded on an efficient market and the common stock in this action tracked the movements of the Toronto stock;

b.   During the Class Period, on average 6,073,232 shares of Poseidon were traded on a weekly basis among the Toronto Stock Exchange and the OTC Pink marketplace. During the Class Period, approximately 81 million shares were outstanding.[13] Approximately 7.5% of all outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

c.   Poseidon regularly communicated with public investors via established market

---

[13] In its Q3 2012 MD&A filed on SEDAR on November 14, 2012, the Company stated for the three months ended September 30, 2012, the Company had a weighted average basis of approximately 81,097,000 basic common shares outstanding.

communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.  Poseidon was followed by several securities analysts employed by major brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

e.  Numerous FINRA member firms were active market-makers in Poseidon at all times during the Class Periods; and

f.  Unexpected material news about Poseidon was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

## XI.   FIRST CAUSE OF ACTION
### Violation of Section 10(b) of the Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against the Poseidon Defendants and KPMG

211.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

212.   This cause of action is asserted against all Defendants.

213.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Poseidon's securities at artificially inflated and distorted prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

214.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business,

operations and future prospects of Poseidon as specified herein.

215.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of  Poseidon's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Poseidon and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Poseidon securities during the Class Period.

216.     KPMG knowingly or recklessly issued false and misleading audit and review reports certifying Poseidon's financial statements during the Class Period.

217.     Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially

false and misleading.

218.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Poseidon's financial condition from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

219.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Poseidon's securities was artificially inflated during the Class Period.

220.    In ignorance of the fact that market prices of Poseidon's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Poseidon's securities during the Class Period at artificially high prices and were damaged thereby.

221.    At the time of said misrepresentations and omissions, Plaintiff and other members

of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Poseidon's financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Poseidon securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

222.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

223.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

224.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## XII.    SECOND CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act
### Against the Poseidon Defendants

225.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

226.    This second cause of action is asserted against each of the Poseidon Defendants.

227.    The Poseidon Defendants acted as controlling persons of Poseidon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Poseidon Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements that Plaintiff contends are false and misleading. The Poseidon Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

228.  In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

229.  As set forth above, Poseidon violated Section 10(b) and Rule 10b-5 by their acts and Poseidon as alleged in this Complaint.

230.  By virtue of their positions as controlling persons, the Poseidon Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

231.  This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.  Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b.   Awarding compensatory damages in favor of Plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   Awarding Plaintiff such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

64

Dated: November 30, 2015                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Horne

Laurence M. Rosen
lrosen@rosenlegal.com
Phillip Kim
pkim@rosenlegal.com
Jonathan Horne
jhorne@rosenlegal.com
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY, 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

**<u>CERTIFICATE OF SERVICE</u>**

I, Jonathan Horne, hereby certify that on November 30, 2015, I filed a copy of the foregoing document with the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Jonathan Horne