**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE POSEIDON CONCEPTS SECURITIES LITIGATION | Case No. 13-CV-1213 (DLC)<br><br>ECF Case |

**MEMORANDUM IN SUPPORT OF DEFENDANT KPMG'S MOTION TO DISMISS**

Nathaniel J. Kritzer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
(212) 446-4900 (fax)

-and-

John F. Hartmann, P.C. (admitted pro hac vice)
Joshua Z. Rabinovitz (admitted pro hac vice)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000
(312) 862-2200 (fax)

*Counsel for KPMG LLP (Canada)*

## **Table of Contents**

Preliminary Statement ............................................................................................................1

Background ...............................................................................................................................2

    A.    Poseidon's Business ................................................................................................2

    B.    Poseidon's Financial Statements And Other Disclosures ......................................3

    C.    KPMG's Audit Of Poseidon's Annual Financial Statements .................................5

Argument ...................................................................................................................................8

I.    The Court Lacks Personal Jurisdiction Over KPMG ........................................................8

    A.    Plaintiff Has Not Established That KPMG Had Minimum Contacts With The United States. ...............................................................................................9

    B.    Asserting Personal Jurisdiction Over KPMG Would Not Comport With "Fair Play And Substantial Justice." ..............................................................16

II.    Venue Is Not Proper In This District. ..............................................................................17

III.    The Court Should Dismiss This Action For *Forum Non Conveniens*. .............................18

    A.    Plaintiff's Choice Of Forum Should Not Be Accorded Deference ......................18

    B.    Canada Is An Adequate Alternate Forum For This Action. .................................21

    C.    Private And Public Interests Weigh In Favor Of Litigating This Case In Canada .................................................................................................................22

IV.    The Complaint Does Not Plead Facts Sufficient To Give Rise To A Plausible Inference That § 10(b) Applies To Plaintiff's Claim Against KPMG .............................24

    A.    Plaintiff Has Not Pled That His Alleged Purchases Of Poseidon Stock Occurred In The United States. ..........................................................................24

        1.    The OTC Pink Sheets Is Not A Domestic Exchange ...............................25

        2.    Plaintiff Has Not Pled That His Purchases Of Poseidon Stock Took Place In The United States. ...........................................................27

    B.    Section 10(b) Does Not Apply To An Audit Conducted In A Foreign Country Of A Foreign Company's Financial Statements Whose Stock Is Registered On A Foreign Exchange. ..................................................................30

i

V.      The Complaint Does Not State A Claim Against KPMG..................................................31

        A.      The Complaint Does Not Allege With Particularity That KPMG's 2011
                Audit Report Was False........................................................................................33

                1.      The Complaint Does Not Allege With Particularity That KPMG's
                        Audit Did Not Comply With Canadian Auditing Standards. ...................33

                2.      The Complaint Does Not Allege With Particularity That KPMG
                        Knew Poseidon's Financial Statements Did Not Comply With
                        International Financial Reporting Standards. ...........................................38

        B.      The Complaint Does Not Allege With Particularity That KPMG Acted
                With Scienter. .....................................................................................................41

Conclusion ........................................................................................................................45

## Table of Authorities

<u>**Cases**</u>

*Able Fund v. KPMG Accountants NV,*
  247 Fed. Appx. 504 (5th Cir. 2007) ................................................................. 12

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d. Cir. 2012) ................................................. 24, 27, 28, 29

*Arco Capital Corp. v. Deutsche Bank AG,*
  949 F. Supp. 2d 532 (S.D.N.Y. 2013) ............................................................. 24

*Asahi Metal Indus. Co. v. Superior Ct. of Calif.,*
  480 U.S. 102 (1987) ........................................................................... 9, 10, 16

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) ................................................................................... 9, 16

*Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC,*
  155 F.3d 603 (2d Cir. 1998) ............................................................................ 22

*Consulting Engineers, Inc. v. Geometric Software Solutions,*
  2007 WL 2021901 (E.D. Va. July 6, 2007) ..................................................... 12

*Daimler AG v. Bauman,*
  134 S.Ct. 746 (2014) ................................................................................... 9, 13

*DeCusati v. Reiss Engineering, Inc.,*
  2015 WL 4622494 (E.D. Va. July 30, 2015) ................................................... 12

*DiFolco v. MSNBC Cable LLC,*
  622 F.3d 104 (2d. Cir. 2010) .................................................................... 37, 42

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ........................................................................................ 33

*Eagle Technology v. Expander Americas, Inc.,*
  783 F.3d 1131 (8th Cir. 2015) ......................................................................... 11

*General Electric Capital Corp. v. Grossman,*
  991 F.2d 1376 (8th Cir. 1993) ..................................................................... 9, 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  131 S.Ct. 2846 (2011) .......................................................................... 9, 11, 13

*Gulf Ins. Co. v. Glasbrenner,*
  417 F.3d 353 (2d Cir. 2005) ............................................................................ 17

*In re Banco Santander Securities-Optimal Litig.*,
    732 F. Supp. 2d 1305 (S.D.N.Y. 2010) ................................................................ 13

*In re Lehman Bros. Sec. & ERISA Litig.*,
    __ F. Supp. 3d __, No. 09-2017 (LAK), 2015 WL 5514692 (S.D.N.Y. Sept. 18, 2015) ......... 38

*In re Satyam Computer Svcs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013) ............................................................ 24, 28

*In re Societe Generale Sec. Litig.*,
    No. 08-2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ....................... 28

*In re Warrick*,
    70 F.3d 736 (2d Cir. 1995) ...................................................................... 19

*Iragorri v. United Technologies Corp.*,
    274 F.3d 65 (2d Cir. 2001) (en banc) ........................................................ 19

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d. Cir. 1981) .................................................................... 8

*Maverick Fund, L.D.C. v. Lender Processing Services, Inc.*,
    No. 13-5474 (DLC), 2013 WL 6467889 (S.D.N.Y. Dec. 10, 2013) ................... 21, 23

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
    487 Fed. Appx. 636 (2d Cir. 2012) ............................................................ 41

*Mori v. Saito*,
    No. 10-6465 (KBF), 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ....................... 28

*Morrison v. National Australia Bank Ltd.*,
    130 S.Ct. 2869 (2010) ........................................................................ 24, 26

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
    416 F.3d 146 (2d Cir. 2005) .......................................................... 18, 20, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*,
    135 S.Ct. 1318 (2015) .......................................................................... 38

*Pace v. Quintanilla*,
    No. 13-91 (RJS), 2013 WL 5405563 (S.D.N.Y. Sept. 23, 2013) .......................... 19

*Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .................................................................... 30

*Penguin Group Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010) ...................................................................... 8

iv

*Rentokil-Initial Pension Scheme v. Citigroup Inc.*,
  614 Fed. Appx. 27 (2d Cir. 2015) ................................................................ 22, 23

*Roaring Fork Capital SBIC v. ATC Healthcare, Inc.*,
  2011 WL 1258504 (D. Colo. Mar. 29, 2011)................................................ 16

*SEC v. Big Apple Consulting USA, Inc.*,
  783 F.3d 786 (11th Cir. 2015) ...................................................................... 25

*SEC v. Boock*,
  No. 09-8261 (DLC), 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) .............. 25

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990) ......................................................................... 9

*Special Situations Fund III v. Deloitte Touche Tohmatsu CPA*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014)............................................................. 34

*SST Global Technology, LLC v. Chapman*,
  270 F. Supp. 2d 444 (S.D.N.Y. 2003) ........................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) .......................................................................... 32, 41, 44

*Trierweiler v. Croxton & Trench Holding Corp.*,
  90 F.3d 1523 (10th Cir. 1996)................................................................ 11, 15

*United States v. Georgiou*,
  777 F.3d 125 (3d Cir. 2015)........................................................................... 25

*Wenzel v. Marriott Int'l, Inc.*,
  __ Fed. Appx. __, 2015 WL 6643262 (2d. Cir. Nov. 2, 2015) ...................... 19

*Young v. FDIC*,
  103 F.3d 1180 (4th Cir. 1997)................................................................ 13, 23

## Statutes

15 U.S.C. § 78aa(a)................................................................................... 9, 18

15 U.S.C. § 78u-4(b)(1) .................................................................................. 33

15 U.S.C. § 78u-4(b)(2)(A)............................................................................. 41

28 U.S.C. § 1391(b) ....................................................................................... 17

## Rules

Fed. R. Civ. P. 12(b)(2)...................................................................................... 8

Fed. R. Civ. P. 12(b)(3).............................................................................................. 17

Fed. R. Civ. P. 12(b)(6)....................................................................................... 24, 31

Fed. R. Civ. P. 9(b) ..................................................................................................... 33

**Preliminary Statement**

Plaintiff Gerald Kolar brings this putative securities fraud class action against KPMG LLP (Canada) and others concerning his alleged purchases of stock in Poseidon Concepts Corporation.  Plaintiff's claim against KPMG does not belong in this country, much less this Court.  KPMG is a Canadian accounting firm that audited the financial statements of a Canadian company, Poseidon.  Poseidon's stock was registered on a Canadian stock exchange and it filed financial reports with Canadian regulators.  Poseidon's financial statements were governed by Canadian accounting rules, and KPMG's audit of those financial statements was governed by Canadian auditing standards and took place entirely in Canada.

As a result, Plaintiff's claim against KPMG should be dismissed.  First, the Court lacks personal jurisdiction over KPMG.  Second, venue is improper in this District.  Third, the Court should dismiss the claim under the *forum non conveniens* doctrine in favor of it being litigated in Canada, where stockholders of Poseidon are already litigating the same claim against KPMG on behalf of a putative class *that includes Plaintiff*.  And, fourth, the complaint does not give rise to a plausible inference that Plaintiff purchased his Poseidon stock in the United States, a necessary prerequisite for the Securities Exchange Act to apply.

But the complaint is more than just procedurally defective.  If the Court reaches the substance of Plaintiff's allegations (which it should not), it should dismiss for failure to state a claim.  Plaintiff's principal allegation is that KPMG was told during its audit of Poseidon's 2011 annual financial statements that Poseidon recognized revenue for services it provided even if it had not obtained a signed "field ticket" from the customer, which Plaintiff alleges is necessary before collecting payment.  But Plaintiff ignores that his own allegations make clear that Poseidon told KPMG that the effect of a missing field ticket was to *delay* the collection of payment—because Poseidon would have to go get a signed field ticket—not to prevent collection entirely.

1

A delay in collecting amounts owed does not suggest that revenue should not be recognized.  It suggests the delay in collections should be disclosed in the financial statements, which it was.

Plaintiff alleges that KPMG made only one false statement—a March 22, 2012 audit report on Poseidon's 2011 annual financial statements.  However, Plaintiff's allegations mainly concern Poseidon's 2012 quarterly financial statements.  Plaintiff does not allege that KPMG audited the quarterly financial statements or made any public statements about them, nor does Plaintiff attempt to plead a claim against KPMG regarding them.  And Plaintiff's allegations about KPMG's audit report on Poseidon's 2011 financial statements are thin.  Plaintiff does not allege with particularity that KPMG did not use the audit procedures that Canadian auditing standards require, or that it executed those procedures improperly.  Moreover, Plaintiff alleges numerous instances where KPMG's actions were inconsistent with an intent to aid in fraud.  As a result, Plaintiff has not pled a securities fraud claim against KPMG.

