UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                        :
                                        :
                                        :
                                        :      13cv1213 (DLC)
IN RE POSEIDON CONCEPTS SECURITIES      :
LITIGATION                              :      OPINION & ORDER
                                        :
                                        :
                                        :
                                        :
---------------------------------------- X

APPEARANCES

For lead plaintiff Gerald Kolar:

Laurence M. Rosen
Phillip Kim
Jonathan Horne
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, New York 10016

For defendant KPMG LLP (Canada):

Nathaniel J. Kritzer
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

John F. Hartmann
Joshua Z. Rabinovitz
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL 60654

DENISE COTE, District Judge:

      This is a securities class action brought against certain

directors and officers of Poseidon Concepts Corp. ("Poseidon")

and Poseidon's auditor KMPG LLP (Canada) ("KPMG"), pursuant to

the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), on behalf of investors who bought Poseidon stock in the United States.  Poseidon was a Canadian company whose stock traded both on the Toronto Stock Exchange and over-the-counter in the United States.  On December 15, 2015, KPMG filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3), (b)(3), and (b)(6).  For the following reasons, KPMG's motion is granted.

<u>**BACKGROUND**</u>

The following facts are taken from the Third Amended Complaint (the "TAC"), its attached exhibits, or documents integral to the complaint.  The claims against KPMG arise solely from two statements made in KPMG's audit report for Poseidon's 2011 annual financial statements (the "2011 Audit Report"). These statements are that (1) in KPMG's opinion, the financial statements fairly presented Poseidon's financial position in accordance with International Financial Reporting Standards ("IFRS"); and (2) KPMG conducted its audit in accordance with Canadian Generally Accepted Auditing Standards ("Canadian GAAS").

**I.   The Parties**

Lead plaintiff Gerald Kolar (the "Lead Plaintiff") brings this action on behalf of a class consisting of all persons and entities, other than the defendants and their affiliates, who purchased the publicly traded common stock of Poseidon from

March 22, 2012 to February 14, 2013 (the "Class Period") in domestic U.S. transactions or in transactions on a domestic U.S. exchange.  Throughout the Class Period, Poseidon stock was actively traded in the United States on over-the-counter ("OTC") Pink Sheets under the ticker POOSF.[1]  Kolar, a Florida resident, bought all of his Poseidon stock on Pink Sheets through his Florida broker, Charles Schwab & Co.[2]

Poseidon was a Canadian corporation with head administrative offices in Calgary, Alberta.  Poseidon engaged in the development and commercialization of fluid storage and solutions for the oil and gas industry across North America, including in the United States.  As a reporting issuer in Canada, Poseidon was therefore required to issue and file on the System for Electronic Document Analysis and Retrieval ("SEDAR")[3] both quarterly financial statements and audited annual financial statements prepared in accordance with IFRS.

---

[1] Pink Sheets is a U.S. electronic inter-dealer quotation system that display quotes, last-sale prices, and volume information. To trade a particular security on Pink Sheets, broker-dealers must obtain FINRA authorization.

[2] The TAC also notes that certain of Kolar's purchases were for his IRA, that only one of Charles Schwab's 300 offices is located outside the United States, and that once Kolar entered his order to purchase Poseidon stock, he no longer had the discretion to revoke acceptance.

[3] SEDAR is a database of Canadian securities filings, similar to the Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system in the United States.

Poseidon conducted U.S. operations through a subsidiary, Poseidon Concepts, Inc. ("Poseidon U.S."), which was run out of an office in Denver, Colorado by Joseph A. Kostelecky. Kostelecky was Poseidon's Vice President of U.S. Operations from November 2011 to December 2012.  Poseidon recognized the majority of its purported revenues from U.S. transactions: 66.4% in 2011, and 86.3% in the first three quarters of 2012.  As of January 2012, 80% of Poseidon's tank fleet was deployed in the United States, and all but one of Poseidon's clients with accounts receivable balances over 90 days were U.S. customers.

Both Poseidon and Poseidon U.S. have filed for bankruptcy protection in Canada and the United States, respectively. Poseidon's Monitor publically filed a list of 108 creditors with claims of more than 1,000 CAD, 63 of which were based in the United States.  Excluding a 79.5 million CAD claim from the banks supplying Poseidon's credit facility, 10.8 million CAD of the 14.5 million CAD in bankruptcy claims were made by U.S. creditors.  While Poseidon is no longer a named defendant in this case due to its bankruptcy, the TAC lists seven former Poseidon directors and officers as defendants (the "Individual Defendants").

Defendant KPMG, a Canadian partnership, served as Poseidon's independent auditor.  KPMG is a member of KPMG International Cooperative, a Swiss Verein, and is known as one

of the "Big Four" accounting firms.  KPMG's lead auditor partner
for the Poseidon account was Greg Caldwell.  During the course
of its audit and reviews, KPMG corresponded with key Poseidon
employees who were located in the United States, including
Kostelecky and Allyson Finstein.

## II.  Poseidon's Origins and Business

Poseidon began as a side project of a small Canadian oil
and gas company, Open Range, Inc. ("Open Range").  Open Range
employed hydraulic fracturing (better known as "fracking") to
exploit oil and gas wells in operations limited to western
Canada.[4]  Open Range had developed a proprietary method of
storing the vast quantities of fluid used in fracking.  While
most companies stored this fluid in underground pits, Open Range
developed large modular above-ground pools referred to as
"tanks."

While Open Range initially only used tanks in its own
operations, it began offering them for lease to other oil and
gas exploitation companies as a sideline to its main business in
the second quarter of 2010.  In September 2011, Open Range spun-
off its tank business to a stand-alone company -- Poseidon (the
"Spin-Off").  Open Range completed the Spin-Off on November 1,

---

[4] Fracking is a drilling technique that uses pressurized liquid
made of water, sand, and various chemicals to create cracks in
rock formations holding oil, which allows the oil to flow more
freely.