## **Background**[1]

Plaintiff filed suit in 2013 against Poseidon and its officers and directors.  (Docket #1, ¶¶ 8-19)  On July 8, 2015, Plaintiff filed an amended complaint, adding KPMG as a defendant.  (Docket #71)  After KPMG moved to dismiss that complaint, Plaintiff amended his complaint again.  (Docket #104)  The claims against Poseidon's officers and directors are currently stayed.

### A.    **Poseidon's Business**

Poseidon was a Canadian company that provided mobile storage tanks for the wastewater created by hydraulic fracturing.  (Compl. ¶¶ 55-57 (Docket #104))  Poseidon was formed in November 2011 through a split with another Canadian company, Open Range Energy Corp.  (*Id.*

---

[1] For purposes of this motion (except in Parts I, II, and III below), KPMG accepts, as it must, Plaintiff's well-pled factual allegations as true.

¶¶ 2-3)  Poseidon was a reporting issuer in Canada, and its stock was registered on the Toronto Stock Exchange and also quoted over the counter in the United States.  (*Id.* ¶¶ 35, 210(a), 2)

One of the ways in which Poseidon provided services to its customers was through "take or pay" agreements.  (Compl. ¶ 5)  Under such agreements, according to Plaintiff, customers paid a set amount to Poseidon for the right to request a storage tank when needed.  (*Id.*)  If the customer ultimately did not request a storage tank, it paid only the set amount; if the customer did request and use a tank, it paid a higher rate.  (*Id.*)  Plaintiff alleges that approximately a quarter of Poseidon's reported 2011 revenues and two-thirds of its reported 2012 revenues were from take-or-pay agreements.  (*Id.*)

### B.    Poseidon's Financial Statements And Other Disclosures

On March 22, 2012, Poseidon filed with Canadian regulators its 2011 annual financial statements.  (Kritzer Ex. 1, Poseidon 2011 Financial Statements)[2]  The financial statements were governed by International Financial Reporting Standards ("IFRS"), which Canada has adopted, not by U.S. Generally Accepted Accounting Principles ("GAAP").  (Compl. ¶ 35)  As with U.S. GAAP, IFRS requires companies to use accrual accounting, rather than cash accounting.  Under accrual accounting, a company recognizes revenue when it earns the right to payment, not when it collects that payment.  Specifically, "revenue is recognised in the accounting periods in which the services are rendered" and the outcome of a transaction "can be estimated reliably."  (Kritzer Ex. 2, IAS 18, ¶¶ 20-21)  IFRS defines when the outcome of a transaction can be "estimated reliably."  (*Id.* ¶ 20(a)-(d))  That definition does not require collection within any set period of time,

---

[2] Citations herein to "Kritzer Ex." are to the exhibits attached to the December 15, 2015 Declaration of Nathaniel J. Kritzer, filed concurrently with this brief.

nor does it say anything about a signed field ticket—or any statement signed by the customer. (*Id.*)

Poseidon's financial statements detailed when Poseidon recognized revenue, explaining that it did so "when [(a)] there is persuasive evidence of an arrangement, [(b)] tank rentals and related services are provided, [(c)] the rate is fixed and determinable, and [(d)] collectability is reasonably assured." (Compl. ¶ 62) This policy was consistent with IFRS. It did not mention signed field tickets or any signed documentation from the customer.

Plaintiff alleges that Poseidon's financial statements overstated Poseidon's financial results by recognizing revenue from its take-or-pay agreements improperly. Despite signed customer statements not being required by IFRS or Poseidon's revenue recognition policy, Plaintiff alleges that "Poseidon violated accounting rules by recognizing revenues whenever it was missing either a signed field ticket or a signed master agreement." (Compl. ¶ 8) Plaintiff also alleges other revenue recognition problems, such as recognizing revenue and billing customers for services the customers had not requested or received. (*Id.* ¶ 9)

In addition to its 2011 annual financial statements, Poseidon also filed in 2012 quarterly financial statements, which Plaintiff alleges suffered from the same supposed revenue recognition issues as the 2011 annual financial statements. (Compl. ¶¶ 74(c)-(e))

According to Plaintiff, things at Poseidon changed in August 2012, when the Company hired a new operations controller to "get to the bottom" of the field ticket issue. (Compl. ¶ 12) Plaintiff does not explain why a company knowingly perpetrating a fraud would hire a new senior employee to "get to the bottom" of the issue. Plaintiff alleges that the new controller told Poseidon's CFO that he had "no confidence" Poseidon would be paid any of the amounts its financial records showed it was owed from take-or-pay agreements. (*Id.* ¶ 110)

4

From there, according to Plaintiff, Poseidon investigated further.  On November 14, 2012, Poseidon "announced that it had taken a $9.5 million charge for uncollectible debt" in the third quarter of 2012.  (Compl. ¶ 23)  On December 27, 2012, Poseidon formed a committee to investigate the November 2012 charge, and also announced that it "may need to make additional write downs of accounts receivable in future periods."  (*Id*. ¶ 25)  On February 14, 2013, Poseidon announced that "$95 million to $106 million [] of the Company's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue."  (*Id*. ¶ 26)  Poseidon filed for protection from its creditors shortly thereafter.  (*Id*. ¶ 33)

### C.    KPMG's Audit Of Poseidon's Annual Financial Statements

KPMG audited Poseidon's 2011 annual financial statements under Canadian Auditing Standards ("CAS"), not U.S. Generally Accepted Auditing Standards, and issued an audit report opining that the financial statements were prepared in accordance with IFRS.  (Compl. ¶¶ 115, 35)  Under CAS, preparation of the financial statements is the responsibility of the company's management, not the auditor.  (Kritzer Ex. 3, CAS 200, ¶ 4, ¶ A2 (management has responsibility for "preparation of the financial statements in accordance with the applicable financial reporting framework"))  The auditor's responsibility is only to test the financial statements and obtain "reasonable assurance" that they comply with IFRS.  (*Id*. ¶ 11(a))

Although reasonable assurance is a high bar, it "is not an absolute level of assurance, because there are inherent limitations of an audit which result in most of the audit evidence on which the auditor draws conclusions and bases the auditor's opinion being persuasive rather than conclusive."  (Kritzer Ex. 3, CAS 200, ¶ 5)  "The auditor is not expected to, and cannot, reduce audit risk to zero and cannot therefore obtain absolute assurance that the financial statements are free from material misstatement due to fraud or error."  (*Id*. ¶ A45)  As a result, "there is an unavoidable risk that some material misstatements of the financial statements may not be detected,

even though the audit is properly planned and performed in accordance with CASs." (*Id.* ¶ A52) For that reason, "the subsequent discovery of a material misstatement of the financial statements resulting from fraud or error does not by itself indicate a failure to conduct an audit in accordance with CASs." (*Id.*)

Plaintiff's principal criticism of KPMG's audit is his allegation that KPMG was told at a March 22, 2012 Poseidon board meeting that "Poseidon needed signed field tickets to be paid" and that "Poseidon frequently did not obtain signed field tickets." (Compl. ¶ 77[b]) With that knowledge, Plaintiff contends, KPMG knew revenue should not have been recognized. But, critically, Plaintiff does not allege that Poseidon could not obtain signed field tickets *after* the services were provided and *then* collect the amounts owed—or, that if doing so was not possible, KPMG knew it was not possible. Nor does Plaintiff allege what KPMG did to test the revenue Poseidon recognized or what KPMG learned from its testing.

Further, throughout the complaint Plaintiff affirmatively suggests that the lack of signed field tickets meant only a *delay* in collection, not that collection would not occur. (Compl. ¶ 15 (Poseidon employees "explained to KPMG that Poseidon's ballooning accounts receivable and collection *delays* were caused by 'systematic' issues like 'not getting signed field tickets.'") (emphasis added); ¶ 118 ("Poseidon's Doug Robinson told KPMG auditor Meghan Misquita that '[a]ny collection *delays* whether they be from big players or small players have been systematic of the same issues, not getting field tickets signed *in a timely manner* and not submitting contract bills.") (emphasis added)) Plaintiff also alleges that KPMG understood that the unsigned field ticket issue went only to the timing of collection, documenting its understanding as follows:

> Poseidon has no collection issues that they are aware, but currently the company does have an issue with *timely* field ticketing execution/billing. There is currently *bottlenecks* relating to the field ticketing process primarily which in turn pushes out A/R [accounts receivable] collection cycle.… Per Doug, Poseidon has set a

goal to collect $50M of their receivables by the end of Q3 and he believes this is feasible for them to do.

(*Id*. ¶ 128(d) (partial quote); 2d Am. Compl. ¶ 159(d) (Docket #71) (full quote; emphasis added))

Thus, Plaintiff's own allegations make clear that KPMG understood that Poseidon was collecting the amounts it was owed more slowly, not that it would not collect them at all.   But Plaintiff cannot state a claim for failure to disclose that collections had slowed, because the slow collections were disclosed in Poseidon's financial statements.   The financial statements disclosed that Poseidon's past due accounts receivable as of the end of 2010 were only $9,000, but had grown to $6 million by the end of 2011.[3]   (Kritzer Ex. 1, Poseidon 2011 Financial Statements, at 56)   When compared to Poseidon's total accounts receivable, the growth of Poseidon's past due accounts receivable continued to be stark: Past due accounts receivable grew from 0.1% of total accounts receivable at the end of 2010 to 11% of the total accounts receivable at the end of 2011. (*Id*.)   These disclosures showed that the aged debts Poseidon was owed were growing, both in absolute terms and relative to the total amount customers owed Poseidon.

After issuing the audit report on the 2011 financial statements, KPMG reviewed Poseidon's quarterly financial statements for the first three quarters of 2012.   Under CAS, reviews are different than audits:

> The objective of a review of interim financial statements differs significantly from the objective of an audit of financial statements in accordance with generally accepted auditing standards.   The objective of an audit is to enable the auditor to ex-

---

[3] Accounts receivable are amounts that have been recognized as revenue, but for which payment has not yet been collected.   In other words, they are the amounts that a company is currently owed for goods or services it has already provided.   When Poseidon recognized revenue from take-or-pay agreements, it recorded both revenue and an account receivable at the same time, which showed that it believed (1) it was owed that amount and payment was probable (revenue); and (2) it had not yet been paid (account receivable).   As Poseidon collected payment, the accounts receivable balance would decrease, but the revenue balance would not change, because the revenue was already recorded.

press an opinion on whether the financial statements are presented fairly, in all
material respects, in accordance with the applicable financial reporting frame-
work.  A review of interim financial statements does not provide a basis for the
expression of such an opinion.

(Kritzer Ex. 4, OCS 7050.24)  Plaintiff does not allege that KPMG audited or made any state-

ment concerning Poseidon's quarterly financial statements, nor does he attempt to state a claim

against KPMG based on its reviews of Poseidon's quarterly financial statements.