2011.  In January 2012, Poseidon conducted a public offering of its shares in Canada, selling 82.5 million CAD of its shares.

About a quarter of Poseidon's 2011 revenues, and two thirds of its revenues for the first three quarters of 2012, were generated from the pay portion of "take-or-pay" master agreements.  In these take-or-pay contracts, Poseidon agreed to make its tanks available to a customer.  If the customer did not use the tanks during the contract period, it had to pay a minimum daily rate as a penalty -- the "pay" portion of the take-or-pay contracts (the "minimum pay rate").  If the customer actually used the tanks, it had to pay a higher daily rate (the "live rate").

Poseidon claimed to follow the practice of issuing master agreements and field tickets for its services.  In the oil and gas service industry, service providers usually enter into a master agreement that governs the terms of the services for important contracts.  Once services have been provided pursuant to the master agreement, the service provider issues the customer a field ticket.  The field ticket sets out an itemized list of services provided, their individual prices, and the total price.  The ticket is signed by the authorized representatives of both the service provider and the customer.  The field ticket is then used to generate an invoice to send the customer.  Without a signed field ticket or master agreement,

there is no evidence that the services were provided or that the customer has agreed to pay.  The Lead Plaintiff alleges that most of Poseidon's master agreements provided that without a signed field ticket, it would not be paid.  In generally accepted oil and gas services industry accounting practices, revenues are not recognized unless the provider obtains a field ticket signed by the customer setting out the services provided and the amounts owed.  Unsigned field tickets do not necessarily render an account uncollectable, but they do create "bottlenecks" that push out the collection cycle.

### III. Poseidon's 2011 Annual Filing and KPMG's Audit

The 2011 Audit Report is one page and evaluates Poseidon's 2011 Annual Financial Statements and Management's Discussion and Analysis (the "2011 Annual Filing").  The 2011 Annual Filing is dated March 22, 2012, and reports Poseidon's consolidated financial position as at December 31, 2011, December 31, 2010, and January 1, 2010, and its consolidated financial performance and consolidated cash flows for years ended December 31, 2011 and December 31, 2010.

The Lead Plaintiff alleges that the defendants fraudulently recognized much of Poseidon's reported revenue.  He alleges that "virtually all of Poseidon's reported 2011 revenues derived from minimum pay rates derived from transactions in which customers had signed neither a master agreement nor a field ticket."

According to Kostelecky, if Poseidon submitted an invoice without an accompanying signed field ticket, the customer would not pay 80% of the time.  The TAC also makes several allegations describing how Poseidon's attempts to collect minimum pay rates without signed agreements were chaotic.  Among other examples, the Lead Plaintiff alleges that Poseidon repeatedly issued invoices to wrong customers; that Poseidon frequently revised payment terms; and that Poseidon frequently sent duplicate invoices and recognized revenues from both.

The TAC describes actions taken by KPMG in preparing their audit of the 2011 Annual Filing.  First, in a March 8, 2012 email to Belcher, KPMG senior accountant Natalia Krizbai, who was reviewing Poseidon's master agreements, acknowledged that "not signed field tickets" were an audit issue.  Second, on or before March 9, KPMG examined the transaction documents for a sample of entries in Poseidon's accounts receivable and created a spreadsheet listing the results of its inspection (the "March 2012 Spreadsheet").  The spreadsheet, which lists 17 Poseidon customers, includes two columns -- "Field Ticket signed (Y/N)" and "MSA [master agreement] signed (Y/N)."  The spreadsheet reports that field tickets were not signed in numerous cases.  The master agreement column was not filled in.  The spreadsheet also reported that two customers, Anschutz and Chesapeake, had not paid certain bills Poseidon claimed were overdue.  In fact,

Anschutz and Chesapeake claimed that their signatures on the
master agreements and/or field tickets were forged.

The TAC also makes several generalized assertions about
KPMG's audit.  First, it accuses KPMG of knowing that Poseidon
had three critical accounting deficiencies: old accounting
software, deficient staff training on accounting procedures, and
a thinly stretched accounting staff.  For example, as of
November 1, 2011, Poseidon's accounting team had only five
members.  Second, the TAC alleges that KPMG was aware that
Poseidon sales representatives were authorized to negotiate
discounts for service rates by issuing credit notes, yet
Poseidon recognized revenues by simply multiplying tanks by
daily rates.  Third, the TAC claims that the audit's small
budget -- 40,000 CAD -- forced it to raise its materiality
threshold,[5] use small sample sizes and a small audit team, and
rely too heavily on Poseidon management's representations.
Indeed, KPMG never visited Poseidon's Denver office nor any of
its U.S. personnel, and knew that Poseidon's officers'
compensation was heavily tied to Poseidon's revenues.  Lastly,
the TAC claims that based on Poseidon's history and

---

[5] A materiality threshold determines the size of permissible
misstatements and samples for testing.  In its 2010 audit of
Open Range, KPMG established a materiality threshold of 1.0
million CAD; with Poseidon's 2011 audit, the threshold was 2.5
million CAD.

characteristics, KPMG generally knew, or was reckless in not knowing, that Poseidon was a high risk client.

On March 22, 2012, Poseidon's full board held a meeting to approve the 2011 Annual Filing.  All defendants attended the meeting, as well as Kostelecky, KPMG lead audit partner Greg Caldwell, and KMPG auditor Lisa Wesley.  According to Kostelecky, the Poseidon board was alarmed that it could not collect accounts receivable and meeting attendees discussed Poseidon's entire revenue collection and recognition process. In this discussion, Poseidon Vice President of Finance David Belcher warned that field ticketing was "the first gatekeeper" to a receivable and that Poseidon did not always obtain a signed field ticket.  While Belcher warned the attendees of a "lack of collections," he also expressed his hope that in the future, Poseidon might be able to obtain signed field tickets every time.  According to Kostelecky, discussions of Days Sales Outstanding, a measure of accounts receivable as a function of daily revenues, were "a huge part" of the March 22 meeting's discussions.