## Argument

## I.    The Court Lacks Personal Jurisdiction Over KPMG.

The first reason Plaintiff's claim should be dismissed is that the Court lacks personal ju-

risdiction over KPMG.  *See* Fed. R. Civ. P. 12(b)(2).  "A plaintiff bears the burden of demon-

strating personal jurisdiction over a person or entity against whom it seeks to bring suit."

*Penguin Group Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  Specifically, a plaintiff must

show "legally sufficient allegations of jurisdiction, including an averment of facts that, if credit-

ed, would suffice to establish jurisdiction over the defendant."  *Id*. at 36 (alterations omitted).[4]

The Supreme Court has cautioned that courts should be wary of extending personal jurisdiction

to defendants outside the United States: "The unique burdens placed upon one who must defend

oneself in a foreign legal system should have significant weight in assessing the reasonableness

---

[4] On a motion to dismiss for lack of personal jurisdiction, the Court "has considerable procedural
leeway."  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d. Cir. 1981).  It may re-
solve the motion on the papers alone, or may conduct an evidentiary hearing.  *Id*.  "If the court
chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make
only a prima facie showing of jurisdiction through its own affidavits and supporting materials.
Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evi-
dence, either at a pretrial evidentiary hearing or at trial."  *Id*.  KPMG submits that Plaintiff has
not established even a prima facie showing of personal jurisdiction over KPMG.  But, if the
Court disagrees, KPMG respectfully requests a pretrial evidentiary hearing, to make a final de-
termination on personal jurisdiction before the parties engage in costly discovery.

of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Ct. of Calif.*, 480 U.S. 102, 114 (1987).

The Securities Exchange Act permits nationwide personal jurisdiction to the limits of the Constitution. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); 15 U.S.C. § 78aa(a). The Constitution allows for both general and specific personal jurisdiction, *see, e.g., Daimler AG v. Bauman*, 134 S.Ct. 746, 754 (2014), but Plaintiff does not assert that KPMG is subject to general personal jurisdiction in the United States. (Compl. ¶¶ 185-98) Thus, Plaintiff must plead and prove facts satisfying the Supreme Court's two-part test for specific personal jurisdiction: First, the defendant must have had "minimum contacts" with the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Second, the assertion of personal jurisdiction must comport with "fair play and substantial justice." *Id*. at 476. Plaintiff has satisfied neither test.

### A.   Plaintiff Has Not Established That KPMG Had Minimum Contacts With The United States.

"[W]hether the defendant purposefully established 'minimum contacts' in the forum State" is the "constitutional touchstone" for specific jurisdiction. *Burger King*, 471 U.S. at 474. "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id*. at 474-75 (emphasis added). In other words, the defendant's acts must "create a substantial connection with the forum State." *Asahi Metal*, 480 U.S. at 109. Even then, only the actions that "gave rise to the episode-in-suit" are relevant to the analysis. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2853 (2011).

*General Electric Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993) presents an instructive application of the minimum contacts requirement to the particular context of financial statement auditors. There, two Canadian accounting firms had audited the financial statements

of a Canadian company that was owned by a U.S. company, and whose financial statements were incorporated into the U.S. parent company's SEC filings. *Id*. at 1378-80. The firms issued audit reports that the plaintiffs alleged were erroneous. The plaintiffs also alleged that "the accounting firms 'purposefully directed' their activities into Minnesota by directing accounting reports into Minnesota with the knowledge that United States investors would rely on them." *Id*. at 1387. The Eighth Circuit held that the accounting firms lacked the minimum contacts required for specific personal jurisdiction, explaining that it was "not convinced that the sending of financial statements into the United States establishes minimum contacts." *Id*. at 1388. Rather, "the 'focal point' of the alleged wrongdoing and harm occurred in Canada, where [the audited company] was located, [and] where its auditing and accounting functions took place…." *Id*. at 1387. Thus, "[a]lthough it c[ould] be argued that the effects of the harm ultimately occurred in Minnesota, under the circumstances, the accounting firms could not reasonably anticipate 'being haled' into court there." *Id*. at 1387-88.

As in *General Electric Capital Corp.*, the complaint here does not allege facts sufficient to establish the minimum contacts necessary for specific personal jurisdiction over KPMG. The complaint alleges that KPMG is a Canadian firm (Compl. ¶ 44), and that it audited the financial statements of a Canadian company (*id*. ¶ 33). The complaint further alleges that Poseidon's financial statements were filed with Canadian regulators, that the financial statements purported to comply with Canadian accounting rules, and that KPMG's audit purported to comply with Canadian auditing rules. (*Id*. ¶ 35) The complaint alleges that KPMG did not visit the United States during its audit (*id*. ¶ 22), and that all of Poseidon's accountants were in Canada (*id*. ¶ 146). In short, the complaint lacks allegations that KPMG created a "substantial connection" with the U.S. that invoked the benefits and protections of U.S. law. *Asahi Metal*, 480 U.S. at 109.

Plaintiff's latest complaint adds allegations that (1) "KPMG corresponded with key Poseidon employees who were located in the U.S." (Compl. ¶ 189); (2) auditors "typically" send written confirmation notices to third parties to confirm accounts receivable balances (*id*. ¶ 190); (3) KPMG consented to the use of *other* audit reports in conjunction with Poseidon's offering of stock in January 2012 (*id*. ¶¶ 192-97); and (4) KPMG's engagement letter for the 2011 audit "explicitly contemplated that Poseidon might use KPMG's 2011 audit report in a private placement or offering in the U.S. or Canada." (*Id*. ¶ 198)  These allegations do not satisfy Plaintiff's burden.

*First*, Plaintiff alleges that KPMG corresponded with Poseidon employees who were in the United States, both Poseidon employees based in the U.S. and employees based in Canada who were visiting the U.S.  (Compl. ¶ 189)  This is not a well-pled allegation.  Plaintiff does not allege any specific correspondence, when it occurred, or with whom it occurred.  More importantly, Plaintiff does not allege that these conversations had anything to do with the subject matter of this lawsuit—that is, Plaintiff does not allege that any of the conversations are connected to the supposed KPMG misstatements in its audit report on Poseidon's 2011 annual financial statements.  *See Goodyear*, 131 S.Ct. at 2853 (acts can only subject a defendant to specific jurisdiction "with respect to those acts").

Further, communications sent to a forum do not establish the "substantial connection" with that forum required for personal jurisdiction.  *See Eagle Technology v. Expander Americas, Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015) ("[T]elephone calls, written, communications and even wire-transfers to and from a forum state do not create sufficient contacts to comport with due process."); *Trierweiler v. Croxton & Trench Holding Corp*., 90 F.3d 1523, 1534 (10th Cir. 1996) ("The fact that Kaplan called Trierweiler's attorney in Michigan does not" establish personal ju-

risdiction); *DeCusati v. Reiss Engineering, Inc.*, 2015 WL 4622494, *3 (E.D. Va. July 30, 2015) ("Telephone calls, email and telex messages, and letters do not form a basis for personal jurisdiction."); *Consulting Engineers, Inc. v. Geometric Software Solutions*, 2007 WL 2021901, *3 (E.D. Va. July 6, 2007) ("This Court has already held that mere electronic communications in furtherance of a transaction are insufficient to form a basis for personal jurisdiction.").  Thus, correspondence with Poseidon employees in the United States does not establish minimum contacts with the United States.

*Second*, Plaintiff alleges that auditors "typically" send written confirmations to third parties during audits in order to confirm accounts receivable balances.  (Compl. ¶ 190)  On that basis, Plaintiff alleges, "KPMG committed itself to a relationship that required continuing and wide-ranging contacts with Poseidon in the United States" when it agreed to audit Poseidon's financial statements.  (*Id*. ¶ 191)  By Plaintiff's analysis, then, auditors would consent to be sued in every jurisdiction where customers of the company whose financial statements they were auditing could be found.  This assertion is absurd.  Plaintiff offers no reason why sending a letter to a customer of the company whose financial statements are being audited would satisfy the Constitution's requirement that the defendant must have availed itself of the protections of, and created a substantial connection with, the forum.

And, in fact, courts have held that gathering information for an audit from a foreign jurisdiction does *not* subject an auditor to suit in that jurisdiction.  *See Able Fund v. KPMG Accountants NV*, 247 Fed. Appx. 504, 507 (5th Cir. 2007) ("KPMG's sole Texas contacts were made to collect information for use in the audit.  As explained above, mere communications with a co-defendant whom a defendant is obliged to communicate with in the carrying out of its duties are not sufficient to establish minimum contacts."); *Young v. FDIC*, 103 F.3d 1180, 1191 (4th Cir.

1997) ("[T]he sole act of using account information from HHB&T in South Carolina does not establish a 'substantial connection' between PW-Bahamas and South Carolina; nor does it constitute a purposeful availment of the privilege of conducting business in South Carolina.").[5]  That is especially true when the dispute has nothing to do with the written confirmations—Plaintiff does not allege that KPMG sent flawed confirmations or failed to review the confirmations when they were returned.  *See Daimler*, 134 S.Ct. at 754 (specific jurisdiction is for "suits relating to that in-state activity").  Indeed, other than the assertion that auditors "typically" send confirmations, the complaint contains no allegations about confirmations at all.  Plaintiff does not even allege that KPMG did send confirmations into the United States during its audit.

*Third*, KPMG's consent to the inclusion, in Poseidon's prospectus for a January 2012 stock offering, of audit reports *other than* KPMG's 2011 audit report is truly a non-sequitur. (Compl. ¶ 195)  For starters, Plaintiff did not purchase his Poseidon shares through the January 2012 offering; he alleges that he purchased his shares nearly a year later in an over-the-counter transaction.  (*Id.* ¶ 183 ("Mr. Kolar bought all of his Poseidon stock on the OTC Pink Sheets under ticker POOSF."); G. Kolar Certification, at 4 (Docket #17-2) (alleging Plaintiff purchased all his Poseidon shares in November and December 2012))  KPMG's consent to the use of audit reports in connection with Poseidon's January 2012 offering is unrelated to Poseidon's stock trading over the counter afterwards, and so cannot create specific personal jurisdiction over KPMG for Plaintiff's claim.  *See Goodyear*, 131 S.Ct. at 2851 (rejecting assertion of specific jurisdiction

---

[5] *Cf. In re Banco Santander Securities-Optimal Litig.*, 732 F. Supp. 2d 1305, 1328 (S.D.N.Y. 2010) ("In this case, an Irish auditing firm obtained some information from New York in connection with its audits of a Bahamian fund whose investors all resided outside of the United States.  As such, PWC Ireland is not subject to personal jurisdiction in New York because it was not transacting business in New York; it was transacting business in Ireland on behalf of non-United States clients.").

based on acts other than the acts at issue in the lawsuit, explaining that such assertions impermissibly "blend" general and specific jurisdiction).