Later that day, Poseidon's audit committee held a meeting, which was attended by Caldwell and Wesley.  The minutes from that meeting state that "Mr. Belcher reviewed the balance sheet, noting the timing for collection of outstanding accounts receivables has improved and provided further details regarding

the invoicing and collection process."  The Poseidon board
ultimately approved the 2011 Annual Filing that day and Poseidon
filed them on SEDAR.  The 2011 Audit Report was filed with the
2011 Annual Filing.

## IV.  Poseidon's 2012 Quarterly Filings

Poseidon filed three more quarterly filings over the
remainder of the 2012.  Although the only KPMG false statements
alleged by the Lead Plaintiff arise from the 2011 Audit Report,
the bulk of the TAC discusses events after the report was filed.
For example, the TAC describes a November 13, 2012 meeting of
the Poseidon Board and its audit committee to approve its third
quarter filings.  At this meeting, the attendees agreed that
Poseidon would take a 9.5 million CAD revenue impairment.  While
Kostelecky stated that the write-down should be larger because
other accounts not discussed were also uncollectable, a KPMG
partner cut Kostelecky off, telling him "let's go through with
what we have in front of us."

The Lead Plaintiff alleges that over the course of its
audit and through the end of the Class Period, KPMG saw and
ignored red flags demonstrating that its 2011 Audit Report did
not comply with IFRS and Canadian GAAS standards.  Specifically,
the TAC claims that KPMG violated these standards by ignoring
red flags related to impairment, revenue recognition, and
Poseidon's internal accounting systems.  The Lead Plaintiff

11

alleges that KPMG was obligated to review Poseidon's accounting records to determine whether it had followed IFRS's impairment standard and Poseidon's own impairment policy, but failed to do so.

**V.    Poseidon's Demise**

Between August and November of 2012, the enormity of Poseidon's financial problems were uncovered.  In August 2012, Poseidon hired an operations controller, Doug Robinson, whose first task was to handle accounts receivables issues.  An inventory of its unsigned master agreements revealed that only 11 of Poseidon's 54 master agreements were signed.[6]

In late 2012, Poseidon retained the accounting firm Ernst & Young to investigate its revenues.  After a month-long investigation, Ernst & Young determined that, as to the take-or-pay contracts "almost 100% of the [Contracts] are not considered valid or enforceable . . . there are virtually no valid Contracts."  Accordingly, Ernst & Young estimated that of Poseidon's approximately 53.6 million CAD in accounts receivable as of December 31, 2011, 13.3 million CAD related to revenues that should never have been recognized.  Ernst & Young recommended that Poseidon restate two thirds of its 2012 revenues, or about 100 million CAD.

---

[6] All of the Master Agreements were available on a shared "P-Drive."

12

The TAC summarizes Poseidon's overstated revenues from 2011 as follows, based on SEDAR filings, Ernst & Young reports, and emails.

|  | Full year 2011 |
|---|---|
| Revenues | 78.8 million CAD |
| Dollar amount of revenue overstatement from incorrectly recognized minimum pay rate | 13.3 million CAD |
| Revenue overstatement (percentage) | 16.9% |
| Dollar amount of Unsigned field ticket and/or master agreement | 12.5 million CAD |
| Unsigned field ticket and/or master agreement (percentage) | 15.9% |
| Accounts receivable | 53.6 million CAD |
| Overstatement of accounts receivable | 13.3 million CAD |
| Overstatement of accounts receivable (percentage) | 24.8% |

On November 14, 2012, Poseidon announced that it had taken a 9.5 million CAD charge for uncollectible debt, that accounts receivable had therefore increased to 125.5 million CAD, that it had enacted a new credit policy to mitigate the problems with its receivables, and that only 38% of its accounts receivable were due from parties with investment-grade credit ratings. The next trading day, Poseidon's stock price fell by 8.15 USD per share to close at 4.95 USD per share.

13

On November 28, the Canadian law firm Siskinds LLP announced that it had filed a class-action lawsuit in the Ontario Superior Court of Justice against Poseidon and certain of its officers and directors, alleging that Poseidon made materially false and misleading statements regarding its financial conditions and compliance accounting policies.  During trading hours, analysts at BMO Capital Markets Corp and Haywood Securities Inc. downgraded their outlook on Poseidon's shares. That day, Poseidon's stock price fell by 1.28 USD to close at 4.07 USD per share.

On December 27, Poseidon announced that it had formed a Special Committee to evaluate issues stemming from its November 14 write-off.  Poseidon admitted that "the Company may need to make additional write downs of accounts receivable in future periods and such write downs may be significant" and disclosed additional management changes.  That day, Poseidon's stock price fell about 1.87 USD per share, to close at 1.49 USD.

On December 28, analysts at First Energy Capital Corp. and Haywood Securities Inc. downgraded their outlook of Poseidon. Poseidon's stock price fell another 0.20 USD per share to close at 1.29 USD per share.

Finally, on February 14, 2013, Poseidon issued a press release announcing the findings of the Special Committee.  Among other disclosures, the press release stated the Special

14

Committee's preliminary conclusion that "approximately $95 million [CAD] to $106 million [CAD] . . . of the Company's $148.1 million [CAD] in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the Company's financial statements," and that investors "should no longer rely on the Financial Statements as well as the corresponding Management's Discussion & Analysis" from the first three quarters of 2012.  The press releases also stated that Poseidon's financial statements for the first three quarters of 2012 did not comply with IFRS or with Poseidon's own accounting policies.  That day, Poseidon's stock price fell 0.61 USD per share to close at 0.28 USD.