Moreover, the audit reports that KPMG consented to Poseidon incorporating into its prospectus are not alleged to be misstatements in this case.  The first audit report that Plaintiff alleges KPMG consented to Poseidon incorporating into its prospectus is KPMG's "audit report on Open Range's 2010 annual financial statements."  (Compl. ¶ 195)  At the end of 2010, the businesses that became Open Range and Poseidon were still a single, combined company, so Open Range's 2010 financial statements included information on the business that would become Poseidon.  But Plaintiff does not allege that this audit report was false, so it cannot be the basis for the assertion of specific jurisdiction.  (*Id*. ¶¶ 115-17)  The second audit report that Plaintiff alleges KPMG consented to have incorporated into Poseidon's prospectus is "the Spin-Off KPMG Opinion."  (*Id*. ¶ 195)  Plaintiff alleges that the Spin-Off KPMG Opinion was "an opinion on Poseidon's financial statements as of September 14, 2011."  (*Id*. ¶ 192)  This is incorrect.  As explained by KPMG auditor Greg Caldwell, KPMG's audit report concerned the company that would become Open Range after the split, not Poseidon.  (Caldwell Decl. ¶ 9)  As a result, this audit report is wholly unrelated to Plaintiff's claim against KPMG, and cannot be the basis for the assertion of specific jurisdiction.

Additionally, even if KPMG had consented to the use of an audit report on Poseidon's financial statements in the prospectus, it would not establish a connection between KPMG and the United States because the prospectus was used to sell Poseidon stock in *Canada*, not the U.S.  Thus, the prospectus itself stated clearly that "[t]his short form prospectus does not constitute an offer to sell, or a solicitation of an offer to buy, any of the Offered Shares in the United States."  (Kritzer Ex. 5, Prospectus, at 12)  In the U.S., underwriters sold Poseidon shares to a limited

14

class of investors pursuant to a private placement memorandum.[6]  (Kritzer Ex. 6, Priv. Placement

Mem.)  But KPMG did not consent to the incorporation of its audit reports into the private

placement memorandum.  Rather, it consented only to the incorporation of the audit report "in

the above-mentioned short form prospectus."  (Kritzer Ex. 5, Prospectus, at 17)  Ultimately, Po-

seidon or its underwriters included the prospectus in the private placement memorandum.

(Kritzer Ex. 6, Priv. Placement Mem., at 21-43)  But KPMG did not issue any consent for them

to do so, and Plaintiff does not allege otherwise.  Thus, KPMG's consent to the inclusion of audit

reports that are not at issue in this case into Poseidon's January 2012 prospectus for the sale of

stock in Canada does not establish a "substantial connection" between KPMG and the U.S.

Finally, even if KPMG had consented to the inclusion of a (relevant) audit report in a set

of financial statements that it knew would be sent to a foreign jurisdiction (which it did not), that

would be insufficient to establish personal jurisdiction.  *See Trierweiler*, 90 F.3d at 1534 (reject-

ing personal jurisdiction even though "Machol may have known that the opinion letter to Dublin

would be sent, via an intermediary, into Michigan"); *General Electric Capital Corp.*, 991 F.2d at

1388 (holding the court was "not convinced that the sending of financial statements into the

United States establishes minimum contacts").  As one court reviewing the same argument held:

> GGK is not alleged to have affirmatively taken some action on its own to send its
> audit report into Colorado; rather, it has simply given consent for ATC to file that
> audit report with the SEC and distribute it with ATC's prospectus.  The affirma-

---

[6] The private placement memorandum indicated that Poseidon's shares "have not been and will
not be registered under the 1933 Act or the securities laws of any state of the United States."
(Kritzer Ex. 6, Priv. Placement Mem., at 1)  Thus, shares were available under the private place-
ment offering only to Qualified Institutional Buyers and Institutional Accredited Investors.  (*Id*.)
The memorandum also expressly told U.S. investors that "it may be difficult for investors to ef-
fect service of process within the United States upon the Corporation and such directors, officers
and experts, or to realize in the United States upon judgments of courts of the United States pred-
icated upon civil liability of the Corporation and such directors, officers or experts under United
States federal securities laws."  (*Id*. at US-5)

tive act of sending the audit report into Colorado was performed by ATC, not
GGK, and this Court can locate no 'affirmative act' by GGK directed specifically
at Colorado.

*Roaring Fork Capital SBIC v. ATC Healthcare, Inc.*, 2011 WL 1258504, *5 (D. Colo. Mar. 29,
2011) (dismissing claim for lack of personal jurisdiction).

    <u>*Fourth*</u>, that KPMG's engagement letter for the 2011 audit contemplated that Poseidon

"might" use the audit report in another private placement offering in the United States is mean-

ingless, because Plaintiff does not allege that any such offering took place or that KPMG issued

any such consent.  (Compl. ¶ 198)  And Plaintiff did not purchase his stock through any such of-

fering.  *See supra* at 13.  The question under the Constitution is whether KPMG took acts to avail

itself of the benefits and protections of U.S. laws.  That KPMG knew Poseidon *might* do some-

thing it ultimately did not do is irrelevant to that question.  Consequently, Plaintiff has not satis-

fied the minimum contacts test for specific personal jurisdiction.

    **B.**    **Asserting Personal Jurisdiction Over KPMG Would Not Comport With
        "Fair Play And Substantial Justice."**

    Nor can Plaintiff satisfy the second part of the specific jurisdiction test—that the asser-

tion of jurisdiction must comport with "fair play and substantial justice."  *Burger King*, 471 U.S.

at 476.  The Supreme Court considers this question by balancing five factors: (1) the burden the

exercise of jurisdiction would impose on the defendant; (2) the interests of the forum state in ad-

judicating the litigation; (3) the plaintiff's interest in obtaining convenient and effective relief;

(4) the judicial system's interest in obtaining the most efficient resolution of the controversy; and

(5) the shared interest of the states in furthering substantive social policies.  *Id.* at 477.

    First, exercising jurisdiction over KPMG here would subject it to a significant burden:

KPMG does not have offices or in-house counsel in the U.S., and so the costs of defending this

litigation would be higher for it.  *See* Caldwell Decl., ¶ 2; *Asahi Metal*, 480 U.S. at 114 (describ-

ing the "unique burdens" that defendants from other countries face here).  Second, the United

States has little interest in adjudicating this claim.  KPMG is a Canadian firm that conducted an

audit under Canadian rules and issued the supposedly false audit report in Canada.  Third, given

that most of the witnesses and evidence are located in Canada, the United States is not a more

convenient and effective forum for Plaintiff to obtain relief than Canada.  Fourth, putative class

actions that include the claim brought here and are brought on behalf of investors *including

Plaintiff* are already pending in Canada.  (*See* G. McLennan Decl., ¶ 4 (Docket #88))  Plainly,

adjudicating the claims of all investors in one proceeding is more efficient than each country

where Poseidon investors reside adjudicating its own investors' claims.  As a result, the factors

governing whether the exercise of personal jurisdiction over KPMG would be fair dictate that it

would not be.

## II.    Venue Is Not Proper In This District.

The second reason to dismiss Plaintiff's claim is improper venue.  *See* Fed. R. Civ. P.

12(b)(3).  Plaintiff bears the burden of establishing proper venue.  *See Gulf Ins. Co. v. Glasbren-

ner*, 417 F.3d 353, 355 (2d Cir. 2005).  Plaintiff asserts that "[v]enue is proper in this Judicial

District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)

as a substantial part of the conduct complained of herein occurred in this District."  (Compl.

¶ 30)  But, to the contrary, Plaintiff does not allege that "a substantial part of the conduct com-

plained of" occurred in New York.  Indeed, the complaint does not allege that *any* part of the

conduct complained of occurred in New York.  The complaint's only mention of New York is

the venue paragraph itself, which is quoted above in its entirety.

Nor does the complaint contain any other basis for venue in this District.  The Exchange

Act's venue provision displaces 28 U.S.C. § 1391(b)'s venue provision, so Plaintiff's citation of

the latter is erroneous.  *See, e.g., SST Global Technology, LLC v. Chapman*, 270 F. Supp. 2d 444,

452 (S.D.N.Y. 2003) ("Venue with regard to securities law claims under the Securities Exchange Act is controlled exclusively by 15 U.S.C. § 78aa, without regard to the general venue provisions of 28 U.S.C. § 1391.").  And the Exchange Act's venue provision permits a plaintiff to sue only in a district where (1) "a defendant is found or is an inhabitant or transacts business"; or (2) where "any act or transaction constituting the violation occurred."  15 U.S.C. § 78aa(a).  But the complaint does not allege that any defendant is found in this District or otherwise transacts business here.  (Compl. ¶¶ 36-44)  Nor does it allege that any act that violated § 10(b) occurred in this District.  As a result, venue is not proper in this District.  (*See also* Caldwell Decl., ¶¶ 5-6 ("I am not aware of any actions Poseidon took in New York or any connection between the allegations in the complaint and New York."))

## III.    The Court Should Dismiss This Action For *Forum Non Conveniens.*

The Court should also dismiss this lawsuit under the *forum non conveniens* doctrine. Courts consider *forum non conveniens* motions in three steps.  "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum."  *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).  Second, the court "considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  *Id*.  "Finally, at step three, a court balances the private and public interests implicated in the choice of forum."  *Id*.  Here, all three steps favor dismissal of this lawsuit in favor of adjudication in Canada.

### A.    Plaintiff's Choice Of Forum Should Not Be Accorded Deference.

The degree of deference that courts accord a plaintiff's choice of forum is dictated by whether the forum truly is convenient or whether the choice suggests forum shopping:

> [T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more diffi-

cult it will be for the defendant to gain dismissal for *forum non conveniens*.… On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons … the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on *forum non conveniens* motion by showing that convenience would be better served by litigating in another county's courts.

*Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc). Five factors determine whether a choice of forum was likely motivated by genuine convenience: "[1] the convenience of the plaintiff's residence in relation to the chosen forum; [2] the availability of witnesses or evidence to the forum district; [3] the defendant's amenability to suit in the forum district; [4] the availability of appropriate legal assistance; and [5] other reasons relating to convenience of expense." *Id.* at 72. Additionally, "in class actions less weight is given to the plaintiff's choice." *Pace v. Quintanilla*, No. 13-91 (RJS), 2013 WL 5405563, *2 (S.D.N.Y. Sept. 23, 2013); *In re Warrick*, 70 F.3d 736, 741 n.7 (2d Cir. 1995) (similar). These factors demonstrate that Plaintiff's decision to sue in this Court was forum shopping, not genuine convenience:

*Plaintiff's Residence*. The complaint does not plead any connection between Plaintiff and this forum. To the contrary, Plaintiff lives in Florida. (Compl. ¶ 184) Plaintiff's residence in Florida suggests that his decision to file in New York was not made because of proximity to his residence. *See, e.g., Wenzel v. Marriott Int'l, Inc.*, __ Fed. Appx. __, 2015 WL 6643262, *1 (2d. Cir. Nov. 2, 2015) (limiting the deference shown *even to a plaintiff who resided in New York*, because "the operative facts of this action took place outside of the Southern District of New York.").