## VI.  Procedural History

This class action was filed on February 22, 2013.  The action was a tagalong to parallel proceedings pending in Canada. Shareholders who bought Poseidon stock in Canada ("Canadian Plaintiffs") brought actions against three sets of defendants (collectively, the "Canadian Actions"): (1) Poseidon and its directors and officers (the "Poseidon Actions"); (2) Poseidon's lender and underwriter, National Bank of Canada (the "NBC Actions"); and KPMG (the "KPMG Action").  On April 9, 2013, what is effectively a Canadian bankruptcy court issued an order staying proceedings against Poseidon and its directors and

officers (the "Stay Order").[7]  On May 15, 2013, a U.S. Bankruptcy
Court recognized the Canadian bankruptcy action as a foreign
main proceeding, thus giving the Stay Order full effect in the
United States.

Following a May 17, 2013 conference in the instant action,
an Order of that same day stayed this case against the
Individual Defendants and Poseidon.  The May 17 Order also
appointed Kolar as Lead Plaintiff and permitted him to file a
consolidated amended complaint ("CAC"), which he did on June 14,
2013.

On May 15, 2015, in response to information gleaned from
the Canadian Actions, the Lead Plaintiff moved to add claims
against KPMG to its CAC.  On June 24, the motion was granted,
and Lead Plaintiff filed his Second Amended Complaint (the
"SAC") on July 6.[8]  The SAC named as defendants only the seven
Individual Defendants and KPMG.

On November 6, Lead Plaintiff filed a motion for leave to
amend the SAC.  His motion was granted on November 30, and he
filed the TAC that same day.  The TAC asserts two causes of
action: (1) that KPMG and the Individual Defendants committed

---

[7] Because the Stay Order limits proceedings against only Poseidon
and its directors and officers, the Poseidon Actions have been
stayed for substantially the entire period since the April 9,
2013 Stay Order, but the NBC and KPMG Actions have proceeded.

[8] The plaintiff filed a corrected SAC on July 8.

fraud in violation of § 10(b) of the Securities Exchange Act of
1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5
promulgated thereunder, 17 C.F.R. § 240.10b-5; and (2) that the
Individual Defendants are liable as control persons under
Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

KPMG filed its motion to dismiss the TAC on December 15,
2015 pursuant to Fed. R. Civ. P. 12(b)(2), (b)(3), and (b)(6).
The motion became fully submitted on February 12, 2016.

## DISCUSSION

KPMG seeks dismissal of the § 10(b) claim against it on the
following four grounds: (1) that this Court lacks personal
jurisdiction over KPMG; (2) that this district is an improper
venue; (3) the forum non conveniens doctrine; and (4) that the
TAC does not state a claim against KPMG.

## I.   Personal Jurisdiction

When responding to a Rule 12(b)(2) motion to dismiss for
lack of personal jurisdiction, "[t]he plaintiff bears the burden
of establishing personal jurisdiction over the defendant."
MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012)
(citation omitted).  Where "a court relies on pleadings and
affidavits, rather than conducting a full-blown evidentiary
hearing, the plaintiff need only make a prima facie showing that
the court possesses personal jurisdiction over the defendant."
Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84

(2d Cir. 2013).  In evaluating whether this showing has been made, "we construe the pleadings and any supporting materials in the light most favorable to the plaintiffs."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013).

The Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."  S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990); see also 15 U.S.C. § 78aa.  Under the Exchange Act, the relevant inquiry is the defendant's contacts with the United States as a whole.  See Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974) (finding personal jurisdiction under the Exchange Act in New York over Massachusetts defendants); see also Warfield v. Alaniz, 569 F.3d 1015, 1029 (9th Cir. 2009) (citation omitted) ("[S]o long as a defendant has minimum contacts with the United States, Section 27 of the [Exchange] Act confers personal jurisdiction over the defendant in any federal district court.").  "[U]nder the Fifth Amendment the court can consider the defendant's contacts throughout the United States."  Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998).

The Supreme Court has emphasized that "it is the defendant's actions, not his expectations, that empower a [forum's] courts to subject him to judgment."  J. McIntyre

18

Machinery, Ltd. v. Nicastro, 564 U.S. 873, 883 (2011).

Therefore, "[t]he principal inquiry" under the Due Process

Clause "is whether the defendant's activities manifest an

intention to submit to the power of a sovereign." Id. at 882.

In other words, it is essential in each case that there be some

act by which the defendant "purposefully avails itself of the

privilege of conducting activities" within the United States,

thus "invoking the benefits and protections of its laws." Id.

(quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

Moreover, the resulting litigation must result "from alleged

injuries that arise out of or relate to" that act. Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985) (citation

omitted); see also Chloe v. Queen Bee of Beverly Hills, LLC, 616

F.3d 158, 167 (2d Cir. 2010).

    Here KPMG engaged in an audit of a Canadian company with

extensive U.S. operations.  Poseidon U.S. was Poseidon's largest

source of income and tank rentals.  Accordingly, KPMG's audit

hinged on the accurate reporting of those United States

operations.  During the course of its audit, KMPG corresponded

with Poseidon employees in the United States, including

Kostelecky and Finstein.  By agreeing to audit a company with

such significant business assets, operations, and income sources

located in the United States, KPMG necessarily chose to avail

itself of the privilege of conducting activities within the United States.  This lawsuit arises out of that very work.

KPMG argues that the TAC does not identify any specific item of correspondence and that, in any case, communications sent to a forum do not establish a substantial connection to that form for personal jurisdiction.  Even a single act, however, may be enough to establish jurisdiction if it demonstrates that the defendant "availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 169 (2d Cir. 2015) (citation omitted).  Here, the Lead Plaintiff explained how KPMG's performance of its audits and reviews of Poseidon's operations required it to have repeated and substantive engagement with Poseidon's United States offices and operations.  This more than satisfies the plaintiff's burden to show KPMG's purposeful availment of the privilege of doing business in the United States.

KPMG also relies on General Elec. Cap. Corp. v. Grossman, 991 F.2d 1376, 1378-80, 1386-88 (8th Cir. 1993), for the proposition that sending financial statements into the United States was insufficient to establish jurisdiction over two Canadian auditing firms conducting an audit of a Canadian subsidiary owned by a U.S. company.  While the Grossman auditors examined a subsidiary located in Canada, id. at 1387, the focal

point of the KPMG audit is an <u>American</u> subsidiary of a Canadian company.