*Availability Of Witnesses Or Evidence*. "[A]t the first step of *forum non conveniens* analysis, the issue is not whether witnesses and evidence are unavailable in the defendant's preferred forum, but whether they are more available in plaintiff's chosen foreign forum than in its home forum. If … the answer to that question is yes, then it appears likely that convenience ra-

ther than forum shopping influenced the plaintiff's choice of a foreign forum." *Norex Petroleum*, 416 F.3d at 156.  Here, witnesses and evidence are not more available in New York than in Plaintiff's home forum (Florida) or KPMG's home forum (Canada).  Indeed, the complaint does not allege that *any* defendant, witness, or evidence is located in New York.  Thus, this factor too suggests that Plaintiff chose New York for reasons other than convenience.

*Defendants' Amenability To Suit In This District*.  There is no basis for a conclusion that Plaintiff chose to sue in New York because Defendants are amenable to suit here, for they are not: The complaint admits that KPMG is a Canadian firm.  (Compl. ¶ 44)  All but one of the other defendants live in Canada as well.  (Caldwell Decl., ¶ 8)

*Availability Of Legal Assistance*.  Plaintiff cannot credibly claim that legal representation is somehow more available here than in his home forum or Defendants' home forum.  There are able lawyers in Florida and Canada, and Plaintiff would have ready access to them.

*Other Reasons Relating To Convenience Or Expense*.  The complaint does not identify any other convenience from litigating in New York.  In such circumstances, the Second Circuit has concluded that it will not defer to the plaintiff's choice of forum.  For example, in *In re Herald,* 540 Fed. Appx. 19 (2d Cir. 2013), a case arising out of the Madoff Ponzi scheme, a foreign plaintiff sued foreign defendants in this Court.  The Second Circuit refused to defer to the plaintiffs' choice of forum.  The court reasoned that "Plaintiffs have not identified a single potential witness in New York or within 100 miles of this courthouse, the core operative facts of these cases involve the operations of foreign entities outside of the United States, and Plaintiffs, who are themselves foreign, each purport to represent a class of foreign investors …, and appear to have little or no connection to the United States."  *Id*. at 26 (internal quotation marks omitted).  Other than the fact that Plaintiff here appears to be a U.S. resident—which can be disregarded for

this analysis because he has no alleged connection to this District—the analysis in *Herald* applies fully.

In sum, none of the factors used to assess whether a plaintiff chose a forum for convenience suggests that Plaintiff might have had a legitimate reason to file here.  As a result, the Court should not defer to Plaintiff's choice of forum.  *See Maverick Fund, L.D.C. v. Lender Processing Services, Inc.*, No. 13-5474 (DLC), 2013 WL 6467889, *2 (S.D.N.Y. Dec. 10, 2013) (refusing to defer to the plaintiff's chosen forum because the plaintiff had "not attempted to show that the critical decisions regarding this litigation will be made in New York.  The Maverick plaintiffs are managed by Maverick Capital Ltd., whose headquarters and principal place of business are located in Texas.  Maverick is represented by California counsel.  And significantly, the operative events that drive this litigation occurred in Florida.").

**B.      Canada Is An Adequate Alternate Forum For This Action.**

In the second step of the *forum non conveniens* analysis, the movant must demonstrate the availability of an adequate alternative forum.  *See Norex Petroleum*, 416 F.3d at 157.[7]  "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Id.*  "[T]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies."  *Id.* at 158.

Here, Canada clearly is an available and adequate forum for suing KPMG, because Canada is currently serving as a forum for three such suits: As Plaintiff has told the Court previously, "[i]nvestors who bought Poseidon stock on Canadian exchanges have sued (among others) …

---

[7] Courts consider the second step even if according some degree of deference to the plaintiff's choice of forum under the first step.  *See id*.

KPMG LLP." (6/11/2015 Letter, at 1 (Docket #65))  Even more, two of the Canadian lawsuits were brought on behalf of *all* acquirers of Poseidon stock, *including Plaintiff and the putative class he seeks to represent here*. (McLennan Decl., ¶ 4 (Docket #88))

### C. Private And Public Interests Weigh In Favor Of Litigating This Case In Canada.

Finally, the private and public interests support litigating this case in Canada.  The private factors that courts consider are "(1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive." *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998).  The public factors are: "(1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community." *Id*.

The private factors favor litigating the claim against KPMG in Canada.  Because Poseidon's accounting department was located in Canada during KPMG's audit (Compl. ¶ 146), and KPMG's audit took place exclusively in Canada (*id*. ¶ 22), Canada offers easier access to evidence than does New York.  Trying the case would be cheaper for witnesses in Canada, where all the KPMG witnesses reside, as do most of the Poseidon witnesses.  For the same reason, compulsory process for unwilling witnesses would be easier in Canada.  Finally, litigation in Canada would be more efficient, because Plaintiff's claim can be coordinated—or even consolidated—with the cases against KPMG currently pending in Canada that Plaintiff's claim duplicates.  In these circumstances, courts dismiss cases in favor of the more convenient forum. *See Rentokil-Initial Pension Scheme v. Citigroup Inc.*, 614 Fed. Appx. 27, 28 (2d Cir. 2015) (affirming *forum non conveniens* dismissal where the district court found, among other things, that "the most relevant fact witnesses are U.K. citizens," that the securities at issue were regulated by a

foreign regulator, and "that the U.K. possessed an interest in having 'localized controversies decided at home'"); *Maverick Fund*, 2013 WL 6467889, at *3 (Weighing private factors in favor of the defendants: "Virtually all of the critical events that will need to be explored in this litigation occurred in the Middle District of Florida.  That is where the defendants prepared the SEC filings, press releases, and earnings call statements that give rise to allegations that the defendants engaged in fraud.…  Maverick has not identified any New York witness who has material evidence to provide regarding the allegations in its complaint.").

The public factors also favor litigating in Canada.  This is a case about a Canadian company, a Canadian audit firm, and financial statements prepared according to Canadian accounting rules, audited under Canadian auditing rules, and filed with Canadian regulators.  The case is Canadian to its core and lacks any connection to New York.  *See Rentokil-Initial Pension Scheme*, 614 Fed. Appx. at 29 (affirming dismissal and weighing public factors: "jury service would impose an unfair burden on New Yorkers with little stake in the outcome of this case," and "U.S. courts should avoid adjudicating the issues of foreign law relevant here"); *Herald*, 540 Fed. Appx. at 29 ("the public interest factors often favor dismissal where there is … parallel litigation arising out of the same or similar facts already pending in the foreign jurisdiction."); *Young v. FDIC*, 103 F.3d 1180, 1192 (4th Cir. 1997) ("South Carolina, the forum state, has little interest in the dispute since Young is a Texas resident and PW-Bahamas prepared the audit report in the Bahamas.").

In sum, to the extent Plaintiff's claim against KPMG should proceed at all, it should proceed in Canada.  Plaintiff has no connection to this forum, nor do any of the events alleged in the complaint.  Under these circumstances, the claim should be dismissed for *forum non conveniens*.

**IV.    The Complaint Does Not Plead Facts Sufficient To Give Rise To A Plausible Inference That § 10(b) Applies To Plaintiff's Claim Against KPMG.**

The fourth reason to dismiss Plaintiff's claim against KPMG is that the complaint's allegations do not support a plausible inference that § 10(b) applies to the conduct pled, for the Supreme Court has held that § 10(b) does not apply extraterritorially.  *See Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869, 2881 (2010).  As a result, the claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

**A.    Plaintiff Has Not Pled That His Alleged Purchases Of Poseidon Stock Occurred In The United States.**

To plead that § 10(b) applies, a complaint's allegations must give rise to a plausible inference that the plaintiff's stock purchases occurred "in the United States."  *Morrison*, 130 S.Ct. at 2884.  Without such allegations, a complaint does not state a claim.  *Id.* at 2877; *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69-70 (2d. Cir. 2012) ("[W]e conclude that the allegations do not sufficiently allege that purchases or sales took place in the United States."); *Arco Capital Corp. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541 (S.D.N.Y. 2013) (similar); *In re Satyam Computer Svcs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 476 (S.D.N.Y. 2013) (similar).  *Morrison* held that there are two ways in which transactions can occur "in the United States."  First, they can be "transactions in securities listed on domestic exchanges."  *Morrison*, 130 S.Ct. at 2884.  Second, they can be domestic transactions in securities not registered on domestic exchanges.  *Id.* at 2885.  Plaintiff argues, in the alternative, that he meets both tests.  His allegations are insufficient as to both.

24

### 1.    The OTC Pink Sheets Is Not A Domestic Exchange.

Plaintiff alleges that he "bought all of his Poseidon stock on the OTC Pink Sheets under ticker POOSF."[8]  (Compl. ¶ 183)  But the OTC Pink Sheets is not a domestic exchange.  First, the OTC Pink Sheets itself says it is not an exchange, describing its stocks as "off-exchange traded securities."  (Kritzer Ex. 7, at 1)[9]  Second, the SEC does not consider the OTC Pink Sheets to be an exchange: "According to the SEC, there are eighteen registered national security exchanges; the Pink Sheets and the OTCBB [Over The Counter Bulletin Board] are not among them."  *United States v. Georgiou*, 777 F.3d 125, 134 (3d Cir. 2015).

Thus, the majority of courts to consider the question have held that over-the-counter markets are not exchanges.  *See Georgiou*, 777 F.3d at 135 ("[W]e are persuaded that those exchanges are not national securities exchanges within the scope of *Morrison*."); *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 791 (11th Cir. 2015) (Pink Sheets "displays the bid and ask prices for over-the-counter securities (*i.e.*, securities that are not listed on a U.S. exchange)"); *SEC v. Boock*, No. 09-8261 (DLC), 2011 WL 3792819, *18 (S.D.N.Y. Aug. 25, 2011) ("The OTC Pink Sheets is a quotation service that certain broker-dealers use to post offers to sell and to buy securities not listed on a national exchange, and is not itself an exchange.").  Indeed, the stock at issue in *Morrison*—ordinary shares of National Australia Bank—traded over the counter in the United States, under the ticker symbol NAUBF.  *See* www.otcmarkets.com/stock/NAUBF.

---

[8] As the OTC Pink Sheets' website explains, the "F" at the end of Poseidon's stock ticker "POOSF" stands for "foreign ordinary" share.  (Kritzer Ex. 7, at 2)

[9] The Over The Counter Bulletin Board, the other principal over-the-counter market, similarly describes itself as not being an exchange.  (Kritzer Ex. 8, at 1 ("The OTCBB is a quotation service for securities which are not listed or traded on NASDAQ *or any other national securities exchange.*") (emphasis added))

Despite that fact, the Supreme Court explained that "[t]his case involves no securities listed on a domestic exchange." *Morrison*, 130 S.Ct. at 2888.