If a defendant has purposefully availed itself of the privilege of conducting activities within the United States, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>Eades</u>, 799 F.3d at 169 (citation omitted). Factors in determining whether exercising jurisdiction is reasonable include:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

<u>Id</u>. (citation omitted).

The allegations in the TAC are brought by American purchasers of OTC Poseidon stock.  The United States has a strong interest in enforcing its own securities laws and protecting U.S. markets, and the plaintiffs have a strong interest in pursuing their claims in a United States court. KPMG, a member of one of the large "Big Four" accounting conglomerates, can easily adjudicate this claim in the United States.

## II.   Venue

KPMG seeks dismissal on the ground of improper venue.   The legal standard for a motion to dismiss under Rule 12(b)(3) for improper venue is the same as for a motion to dismiss based on a lack of personal jurisdiction:  "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a prima facie showing of [venue]."  Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (citation omitted).

Under the general venue statute, a defendant not resident in the United States "may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."  28 U.S.C. § 1391(c)(3).  Therefore, as a foreign entity, KPMG may be sued in any judicial district in the United States.  See, e.g., FS Photo, Inc. v. PictureVision, Inc., 48 F. Supp. 2d 442, 446 n.4 (D. Del. 1999) (analyzing venue under the Exchange Act using § 1391).

KPMG argues that the Exchange Act's venue statute governs here, and that the Lead Plaintiff has failed to make a prima facie showing of venue under that statute.  Section 27 of the Exchange Act, 15 U.S.C. § 78aa, provides for venue in any district where "any act or transaction constituting the violation occurred" or "wherein the defendant is found or is an inhabitant or transacts business."  15 U.S.C. § 78aa.  It is

22

true that the Lead Plaintiff has not shown that venue exists under § 27, but § 1391(c)(3) is not displaced by special statutory venue statutes.  See Brunette Mach. Works, Ltd. v. Kockum Indus., Inc., 406 U.S. 706, 713 (1972); cf. Go-Video, Inc. v. Akai Elec. Co., 885 F.2d 1406, 1413 (9th Cir. 1989) (refusing to nullify general venue laws in the face of more narrow venue provisions in specific federal statutes).

### III. Forum Non Conveniens

KPMG also seeks dismissal of this lawsuit under the forum non conveniens doctrine.  In addressing a forum non conveniens argument, the court undertakes a three step analysis.  At step one, a court determines the "degree of deference properly accorded the plaintiff's choice of forum."  Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005).  At step two, it considers "whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  Id.  Lastly, a court balances "public interest factors" and "private interest factors."  Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc).  The parties do not dispute that Canada is an adequate alternative forum for this litigation.

### A. Deference to the Plaintiff's Choice of Forum

As noted by the Court of Appeals, "the degree of deference given to a plaintiff's forum choice varies with the

23

circumstances." Id. at 71. Iragorri instructed that district
courts should locate the degree of deference to be afforded a
plaintiff's forum choice "'on a sliding scale' depending on the
degree of convenience reflected by the choice in a given case."
Norex Petroleum Ltd., 416 F.3d at 154 (quoting Iragorri, 274
F.3d at 71). Courts must consider "the totality of
circumstances supporting a plaintiff's choice of forum." Id.

> The more it appears that a domestic or foreign
> plaintiff's choice of forum has been dictated by
> reasons that the law recognizes as valid, the
> greater the deference that will be given to the
> plaintiff's forum choice. Stated differently, the
> greater the plaintiff's or the lawsuit's bona fide
> connection to the United States and to the forum of
> choice and the more it appears that considerations
> of convenience favor the conduct of the lawsuit in
> the United States, the more difficult it will be for
> the defendant to gain dismissal for forum non
> conveniens. . . . On the other hand, the more it
> appears that the plaintiff's choice of a U.S. forum
> was motivated by forum-shopping reasons . . . the
> less deference the plaintiff's choice commands and,
> consequently, the easier it becomes for the
> defendant to succeed on a forum non conveniens
> motion by showing that convenience would be better
> served by litigating in another country's courts.

Iragorri, 274 F.3d at 71-72. Iragorri also stated some factors
that argue against the convenience of the forum to a plaintiff:
"the convenience of the plaintiff's residence in relation to the
chosen forum, the availability of witnesses or evidence to the
forum district, the defendant's amenability to suit in the forum
district, the availability of appropriate legal assistance, and
other reasons relating to convenience or expense." Id. at 72.

The Lead Plaintiff's choice of this district is entitled to significant deference.  The claims arise under U.S. securities laws.  Securities litigation is regularly litigated in New York, which is the nation's financial center.  As a result, its bar and courts are well-versed in suits of this nature.  As a transportation hub, travel to New York is relatively convenient for both the Floridian Lead Plaintiff and the Canadian defendants.  Accordingly, there is no reason to find that this forum was selected for improper purposes and the choice will be given deference.

### B. Private and Public Interests

Even if the Lead Plaintiff's choice of forum were entitled to little deference, to achieve a forum non conveniens dismissal a defendant must show that the balance of the private and public convenience factors "tilt[s] strongly in favor of the foreign forum."  Aguinda v. Texaco, Inc., 303 F.3d 470, 479 (2d Cir. 2002) (citation omitted).  These factors are discussed in Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).  The private factors include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."  Gross v. British

Broad. Corp., 386 F.3d 224, 232 (2d Cir. 2004) (quoting Gulf Oil Corp., 330 U.S. at 508).  The public factors include include congestion in the courts, the interests of forums in "having localized controversies decided at home," the interest in not imposing jury duty on people in a community that has no interest in the litigation, and the appropriateness of the application of foreign law.  DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 31 (2d Cir. 2002) (quoting Gulf Oil Corp., 330 U.S. at 508-09).