The reason the OTC Pink Sheets is not an exchange is because securities quoted over the counter are fundamentally different than securities traded on exchanges. Securities traded on domestic exchanges are fundamentally connected to the United States. The issuer of such securities must register with the SEC and agree to abide by various reporting regulations. By contrast, an issuer of securities quoted over the counter undertakes no such obligations. In fact, it does not even decide to have its stock quoted over the counter. "Unlike on stock exchanges, companies do not list their own stock for trading [over the counter]. Rather, broker-dealers begin quoting new securities on OTC Link ATS by submitting a Form." (Kritzer Ex. 9, OTC Markets: "How To Get Traded," at 1; *see also* Kritzer Ex. 7, OTC Markets: "FAQs For Companies and Investors," at 1 ("The OTC Pink Open Marketplace is for broker-dealers to trade all types of securities *without requiring company involvement*.") (emphasis added)) Nor can a company stop its stock from being quoted over the counter. "The only way to remove a company from the OTCQX, OTBQB, and OTC Pink marketplaces is for all of the broker-dealers to stop quoting it." (*Id.*, at 2) Thus, *Morrison*'s distinction between "transactions in securities listed on domestic exchanges" and "securities not registered on domestic exchanges" is meaningful. *Morrison*, 130 S.Ct. at 2884-85. The Supreme Court reasonably distinguished, for purposes of considering § 10(b)'s reach, between issuers of securities who affirmatively take steps to associate with the U.S. regulatory system, and issuers of securities who do not. As a result, it is clear that the OTC Pink Sheets is not an exchange under *Morrison*'s first prong.

### 2. Plaintiff Has Not Pled That His Purchases Of Poseidon Stock Took Place In The United States.

Plaintiff also argues in the alternative that his purchases of Poseidon stock took place domestically even if Poseidon's stock was not registered on an exchange.  To establish that a transaction occurred domestically, a plaintiff cannot simply allege that he made his purchase "through" the OTC Pink Sheets because that is not how the OTC Pink Sheets works.  The OTC Pink Sheets is "an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter (OTC) securities."  (Kritzer Ex. 10, SEC Publication, at 1) "There is no central 'exchange' for securities that trade in the OTCQC, OTCQB, and OTC Pink marketplaces; therefore, broker-dealers must communicate and trade directly with other broker-dealers."  (Kritzer Ex. 11, OTC Markets: "Market 101 – Market Structure," at 2)  The only requirement is that the trade must occur between broker-dealers who are registered with FINRA— the Financial Industry Regulatory Authority.  (Kritzer Ex. 7, OTC Markets: "FAQs For Companies and Investors," at 2)  But such broker-dealers need not be in the United States; the list includes many foreign broker-dealers.  *See* www.finra.org/about/firms-we-regulate.  Thus, an allegation that a trade was made "through" the OTC Pink Sheets does not indicate in what country the trade occurred.

As a result, to plead that a transaction occurred domestically, "a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States."  *Absolute Activist*, 677 F.3d at 68.  Attempting to meet this standard, Plaintiff alleges that (1) he "resided in Florida in the entire time he purchased Poseidon stock"; (2) he "bought all his Poseidon stock through his U.S. Charles Schwab account," using a broker "located in Florida"; and (3) once he "entered his order to purchase Poseidon stock, he no longer had the discretion to revoke acceptance."  (Compl. ¶ 184)  These allegations are insufficient to plead that

Plaintiff's purchases took place domestically. "[T]he failure to adequately allege the location of the transactions in issue requires the Court to dismiss plaintiffs' remaining claims under the Securities Exchange Act." *Mori v. Saito*, No. 10-6465 (KBF), 2013 WL 1736527, *8 (S.D.N.Y. Apr. 19, 2013).

*First*, that Plaintiff resided in Florida when he purchased his Poseidon shares does not imply a domestic transaction. It indicates where Plaintiff interacted with his broker, but not where the broker interacted with the seller's broker, where the contract of sale was formed, where title passed, or where money was exchanged. Thus, Plaintiff's residence at the time he placed his order is irrelevant to where the transaction took place. *See Absolute Activist*, 677 F.3d at 69 ("[A] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States."); *Satyam*, 915 F. Supp. 2d at 474 ("An investor's location in the United States does not transform an otherwise foreign transaction into a domestic one."); *In re Societe Generale Sec. Litig.*, No. 08-2495 (RMB), 2010 WL 3910286, *6 (S.D.N.Y. Sept. 29, 2010) ("By asking the Court to look to the location of 'the act of placing a buy order,' … Plaintiffs are asking the Court to apply the conduct test specifically rejected in *Morrison*.").

*Second*, the same analysis applies to Plaintiff's allegation that he purchased his Poseidon shares through a U.S. account, using a broker located in the U.S. This allegation does not address the key questions of where title passed or irrevocable liability was incurred between Plaintiff (through his broker) *and the seller*. As explained above, the OTC Pink Sheets is not a central exchange for trades; broker-dealers must communicate directly with one another when they want to trade. *See supra* at 27. Consequently, knowing where Plaintiff interacted with his broker does

not establish where the trade took place—that is, where title passed or irrevocable liability was incurred—as the Second Circuit has held explicitly:

> Plaintiffs suggest that the location of the broker-dealer should be used to locate securities transactions. While we agree that the location of the broker could be relevant to the extent that the broker carries out tasks that irrevocably bind the parties to buy or sell securities, the location of the broker alone does not necessarily demonstrate where a contract was executed.

*Absolute Activist*, 677 F.3d at 68.

<u>Third</u>, that Plaintiff could not revoke his order once he submitted it to his broker is also not relevant to the question at hand. Whether Plaintiff could revoke his order from his broker is a different question than whether Plaintiff had definitively agreed to buy Poseidon shares *from the seller*. A definitive purchase agreement does not occur at the moment Plaintiff instructs his broker to make a purchase, even if Plaintiff has agreed with his broker that he cannot cancel once he instructs his broker to buy. The complaint contains no allegations about where Plaintiff's broker incurred irrevocable liability on Plaintiff's behalf.

The allegations in *Absolute Activist* illustrate the specificity needed to allege a domestic transaction. In *Absolute Activist*, the plaintiffs were funds that had invested in U.S. companies. The plaintiff-funds were foreign, but the companies they invested in were (1) incorporated in the United States, 677 F.3d at 63; (2) registered with the SEC, *id*. at 70; and (3) quoted on the OTC Pink Sheets and another over-the-counter market, *id*. at 63. Despite these allegations that centered around the United States, the Second Circuit held that the plaintiffs had not alleged where the transaction took place, because their allegations did not address where irrevocable liability was incurred or title passed. *Id*. at 69-70.

*Absolute Activist* was a more difficult case than this one. Although the stocks at issue in both cases traded over the counter, the companies at issue in *Absolute Activist* were U.S. companies, and their securities were registered with the SEC—neither of which is true of Poseidon.

Even on those facts, the Second Circuit held that the plaintiffs had not alleged enough for the court to plausibly infer a domestic transaction.  The same is true here.

> **B.     Section 10(b) Does Not Apply To An Audit Conducted In A Foreign Country Of A Foreign Company's Financial Statements Whose Stock Is Registered On A Foreign Exchange.**

Even if Plaintiff was able to allege that he purchased Poseidon stock in the United States, that would not be enough for § 10(b) to apply.  "[W]hile [*Morrison*] unmistakably made a domestic securities transaction (or transaction in a domestically listed security) *necessary* to a properly domestic invocation of § 10(b), such a transaction is not alone *sufficient* to state a properly domestic claim under the statute."  *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014) (emphasis added).

*Parkcentral* itself involved securities-based swap agreements whose price was determined by the stock price of Volkswagen AG, a German corporation, traded on foreign exchanges.  763 F.3d at 201.  The defendants were also German, and the alleged misstatements "were made primarily in Germany, but were also accessible in the United States and were repeated here by the defendants."  *Id*.  Significantly, the plaintiffs alleged specific facts indicating that they entered into the swap agreements in the United States, satisfying the *Morrison* test.  *Id*. at 207.  Despite those allegations, the Second Circuit held that § 10(b) did not apply.  It explained that "a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application."  *Id*. at 215.  "It would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it."  *Id*.  As the court summarized: "In our view, the imposition of liability under § 10(b) on these foreign defendants

with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap agreements based on the price movements of foreign securities would constitute an impermissibly extraterritorial extension of the statute." *Id*. at 201.

So too here.  Plaintiff asks the Court to extend § 10(b) to a claim about a foreign firm's audit, conducted in a foreign country, under foreign accounting and auditing rules, concerning securities of a foreign company registered on a foreign exchange, and to a transaction (the sale of Poseidon stock over the counter) in which KPMG is not alleged to have had any involvement. This is the type of claim that *Parkcentral* held § 10(b) does not reach.

## V.     The Complaint Does Not State A Claim Against KPMG.

Finally, independent of the arguments above, the complaint does not state a claim against KPMG, and should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  Plaintiff alleges that KPMG made a single misstatement—the March 22, 2012 audit report on Poseidon's 2011 annual financial statements.  (Compl. ¶¶ 115-16)  Plaintiff does not allege that KPMG audited or issued audit reports on Poseidon's quarterly financial statements during 2012.  Even so, most of Plaintiff's allegations—*including most of Plaintiff's allegations against KPMG*—are from after March 22, 2012, and therefore are irrelevant to KPMG's March 22, 2012 statement.

The crux of Plaintiff's allegations is that Poseidon recognized revenue from take-or-pay agreements even when it did not have a signed field ticket.  Plaintiff alleges that without a signed field ticket, Poseidon would not be paid, and so should not have recognized revenue.  Plaintiff further alleges that KPMG was aware that Poseidon recognized revenue without signed field tickets, and so lied when it said in its audit report that it believed Poseidon's financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS").

This story suffers from a fatal flaw: Plaintiff *assumes*, with no factual allegations in support, that Poseidon could not go get a field ticket signed if it did not have one already.   And Plaintiff also *assumes*, again without any factual support, that KPMG knew this.   However, Plaintiff's assumptions are inconsistent with his own factual allegations.   The allegations indicate that Poseidon told KPMG, and KPMG believed, that the lack of signed field tickets would cause delays in collecting from Poseidon's customers, not that it was an incurable defect that would render the amounts owed uncollectable.

To state a claim under § 10(b) of the Exchange Act, Plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").   The passage of the PSLRA was "prompted by significant evidence of abuse in private securities lawsuits," as the Joint Committee Report of the Senate and House of Representatives explained when Congress passed the legislation.   H.R. Conf. Rep. 104-369, 1995 U.S.C.C.A.N. 730, *31.   These abuses included "the targeting of deep pockets, including accountants … without regard to their actual culpability."  *Id.*; *see also Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 320 (2007) (the PSLRA was "[d]esigned to curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers'").   Congress responded to these abuses by heightening the pleading requirements for securities claims, noting that even Rule 9(b)'s requirement that fraud be pled with particularity "ha[d] not prevented abuse of the securities laws by private litigants."   H.R. Conf. Rep. 104-369 at *41.   In short, Congress intended the PSLRA to require a real change in the specificity of the allegations necessary to plead a securities fraud claim.   Plaintiff has not met this high standard.

The elements of a § 10(b) claim are: (1) a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that caused the plaintiff's economic loss; and (6) is causally connected to the material misrepresentation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiff has not adequately pled even the first two elements of his claim, and so the Court need not even consider the others.