The balance of these factors weighs against dismissal. While KPMG correctly notes that evidence and witnesses are located in Canada, the costs of proceeding with the case in New York will not be unduly burdensome to KPMG.  See id. at 30 (noting that witness travel between Ontario and New York "is not burdensome in terms of cost or time").  Court congestion is not an issue.  And more importantly, there is a strong interest in having American courts interpret and apply U.S. securities law. See id. at 33.

KPMG argues that the Canadian Actions against KPMG and the Poseidon Defendants, two of which are brought on behalf of all acquirers of Poseidon stock, make Canada a more proper forum for this matter.  The existence of such litigation, however, does not obviate United States interests in enforcing securities laws in American courts on behalf of United States investors.

26

## IV.  **Failure to Plead a Claim**

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014).  A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).  In the context of a securities class action, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  Id. (citation omitted).

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b) by "stating with particularity the circumstances constituting fraud."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted).  The PSLRA "builds on Rule 9's particularity requirement,

dictating the pleading standard for claims brought under the Exchange Act." Id.  To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 305 (citation omitted). The PSLRA's requirements are similar, stating that the complaint must

> specify each statement alleged to have been
> misleading, the reason or reasons why the statement
> is misleading, and, if an allegation regarding the
> statement or omission is made on information and
> belief, the complaint shall state with particularity
> all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  Thus, plaintiffs asserting claims under the PSLRA "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted).

The Lead Plaintiff alleges that KPMG violated § 10(b) of the Exchange Act.  Section 10(b) and its implementing SEC Rule 10b-5 make it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading . . . in connection
with the purchase or sale of any security."  17 C.F.R. §
240.10b-5(b); see also 15 U.S.C. § 78j(b).  "To state a claim
under Rule 10b-5 for misrepresentations, a plaintiff must allege
that the defendant (1) made misstatements or omissions of
material fact, (2) with scienter, (3) in connection with the
purchase or sale of securities, (4) upon which the plaintiff
relied, and (5) that the plaintiff's reliance was the proximate
cause of its injury."  Blanford, 794 F.3d at 305 (citation
omitted).

The Supreme Court's recent opinion in Omnicare, Inc. v.
Laborers District Council Construction Industry Pension Fund,
135 S. Ct. 1318 (2015), described how statements of opinion
should be assessed when they are the basis for alleging a
violation of the securities laws.  Specifically, the Court held
that

> [t]he investor must identify particular (and
> material) facts going to the basis for the issuer's
> opinion -- facts about the inquiry the issuer did or
> did not conduct or the knowledge it did or did not
> have -- whose omission makes the opinion statement
> at issue misleading to a reasonable person reading
> the statement fairly and in context.

Tongue, 816 F.3d at 209 (quoting Omnicare, 135 S. Ct. at 1332).
Omnicare affirmed that liability for making a false statement of
opinion may lie if either "the speaker did not hold the belief
she professed" or "the supporting fact she supplied were

untrue." Tongue, 816 F.3d at 210 (citation omitted).  But the
Omnicare Court also held that "opinions, though sincerely held
and otherwise true as a matter of fact, may nonetheless be
actionable if the speaker omits information whose omission makes
the statement misleading to a reasonable investor."  Id.

Meeting the Omnicare standard "is no small task for an
investor."  Id. (citation omitted).  Upon hearing a statement of
opinion from an issuer, a reasonable investor "expects not just
that the issuer believes the opinion (however irrationally), but
that it fairly aligns with the information in the issuer's
possession at a time."  Id. (citation omitted).  Reasonable
investors "understand that opinions sometimes rest on weighing
of competing facts," and do "not expect that every fact known to
an issuer supports its opinion statement."  Id. (citation
omitted).  A statement of opinion "is not necessarily misleading
when an issuer knows, but fails to disclose, some fact cutting
the other way."  Id. (citation omitted).

To meet the scienter requirement in a Rule 10b-5 action
under the PSLRA, a plaintiff must "state with particularity
facts giving rise to a strong inference that the defendant acted
with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).
This "state of mind" requires a showing "of intent to deceive,
manipulate, or defraud, or recklessness."  Blanford, 794 F.3d at
305 (citation omitted).  The PSLRA's "strong inference"

requirement involves "tak[ing] into account plausible opposing inferences" and considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. (citation omitted).  It is "not enough to set out facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (citation omitted).  Rather, "[t]he inference of scienter must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (citation omitted). In making this judgment, a court "must assess the complaint in its entirety, and not scrutinize each allegation." Blanford, 794 F.3d at 305.

    In the securities fraud context, recklessness "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." In re Advanced Battery Techs., Inc., 781 F.3d at 644 (citation omitted).  For an independent auditor, reckless conduct "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them." Id. (citation omitted).  Recklessness may be established

31

where the auditor "failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud." Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 159 (2d Cir. 2012) (citation omitted).  An auditor that issues an unqualified audit report despite "knowledge of accounting improprieties by the client" is "intentionally engaged in manipulative conduct." Id. at 158 (citation omitted).  Nonetheless, "[m]ere allegations of GAAP violations or accounting irregularities or even a lack of due diligence will not state a securities fraud claim absent evidence of corresponding fraudulent intent."  In re Advanced Battery Techs., Inc., 781 F.3d at 644 (citation omitted).

**A. Purchase of Poseidon Stock Within the United States**

KPMG contends that the Lead Plaintiff has failed to plausibly allege that his stock purchases occurred in the United States, as required by § 10(b).  In United States v. Morrison, 561 U.S. 247 (2010), the Supreme Court limited the application of § 10(b) to two contexts: (1) transactions involving "the purchase or sale of a security listed on an American stock exchange," and (2) transactions involving "the purchase or sale of any other security in the United States."  Id. at 273.  To sufficiently allege the existence of a "domestic transaction in other securities," plaintiffs must "allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."  Absolute Activist Value Master Fund

Ltd. v. Ficeto, 677 F.3d 60, 62 (2d Cir. 2012) (citation

omitted).  Absent factual allegations suggesting

> that title was transferred within the United States,
> including, but not limited to, facts concerning the
> formation of the contracts, the placement of
> purchase orders, the passing of title, or the
> exchange of money, the mere assertion that
> transactions "took place in the United States" is
> insufficient to adequately plead the existence of
> domestic transactions.