### A.    The Complaint Does Not Allege With Particularity That KPMG's 2011 Audit Report Was False.

The PSLRA and Rule 9(b) require that securities fraud plaintiffs plead *with particularity* the reasons why the alleged misstatement is false.  *See* 15 U.S.C. § 78u-4(b)(1).  Plaintiff alleges that KPMG's March 22, 2012 audit report on Poseidon's 2011 annual financial statements was false because (1) KPMG's audit did not comply with Canadian Auditing Standards ("CAS") and (2) Poseidon's financial statements did not comply with IFRS.  (Compl. ¶ 116)  But the complaint lacks particularized factual allegations to support these assertions.

### 1.    The Complaint Does Not Allege With Particularity That KPMG's Audit Did Not Comply With Canadian Auditing Standards.

Plaintiff does not allege with particularity that KPMG's audit did not comply with CAS, because Plaintiff alleges almost nothing about the audit.  (Compl. ¶¶ 154-61)  He does not allege what audit steps KPMG took to test *any* area of Poseidon's financial statements, and in particular he does not allege how KPMG tested Poseidon's revenues and accounts receivable.  Nor does Plaintiff allege what results KPMG obtained from any audit testing—or how those results supported or undermined the statements in the audit report.

Instead, the complaint presents generalized assertions that KPMG's audit work was flawed:

- Plaintiff alleges that KPMG knew Poseidon's internal accounting systems and personnel were "dangerously poor."  (Compl. ¶ 156)  But Plaintiff does not allege whether and how KPMG planned its audit to address that supposed issue.  Plaintiff does not allege how CAS requires auditors to deal with such systems and personnel, nor does he allege that KPMG did not follow CAS's requirements on this topic.  Nor does Plaintiff allege that the "dangerously poor" internal accounting systems and personnel affected the audit.

- Plaintiff alleges that KPMG billed too little for the audit, $40,000.  (Compl. ¶ 158)  Plaintiff asserts that this means the audit was not "a careful, measured, time-consuming affair."  (*Id*.)  But Plaintiff does not allege any required procedures that KPMG did not perform, or what CAS standards required them.  Plaintiff certainly does not allege that KPMG did not perform all required procedures on Poseidon's revenue and accounts receivable.  Finally, even if KPMG billed Poseidon only $40,000, Plaintiff does not allege how much time KPMG wrote off during the audit to get to the amount ultimately billed.  After all, there clearly is no requirement that an auditor bill a client for the full amount of time it spent performing the audit.[10]

- Plaintiff alleges that KPMG's materiality threshold, which assists auditors in determining what transactions to test, was $2.5 million in 2011, but only $1 million in 2010.  (Compl. ¶ 160(a))  But Plaintiff does not allege that this violated CAS.  Nor does Plaintiff explain why $2.5 million was not appropriate given Poseidon's growth since 2010.  The 2011 financial statements disclosed that Poseidon's revenues for 2010 were $5.5 million, making the materiality threshold 18% of revenue.  (Kritzer Ex. 1, at 30)  By contrast, Poseidon's revenues were $78.8 million in 2011, making the alleged $2.5 million materiality threshold 3.2% of revenues.  (*Id*.)  In other words, KPMG's alleged materiality threshold was far *lower* in 2011 than in 2010, relative to the size of the company.

- Plaintiff alleges that "KPMG employed exceptionally small samples" when it tested Poseidon's transactions.  (Compl. ¶ 160(b))  Plaintiff does not allege what those sample sizes were, whether they were "small" in the revenue and accounts receivable testing, and how the "small" sample sizes violated CAS.  *See Special Situations Fund III v. Deloitte Touche Tohmatsu CPA*, 33 F. Supp. 3d 401, 430 (S.D.N.Y. 2014) (rejecting allegation of "limited sample" size because the plaintiffs "fail[ed] to state what proportion of the trial balances such records compromise, or why a failure to sample these particular trial balance entries represents a highly unreasonable or 'extreme departure from ordinary care' approximating an actual intent to defraud.").

---

[10] Further, Plaintiff's comparison of the Poseidon audit fee to the average fee for audits of oil and gas companies is misguided.  (Compl. ¶ 159)  That average is for all oil and gas companies—large exploration and production companies and others.  Poseidon provided mobile storage tanks to such companies, but that does not suggest that the audit of its financial statements would be similar in size to the audits of such companies.

- Plaintiff alleges that "KPMG never visited Poseidon's U.S. offices nor any of its U.S. personnel." (Compl. ¶ 160(c))  But Plaintiff also alleges that Poseidon had no accountants in the U.S. until after the completion of the 2011 audit.  (*Id*. ¶ 146 ("Until May 2012, there were no accountants who worked in Poseidon's U.S. operations.")) Plaintiff does not explain why financial statement auditors would visit an office with no accountants.  Plaintiff does not cite any CAS rule requiring visits to particular locations.

- Plaintiff alleges that KPMG's audit team was too small.  (Compl. ¶ 160(d))  He cites no CAS standard for this assertion.  His only support for his conclusion is that a contact list provided to Poseidon's Audit Committee listed only five people, "two of whom were tax experts." (*Id*.)  But Plaintiff does not allege that the contact list included the entire audit team.  (Nor did it.)  It would make no sense for KPMG to have given Poseidon's directors—the most senior people at Poseidon—the contact information for junior accountants at KPMG.  Thus, Plaintiff's proposed inference that the contact list represented the entire audit team cannot be credited.

Plaintiff's criticisms, unsupported by allegations identifying the CAS standard supposedly violated, run headlong into the Second Circuit's recent decision in *In re Advanced Battery Technologies, Inc.*, 781 F.3d 638 (2d Cir. 2015).  There, the plaintiff alleged that an auditor did not use a particular test the plaintiff contended was required, and argued that, as a result, the auditor was liable.  But the court explained that "none of the accounting standards on which [the plaintiff] relies … specifically requires an auditor to" take that step.  *Id*. at 645.  The court held that general allegations that an auditor should have looked at a particular issue are insufficient: "[W]e do not view these standards as imposing a general duty to inquire the breach of which would constitute recklessness."  *Id*.  So too here.  As in *Advanced Battery*, Plaintiff has not alleged any specific CAS standard that required KPMG to do anything differently.  Consequently, Plaintiff's generalized criticisms of the audit do not satisfy Plaintiff's pleading burden.

In only two instances does Plaintiff even discuss specific audit work KPMG allegedly performed (or did not perform) during the 2011 audit.  Neither instance suggests KPMG's audit did not comply was CAS.

*First*, Plaintiff alleges that "KPMG was obligated to review Poseidon's accounting records to determine whether it had followed IAS 39 and its own impairment policy," which required Poseidon to assess whether any of its accounts receivable were uncollectable. (Compl. ¶ 124) Plaintiff alleges that Poseidon did not perform such an assessment, sourcing that allegation to a deposition of a Poseidon employee who was not an accountant, Joseph Kostelecky. (*Id.* ¶ 125) Plaintiff then concludes that, because Poseidon's assessment did not exist, "KPMG could not have met its obligation to review Poseidon's records to determine whether Poseidon had correctly evaluated its accounts receivable to determine whether to impair them as required by IAS 39 and Poseidon's own impairment policy." (*Id.* ¶ 127)

But Plaintiff does not cite any CAS provision that requires auditors to test whether a company is assessing its accounts receivable for impairment. KPMG's audit report made no statement about whether Poseidon had assessed its accounts receivable for impairment. (Compl. ¶ 115) What matters to KPMG's audit report is whether *KPMG* tested the accounts receivable disclosed in Poseidon's financial statements for impairment, not whether Poseidon did. Plaintiff is wholly silent on that question. However, the transcript from Joseph Kostelecky's deposition is not. On the very same page that Plaintiff cites for the allegation that Poseidon did not assess its accounts receivable for impairment, Mr. Kostelecky testified that KPMG *did* do that assessment. (Kritzer Ex. 12, Kostelecky Tr. at 191 ("I was told that certain larger accounts got letters to state what their receivable was on their books and made random 10 percent, if you will, calls is what I was told."))[11] Thus, the evidence Plaintiff relies on contradicts his conclusion that KPMG did not follow CAS.

---

[11] The deposition transcript, and the other historical documents cited in this brief, were all quoted or specifically discussed in the complaint, and were therefore incorporated by reference such that

(Continued…)

*Second*, and relatedly, Plaintiff alleges that, during the 2011 audit, "KPMG examined the transaction documents for a sample of entries in Poseidon's accounts receivable." (Compl. ¶ 135)  Plaintiff notes that the spreadsheet reflecting that examination includes columns for whether there is a signed field ticket and whether there is a signed master services agreement. (*Id*.)  Plaintiff faults KPMG because the "spreadsheet reports that in numerous cases, field tickets were not signed," and the "master agreement column was not filled in." (*Id*. ¶¶ 135(a)-(b))  But Plaintiff neglects to explain that this spreadsheet was not finished.  For instance, the "field ticket" column was not yet completed for 13 of the 21 transactions. (Kritzer Ex. 13, Spreadsheet, at 2)  And, as Plaintiff notes, the "master services agreement" column was not yet completed for *any* of the transactions.  Further, Plaintiff neglects to mention that there was an additional column after those two columns, for "AFE signed"—authorization for expenditure. (*Id*.)  This was apparently another way KPMG was testing to see whether the accounts receivable were valid and collectable.  That column was not completed for any of the transactions either. (*Id*.)  Plaintiff also neglects to mention that the reason this in-progress version of the spreadsheet exists is because it was attached to an email where a KPMG auditor sent it to Poseidon's VP Finance, showing him what information KPMG was missing, presumably so that he could gather and provide KPMG with the information it needed to complete the spreadsheet.  Plaintiff does not allege what next steps KPMG took to complete the spreadsheet or what results it ultimately obtained.  Citing partially completed work, without any allegations about the completed work, does not suggest that KPMG did not follow CAS.  To the contrary, it establishes that KPMG was indeed testing Poseidon's revenues and accounts receivable, as it should have.

---

the Court can consider on this motion to dismiss the entire document, not just Plaintiff's selective presentation of it.  *See, e.g., DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d. Cir. 2010).

2.    **The Complaint Does Not Allege With Particularity That KPMG Knew Poseidon's Financial Statements Did Not Comply With International Financial Reporting Standards.**

The second part of KPMG's audit report that Plaintiff alleges was false is KPMG's statement: "In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of Poseidon … in accordance with International Financial Reporting Standards." (Compl. ¶ 115)

The Supreme Court held in *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 135 S.Ct. 1318 (2015) that statements of belief or opinion are treated differently under the securities laws than statements of fact.   "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id*. at 1325.  "[A]lthough a plaintiff could later prove [an] opinion erroneous, the words 'I believe' themselves admitted that possibility, thus precluding liability for an untrue statement of fact." *Id*. at 1326.  Consequently, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Id*. at 1327.  For that reason, the Court held, a statement of belief or opinion is only a false statement if the speaker did not actually believe it to be true. *Id*.