Id. at 70.  While the location of a transaction's broker-dealer

"could be relevant to the extent that the broker carries out

tasks that irrevocably bind the parties to buy or sell

securities," it does not necessarily "demonstrate where a

contract was executed.  Id. at 68.

        The Lead Plaintiff alleges that the purchase of Poseidon

stock on OTC Pink Sheets constitutes a purchase on an American

stock Exchange.  The Third Circuit has held that OTC markets are

not domestic securities exchanges under Morrison.  See United

States v. Georgiou, 777 F.3d 125, 135 (3d Cir. 2015).  Among

other reasons for its conclusion, the Third Circuit noted that

"a 'national securities exchange' is explicitly listed in

Section 10(b) -- to the exclusion of the OTC markets" and that

OTC Pink Sheets is absent on the list of registered national

security exchanges on the Securities and Exchange Commission

Webpage on Exchanges.  Id.  The Third Circuit's logic is

compelling, as OTC Pink Sheets is "a quotation service that

certain broker-dealers use to post offers to sell and to buy securities not listed on a national exchange, and is not itself an exchange." S.E.C. v. Boock, No. 09cv8261 (DLC), 2011 WL 3792819, at *18 (S.D.N.Y. Aug. 25, 2011); see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am., 568 F.3d 374, 377 (2d Cir. 2009) (contrasting listing on a national exchange with being listed on the "Over-the-Counter Bulletin Board and/or pink sheets").

The Lead Plaintiff has adequately alleged that his purchase of Poseidon stock was a "domestic transaction in other securities."  Kolar, a Florida resident, bought Poseidon stock in Florida through a local office of his broker, Charles Schwab. Once Kolar entered his order to purchase Poseidon stock, he no longer had the discretion to revoke acceptance, and title was transferred to him.

KPMG argues that the Second Circuit's decision in Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198 (2d Cir. 2014), demonstrates that § 10(b) does not extend to the plaintiff's claims.  In Parkcentral, the Second Circuit applied the tests in Morrison and Absolute Activist to the imposition of § 10(b) liability on foreign defendants for securities transactions relating to securities-based swap agreements pegged to the foreign defendants' stock value.

34

Parkcentral, 763 F.3d at 201.  Based in part on "the particular

character of the unusual security at issue," the Court held that

> the imposition of liability under § 10(b) on these
> foreign defendants with no alleged involvement in
> plaintiffs' transactions, on the basis of the
> defendants' largely foreign conduct, for losses
> incurred by the plaintiffs in securities-based swap
> agreements based on the price movements of foreign
> securities would constitute an impermissibly
> extraterritorial extension of the statute.

Id.  Parkcentral was tied to the derivative security it

addressed, noting "we do not suggest that the presence of some

foreign element in a transaction necessarily means that Congress

did not intend to include it in the coverage of § 10(b)."  Id.

at 216.  Kolar purchased Poseidon stock, not a derivative pegged

to Poseidon stock value.  Accordingly, Parkcentral is inapposite

here.

## B. Falsity

The Lead Plaintiff alleges that KPMG made two false

statements, both of which are in the 2011 Audit Report.  His

allegations of falsity are as follows.

### 1. Canadian GAAS

The first alleged false statement is: "[w]e conducted our

audits in accordance with Canadian generally accepted auditing

standards."  The TAC identifies only one standard that KPMG

allegedly violated: Canadian Accounting Standard ("CAS") 230.

It requires an auditor to determine whether it should modify the audit in the face of red flags.  It provides:

> If:
>
> (a)  Audit evidence obtained from one source is inconsistent with that obtained from another; or
>
> (b)  The auditor has doubts over the reliability of information to be used as audit evidence,
>
> the auditor shall determine what modifications or additions to audit procedures are necessary to resolve the matter and shall consider the effect of the matter, if any, on other aspects of the audit.

The Lead Plaintiff asserts that KPMG did not conduct its audit in accordance with CAS 230 because it did not modify its audit procedures or perform a more intensive audit in the face of several red flags.  These red flags include Krizbai's March 8 email, the March 2012 Spreadsheet, the March 22, 2012 meetings about the 2011 Annual Filing, field discounts issued by Poseidon's sales representatives, and Poseidon's weak internal accounting systems.

## 2. IFRS False Statement

Secondly, the TAC alleges that KPMG falsely stated that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of Poseidon Concepts Corp. . . . in accordance with [IFRS]."  This statement of opinion concerns the extent to which Poseidon's financial statements adhered to IFRS.

36

The Lead Plaintiff identified two International Accounting Standards ("IAS"), which are an element of IFRS, that govern the recognition of revenue and internal financial reporting systems that Poseidon was required to comply with.  It contends that Poseidon's financial statements violated these standards.

Under IAS 18, which governs the accounting of revenue,

> [w]hen the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognized by reference to the stage of completion of the transaction.  The outcome of a transaction can be estimated reliably when all the following conditions are satisfied.
>
> (a)  the amount of revenue can be measured reliably;
>
> (b)  it is probable that the economic benefits associated with the transaction will flow to the entity;
>
> (c)  the stage of completion of the transaction at the end of the reporting period can be measured reliably; and
>
> (d)  the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

As such, "[w]hen the outcome of the transaction involving the rendering of services cannot be estimated reliably, revenue shall be recognised only to the extent of the expenses recognised that are recoverable."  IAS 18 also provides that "to make reliable estimates . . . it is also usually necessary for the entity to have an effective internal financial budgeting and

reporting system" that "reviews and, when necessary, revises the estimates of revenue as the service is performed."