KPMG's 2011 audit report read: "*In our opinion*, the consolidated financial statements present fairly…."  (Compl. ¶ 115 (emphasis added))  It also explained: "*We believe* that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion."  (*Id*. (emphasis added))  These statements are statements of belief, subject to *Omnicare*'s elevated pleading standard.  *See, e.g., In re Lehman Bros. Sec. & ERISA Litig.*, __ F. Supp. 3d __, No. 09-2017 (LAK), 2015 WL 5514692, *5-8 (S.D.N.Y. Sept. 18, 2015) (explaining with regard to audit reports that, after *Omnicare*, "it is substantially more difficult for a secu-

rities plaintiff to allege adequately (or, ultimately, to prove) that such a statement is false than it is to allege adequately (or prove) that a statement of pure fact is false").

Plaintiff's complaint does not satisfy *Omnicare*.  As explained above, the complaint alleges little about KPMG's audit testing, and nothing about the results of that testing.  Instead, Plaintiff offers pages of allegations he contends were "red flags" showing KPMG's knowledge that recognizing revenue even without signed field tickets was improper.  (Compl. ¶¶ 119-53)  Many of these allegations are from after March 22, 2012, and so do not speak to KPMG's knowledge at the time it issued the alleged misstatement.[12]  (*See, e.g.,* Compl. ¶ 138 ("On November 5, 2012…."); ¶ 139 ("On November 16, 2012…."))  Other allegations concern Poseidon employees' knowledge, and do not even purport to be about KPMG.  (*See, e.g., id.* ¶ 145 (discussing the lack of roles in Poseidon's Denver office, with no connection to KPMG); ¶ 148 (discussing an email internal to Poseidon, regarding staffing in its accounting department, with no connection to KPMG))  Finally, the allegations from the 2011 audit that do concern KPMG are insufficient:

*First*, Plaintiff alleges that a KPMG auditor "acknowledged that 'not signed field tickets' was an audit issue" during the 2011 audit in an email to Poseidon's David Belcher.  (Compl. ¶ 134)  However, the actual document says nothing of the sort.  (Kritzer Ex. 14, 3/8/2012 Email)  Instead, the email discusses what "supporting documentation" KPMG planned to obtain in order to test Poseidon's revenues and accounts receivable.  (*Id.*)  The email explains that where there are "not signed field tickets," KPMG "cannot rely on other signed tickets for the same location taking them as evidence of existence of the sampled items."  (*Id.*)  As a result, the auditor laid

---

[12] To be clear, the post-March 22 allegations do not establish that KPMG knew after it issued the audit report that Poseidon had recognized revenue improperly either.

out a plan for such a circumstance: "I would suggest to start with MSA's and if we do not have enough information in them, then we would add some other procedures (e.g. phone call or confirmation letter)." (*Id.*)

This email does not support an inference that KPMG knew the lack of a signed field ticket meant that revenue would never be collected and should not be recognized. To the contrary, it discusses what additional steps KPMG planned to take to test Poseidon's accounts receivable for collectability if there was not a signed field ticket, thereby suggesting that KPMG did not believe a signed field ticket was essential to collectability (and therefore revenue recognition). This email also undermines Plaintiff's suggestion that KPMG did not audit Poseidon's revenues and accounts receivable properly; it shows KPMG doing precisely what an auditor should do—testing balances in multiple ways. This is not evidence that KPMG was laying down on the job; it is evidence that KPMG acted professionally and in good faith.

*Second*, Plaintiff alleges that a March 9, 2012 KPMG spreadsheet shows some of the testing KPMG performed on Poseidon's accounts receivable. (Compl. ¶ 135) But, as explained above, this spreadsheet does not support Plaintiff's assertions. *See supra* at 37.

*Third*, Plaintiff alleges that, at a meeting of Poseidon's board on March 22, 2012, a Poseidon executive informed KPMG and others that "the fact that Poseidon did not obtain signed field tickets was causing its accounts receivable to balloon." (Compl. ¶ 136(b)) However, Plaintiff does *not* allege that the executive said that the "ballooning" accounts receivable were uncollectable. There is no basis for inferring that KPMG should have known that growth in accounts receivable indicated that the accounts receivable were uncollectable. Indeed, Plaintiff also alleges that, at a meeting on the same day, the same Poseidon executive explained that "the timing for

collection of accounts receivables has improved and provided further details regarding the invoicing and collection process." (*Id.* ¶ 82)

Consequently, Plaintiff has not met his burden to plead with particularity that KPMG did not believe its statement of opinion that Poseidon's financial statements complied with IFRS.

### B.    The Complaint Does Not Allege With Particularity That KPMG Acted With Scienter.

Plaintiff also fails to plead that KPMG acted with scienter—with the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).   The PSLRA requires that a complaint plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A).   This "strong inference" of state of mind must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.   "In the securities fraud context, recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence."   *Advanced Battery*, 781 F.3d at 644 (internal citations and quotation marks omitted).   "And for an independent auditor, the conduct must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company."   *Id.*; *see also Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 Fed. Appx. 636, 640 (2d Cir. 2012) (similar).

Plaintiff has not alleged facts that give rise to a strong inference of scienter.   Plaintiff does not allege what actions KPMG took to audit Poseidon's financial statements, much less allege an extreme departure from the professional standards.   And in no way do Plaintiff's allegations identify conduct by KPMG that approximates actual intent to aid in a fraud.   Rather, the

stronger and more cogent inference that can be drawn from Plaintiff's complaint is that KPMG

acted in good faith in auditing Poseidon's financial statements.

For example, on July 27, 2012, a KPMG auditor emailed Poseidon's Corporate Control-

ler, describing what she had been told by Poseidon's Operations Controller about Poseidon's ac-

counts receivable, and seeking confirmation of the information's accuracy.  The KPMG auditor

described being told that:

> Poseidon has no collection issues that they are aware, but currently the company
> does have an issue with timely field ticketing execution/billing.  There is currently
> bottlenecks relating to the field ticketing process primarily which in turn pushes
> out A/R [accounts receivable] collection cycle.…  Per Doug, Poseidon has set a
> goal to collect $50M of their receivable by the end of Q3 and he believes this is
> feasible for them to do.

(Kritzer Ex. 15, at 1)[13]  The Corporate Controller's response contained only three words: "100

percent confirmed!"  (*Id*.)

This email shows precisely what Poseidon told KPMG about its outstanding accounts re-

ceivable—that it had "no collection issues," but only "bottlenecks" that slowed collections,

caused by the field ticket issue.  The email undermines conclusively Plaintiff's assertion that Po-

seidon told KPMG it had recognized revenue for amounts that were uncollectable.  Rather, the

email makes plain that Poseidon told KPMG—even after the 2011 audit was completed—that

the field ticket issue was not an issue of collectability, but only of the timing of collection.

This example is inconsistent with an inference of scienter.  Not only does it show that Po-

seidon was telling KPMG that the field ticket issue was not a collectability issue, it also shows

that KPMG was fulfilling its responsibilities as an auditor.  After hearing from one Poseidon ex-

---

[13] Plaintiff's previous complaint quoted this passage in full.  (2d Am. Compl. ¶ 159(d) (Docket #71))  After seeing in KPMG's previous motion to dismiss, Plaintiff eliminated most of the quote from the current complaint.  (Compl. ¶ 128(d))  However, having quoted from the document, Plaintiff has put it before the Court, which can consider it in full.  *See DiFolco*, 622 F.3d at 111.

ecutive how the issue was (and was not) affecting accounts receivable, KPMG went to another

Poseidon executive to double-check.  When added to Plaintiff's other allegations about what

KPMG did—for instance, KPMG's plan to audit accounts receivable by looking to field tickets,

then master services agreements, then other forms of support, *see supra* at 39-40—the strongest

inference is that KPMG was doing its job as an auditor and was unaware that Poseidon's ac-

counts receivable were uncollectable.

The complaint is replete with other allegations of KPMG acting properly to identify is-

sues and raise concerns, which is inconsistent with scienter:

- During the 2011 audit, "KPMG specifically identified revenue recognition as one of just two fraud risks in the Poseidon audit."  (Compl. ¶ 131)  It would make no sense—that is, it is not a cogent story of a culpable mental state—that KPMG would identify as an area of focus for its audit the very area where it knew it would assist Poseidon in violating the accounting rules.

- KPMG "urged Poseidon to upgrade to proper software," rather than using manual spreadsheets to track field tickets.  (Compl. ¶ 20)  An auditor assisting a client in ac-counting fraud would be unlikely to suggest that the client implement rigorous ac-counting software that would make it more difficult to perpetrate that fraud.

- In May 2012, KPMG's lead partner told Poseidon's Audit Committee "that there was 'an ongoing focus on potential credit risk associated with billings and collections.'" (Compl. ¶ 89)  Again, it simply makes no sense that KPMG would choose to focus on the very area where, on Plaintiff's allegations, it knew Poseidon was violating the ac-counting rules, or that it would raise the issue with Poseidon's directors.

- In July 2012, KPMG suggested to Poseidon that it include in its quarterly financial statements "a credit risk note" to "explain a little to the reader" the cause of the growth of accounts receivable.  (Compl. ¶ 128(d))  If KPMG knew that Poseidon's accounts receivable had grown only because it was recognizing revenue improperly, it would make no sense to suggest a more detailed explanation.

- In August 2012, KPMG's lead partner "stated that Poseidon may have to set up a bad debt reserve if it did not [decrease] accounts receivable by the end of the next quar-ter."  (Compl. ¶ 128(e))  If KPMG had agreed to false accounting, it would not make sense to raise a reserve for bad debt that would work counter to the fraud.

- In November 2012, KPMG expressed "more than a little concern about the potential for future collection issues."  (Compl. ¶ 166)  An auditor assisting a client in covering

43

up the collection issues would not come to the client and express concern there might be a collection issue.

Any of these examples by itself would weigh against scienter, for it would not square with Plaintiff's story that KPMG was aware Poseidon was violating the accounting rules and decided to help.  Together, they undermine entirely any "cogent" inference of scienter completely.

As the Supreme Court held in *Tellabs*, not only must Plaintiff plead specific facts giving rise to a "cogent" inference of scienter, but that cogent inference must be "at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  The scienter analysis, then, necessarily involves a weighing of the competing stories.  The relative strength of these competing inferences is not even close.  The inference against scienter is consistent with the facts alleged in the complaint showing that KPMG was focused on revenue recognition issues and accounts receivable collectability and often raised the issues for discussion with Poseidon's directors.  It is consistent with KPMG's lack of motive to participate in a fraud.  On the other hand, the inference that KPMG acted with scienter does not make sense.  It cannot be reconciled with KPMG's actions discussed above.  The Court should reject this inference as not cogent and less likely than the competing inference.

## <u>Conclusion</u>

For the reasons above, the Court should dismiss Plaintiff's claim against KPMG.

Dated: December 15, 2015                          Respectfully submitted,


       */s/ Nathaniel J. Kritzer*
Nathaniel J. Kritzer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
(212) 446-4900 (fax)

-and-

John F. Hartmann, P.C. (admitted pro hac vice)
Joshua Z. Rabinovitz (admitted pro hac vice)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000
(312) 862-2200 (fax)

*Counsel for KPMG LLP (Canada)*