Under IAS 39, which states principles for recognizing and measuring financial instruments, assets, liabilities, and equity instruments, "an entity shall assess at the end of each reporting period whether there is any objective evidence that a financial asset or group of financial assets is impaired." It also requires that "an entity shall recognize a financial asset in its statement of financial position when, and only when, the entity becomes a party to the contractual provisions of the instrument."

Here, as alleged, by the time KPMG had issued its audit, it had notice from the meetings on March 22, 2012 and the March 2012 Spreadsheet that anticipated revenue was being recognized and reported even though it related to work without field tickets or without signed master agreements. KPMG also knew of Poseidon's faulty internal accounting practices, despite the best practices noted in IAS 18. Even with this knowledge, KPMG did not inquire whether Poseidon had performed an impairment assessment in compliance with IAS 39. The TAC alleges that Poseidon did not follow its own impairment policy as it never evaluated its customers to determine whether to recognize a reserve for bad debts, or assessed its portfolio to determine if receivables were collectable. As such, the TAC claims that KPMG

could not have reviewed Poseidon's records for compliance with
IAS 39 because Poseidon did not have any records to show to
KPMG.

### C. Scienter

Without deciding whether the TAC has sufficiently alleged
that KPMG made two material misrepresentations in the 2011 Audit
Report, the TAC fails to plead that KPMG acted with the
requisite scienter.  The scienter allegations in the TAC are
focused entirely on red flags ignored by KPMG, most of which
appeared after the 2011 Audit Report was released.  Since red
flags appearing after the 2011 Audit Report was published cannot
support an inference of knowing misconduct in making the
statements in that report, most of the TAC's allegations have
little or no relevance to the scienter inquiry.  Moreover,
because the TAC alleges no motive for KPMG to make false
statements and is premised entirely on a theory of recklessness,
"the strength of the circumstantial allegations must be
correspondingly greater."  In re Advanced Battery Techs., Inc.,
781 F.3d at 644 (citation omitted).

The few events alleged to have occurred prior to the
issuance of the 2011 Audit Report do not support an inference of
scienter for either alleged false statement.  First, the TAC
alleges that at the March 22, 2012 meetings of Poseidon's board
and the audit committee attended by KPMG representatives, the

attendees discussed deficiencies in collecting field tickets and growing accounts receivable.  But, the TAC also notes that at the audit committee meeting, Blecher reviewed the balance sheet and stated that the collection of outstanding accounts had improved.

Second, the TAC notes that in a March 8 email to Blecher, KPMG accountant Krizbai acknowledged that "not signed field tickets" was an audit issue.  This email actually states that "[f]or the not signed field tickets -- we cannot rely on other signed tickets for the same location taking them as evidence of existence of the sampled items."  If anything, the March 8 email provides evidence of KPMG's diligence in addressing the problem of unsigned field tickets.  The TAC has other examples of KPMG raising concerns in a manner inconsistent with scienter.  For example, "KPMG specifically identified revenue recognition as one of just two fraud risks in the Poseidon audit" and "urged that Poseidon upgrade its accounting software."

Third, the TAC describes the March 2012 Spreadsheet noting "numerous cases" where field tickets were unsigned and an unfilled master agreement column.  This spreadsheet was attached to a March 9 email from Krizbai to a senior KPMG accountant stating "please find attached the list of AR/Revenue sampled items that do not have payment received or signed field tickets."  The spreadsheet, sent almost two weeks before the

2011 Audit Report, is not a "sign of fraud so obvious" that KPMG must have been aware of it.  Id. (citation omitted).  In fact, the partially completed spreadsheet is inconsistent with a theory that KPMG disregarded obvious signs of fraud.  It is more naturally viewed as evidence that KPMG was aware of the importance of confirming the existence of executed master agreements and signed field tickets, and was working on gathering more information about these items as it finalized its audit.[9]  After all, the absence of signed field tickets may only slow collections, rather than rendering the revenue entirely uncollectable.

Thus, these red flags do not give rise to a strong inference that, in issuing its 2011 Audit Report, KPMG either failed to determine whether it should modify its audit to comply with CAS 230, or did not believe that Poseidon's 2011 Annual Filing fairly, and in all material respects, presented its financial position in accordance with IFRS.  In other words, the red flags identified in the period preceding the 2011 Audit Report do not produce a plausible claim that KPMG acted in a highly unreasonable manner that represented an extreme departure from the standard of ordinary care when it issued the report.

Nor do the TAC's generalized criticisms fill this gap and provide sufficient allegations of scienter.  The generalized

---

[9] KPMG argues that the March 2012 Spreadsheet was merely a draft.

allegations in the TAC describing KPMG's audit challenges and its knowledge of Poseidon's internal accounting deficiencies do not suggest the existence of an audit that was "so deficient as to amount to no audit at all." Id. (citation omitted).  Indeed, the Lead Plaintiff has not shown that any of these factors required any change to KPMG's audit procedures under Canadian GAAS.

The Lead Plaintiff argues that the magnitude of overstatements, 68% in 2012 and 24.8% in 2011, shows a scale of recklessness far beyond negligence.  Yet, the only audit statement by KPMG at issue here relates to 2011 Annual Filing and the alleged overstatement in 2011 was nowhere near the size of the fraud alleged in 2012.  Nor does the TAC allege that KPMG knew the full extent of even the 2011 numbers, which were generated in late 2012 by Ernst & Young.

The Lead Plaintiff argues that the facts from the period after KPMG issued its 2011 Audit Report are relevant "because they establish that KPMG was reckless in not withdrawing or correcting its audit report."  The Lead Plaintiff, however, does not bring a claim for failure to correct, and in fact eliminated such a claim when he amended his complaint.

## CONCLUSION

KPMG's December 15, 2015 motion to dismiss is granted.

SO ORDERED:

Dated:     New York, New York
           May 24, 2016

                                    _____
                                              DENISE COTE
                                    United States District Judge